# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TARA GARLICK ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF KERN ET AL., <br><br> Defendants. | CASE NO. 1:13-CV-01051-LJO-JLT <br><br> MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT. <br><br><br> (Docs. 122, 124, 125) |

This case arises from the in-custody death of David S. Silva ("Silva" or "the Decedent"). Plaintiffs bring the instant civil rights action against the arresting officers, alleging excessive force under 42 U.S.C. § 1983 and state law causes of action for civil rights violations, battery, negligence, and wrongful death. Before the Court is the California Highway Patrol ("CHP") Defendants[1] Michael Phillips and Michael Bright's Motion for Summary Judgment or, Alternatively, Partial Summary Judgment (Doc. 122); the Kern County Sheriff's Office ("KCSO") Defendants Sergeant Douglas Sword, Deputy Jeffrey Kelly, and Deputy Luis Almanza's Motion for Summary Judgment or, in the Alternative, Summary Adjudication (Doc. 124); and the Defendants County of Kern, KCSO, and Deputies David Stephens, Ryan Greer, Tanner Miller, and Ryan Brock's Motion for Summary Judgment or, Alternatively, Summary Adjudication of issues (Doc. 125), each respectively filed December 1, 2015. Plaintiffs Tara Garlick, Merri Silva, Chris Silva, M.L.S., C.J.S., C.R.S., E.Z.S., minors by and through their guardian *ad litem*, Judy Silva, individually and as the successors in interest of Silva, the Decedent, as well as J.S., individually and as successor in interest to Silva, the Decedent, by and through her guardian *ad litem*, Adriane Dominguez (collectively, "Plaintiffs") filed their Oppositions on January 5, 2016 (Docs. 129, 130, 131), to which Defendants filed their Replies

---

[1] The Court hereinafter refers to the individual law enforcement officer Defendants Kelly, Sword, Almanza, Brock, Stephens, Phillips, Bright, Miller, and Greer together as "Officers" or "the Officer Defendants," and to all Defendants, collectively, as "Defendants."

on January 12, 2016 (Docs. 139, 141, 142)  (Doc. 81). The Court deems the matter appropriate for resolution without oral argument. *See* E.D. Cal. Civ. L.R. 230(g). Having carefully considered the record in this case, the parties' briefing, and the relevant law, the Court grants in part and denies in part Defendants' motions.

## BACKGROUND

## I.    FACTUAL ALLEGATIONS[2]

### Objections

The parties interpose various evidentiary objections. *See* Docs. 131-2, 142-4. Defendants Kelly, Sword, and Almanza raise objections to Plaintiffs' experts' declarations (DeFoe Decl., Doc. 131-3; O'Halloran Decl., Doc. 131-4); Plaintiffs' counsel's declaration (Gehlawat Decl., Doc. 131-5), an exhibit purporting to be a birthday card (Doc. 131-5, Ex. 27), and an purporting to be a picture of Decedent, Plaintiff Garlick, and their children.

---

[2] The following relevant facts come primarily from Plaintiffs' Second Amended Complaint ("SAC," Doc. 78); the parties' Joint Statement of Undisputed Material Facts ("JSUMF," Doc. 124-2); Defendants Phillips and Bright's Separate Statement of Undisputed Facts ("DPB-SS," Doc. 122-1); Plaintiffs' Opposition to the DPB-SS ("PO-DPB-SS," Doc. 129-1); Defendants Kelly, Sword, and Almanza's Separate Statement of Undisputed Facts ("DKSA-SS," Doc. 124-3); Plaintiffs' Opposition to the DKSA-SS ("PO- DKSA-SS," Doc. 130-1); Defendants Ryan Brock, Ryan Greer, Tanner Miller, David Stephens, and County of Kern's Separate Statement of Undisputed Facts ("DBGMSC-SS," Doc. 125-15); Plaintiffs' Opposition to the DBGMSC-SSUF ("PO-DBGMSC-SS," Doc. 131-1); Officer Defendants Jeffrey Kelly, Douglas Sword, Luis Almanza, Ryan Brock, Ryan Greer, Tanner Miller, David Stephens, Michael Phillips, and Michael Bright's depositions ("Kelly Dep." Docs. 125-2, 129-5, Doc. 130-5, 131-6; "Sword Dep." Docs. 125-3, 129-6, 130-6, 131-7; "Almanza Dep." Docs. 125-4, 129-7, 130-7, 131-8; "Brock Dep." Docs. 125-8, 129-11, 130-12, 131-13; "Greer Dep." Docs. 125-10, 129-9, 130-10, 131-11; "Miller Dep." Docs. 125-9, 129-12, 130-13, 131-14; "Stephens Dep." Doc. 125-7, 129-10, 130-11, 131-12; "Phillips Dep." Docs. 125-6, 129-32, 130-9, 131-10); "Bright Dep." Docs. 125-5, 129-8, 131-9); as well as some Officer Defendants' declarations ("Kelly Decl.," Doc. 124-5; "Sword Decl.," Doc. 124-4; Almanza Decl.," Doc. 124-6); the declarations of James D. Weakley, Neil K. Gehlawat, Marshall S. Fontes, and Edward Wolfe ("Weakley Decl.," Doc. 124-7-11; "Gehlawat Decl.," Docs. 129-4, 131-5; "Fontes Decl.," Doc. 125-16; "Wolfe Decl.," Doc. 122-2); Kern County Custodian of Records, Michael Mahoney's declaration ("Mahoney Decl.," Docs. 125-18, 19); Plaintiff Tara Garlick's deposition ("Garlick Dep." Docs. 129-27, 130-28, 131-29); depositions of relevant witnesses: Deputy Brandon Rutledge ("Rutledge Dep." Docs. 129-13, 130-14, 131-15); depositions of percipient witnesses Jason Land, Danny Medina, Robert O'Connor, Celinda Dorsett, Francisco Arrieta, Laura Vasquez, T.A., Sulina Quair, Maria Melendez, Joseph Williams ("Land Dep." Docs. 129-17, 130-18, 131-19; "Medina Dep." Docs. 129-18, 130-19, 131-20; "O'Connor Dep." Docs. 129-19, 130-20, 131-21; "Dorsett Dep." Docs. 129-20, 130-21, 131-22; "Arrieta Dep." Docs. 129-21, 130-22, 131-23; "Vasquez Dep." Docs. 129-23, 130-24, 131-25; "T.A. Dep." Docs. 129-22, 130-23, 131-24; "Quair Dep." Docs. 129-24, 130-25, 131-26; "Melendez Dep." Docs. 129-25, 130-26, 131-27; "Williams Dep." Docs. 129-26, 130-27, 131-28); the guardian *ad litem* of four minor Plaintiffs, Judy Silva's deposition ("J. Silva Dep." Docs. 129-28, 130-29, 131-30); Michael Price's deposition ("Price Dep." Doc. 130-8); KCSO Lieutenant Lance Grimes's deposition ("Grimes Dep." Docs. 125-11, 129-14, 130-15, 131-16); KCSO Chief Deputies Fred Wheeler and Brian Wheeler's depositions ("F. Wheeler Dep." Docs. 129-19, 130-16, 131-17, 131-18;"B. Wheeler Dep." Docs. 125-13, 129-14, 130-15, 131-16); Plaintiff's medical expert, Scott DeFoe's deposition ("DeFoe Decl.," Docs. 129-2, 131-3; "DeFoe Dep." Doc. 125-14); the declaration and report of Plaintiff's expert, Dr. Ronald O'Halloran, a forensic pathologist ("O'Halloran Decl.," Docs. 129-3, 130-3, 131-4; "Pathologist's Report," Docs. 129-3 Ex. 1, 130-3, Ex. 1; 131-4 Ex. 1); and the KCSO's "Officer Individual Training Activity" Documents (Doc. 125-15). In compliance with Local Rule 133(j), the parties lodged with the Court courtesy copies of the full depositions upon which they rely. *See* Docs. 145-148, 151.

Defendants object to Plaintiffs' response to an interrogatory (*see* Doc. 131-5, Ex. 26) on the basis of lack of foundation and authentication. Defendants argue that the interrogatory response omits question number 15 "and does not have verification from Ms. Garlick to verify the response." Doc. 142-4 at 2. This objection is **OVERRULED** because the Court "is confident plaintiff *would* be able to authenticate them at trial, which is all that Rule 56(e) demands." *Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1124 (E.D. Cal. 2006) (emphasis in original) ("Rule 56(e) requires only that evidence "*would* be admissible", not that it presently *be* admissible. Such an exception to the authentication requirement is particularly warranted in cases such as this where the objecting party does not contest the authenticity of the evidence submitted but nevertheless makes an evidentiary objection based on purely procedural grounds."). Defendants also object to exhibits to opposing counsel's declaration (Doc. 131-5, Exs. 27, 28) and Plaintiffs object to Almanza's declaration (Doc. 124-6). The Court need not address these objections, however, because in ruling on the instant motions it does not consider the materials to which the parties object. *See Norse v. City of Santa Cruz,* 629 F.3d 966, 973 (9th Cir. 2010).

Finally, the parties make nearly blanket objections to the proffered evidence in support of the motions for summary judgment, the oppositions' evidence, and the various separate statements on the basis of relevance, hearsay, lack of foundation, lack of personal knowledge, prejudice, improper character evidence, and assuming facts not in evidence. The Court reminds the parties that, on summary judgment, evidence need not be in a form that is admissible at trial. *See Burch v. Regents of the Univ. of Cal.,* 433 F.Supp.2d 1110, 1119 (E.D.Cal. 2006) (citing *Celotex,* 477 U.S. at 324 (1986)). "[M]any of these objections are unnecessary when made to evidence presented in support of a motion for summary judgement as the court is not in danger of prejudice and the summary judgment standard dictates that summary judgment can be granted "only when there is no genuine dispute of *material* fact." *Arias v. McHugh*, No. CIV. 2:09-690 WBS GG, 2010 WL 2511175, at *6 (E.D. Cal. June 17, 2010) (citing *Burch,* 433 F.Supp.3d at 1119-20). These objections are **OVERRULED**. The parties may address evidentiary issues in pre-trial motions.

//

//

**A.  The Parties**

Plaintiff Merri Silva ("Mrs. Silva") is the mother of the Decedent, Silva, who died on May 7, 2013. Mrs. Silva sues in her individual capacity and as the successor in interest of her son, the Decedent, (pursuant to Section 377.11 of the California Code of Civil Procedure) alleging a substantive due process violation pursuant to the Fourteenth Amendment. Salvador Silva ("S. Silva"), the decedent Silva's father, passed away while this case was pending. Therefore, his son, Chris Silva ("C. Silva"), as successor in interest, substituted into the case in a representative capacity, pursuant to Rule 25 and California Code of Civil Procedure 377.11 and 377.32 (*see* Docs. 106 & 113), for his father's only claim for loss of familial relationship under the Fourteenth Amendment. *See* Docs. 106, 111 & 113. By the complaint he seeks general, special, compensatory, and punitive damages. *See* SAC, Doc. 78.

The Decedent's surviving children, Plaintiffs M.L.S., C.J.S., C.R.S., E.Z.S., minors by and through their guardian *ad litem*, Judy Silva, bring this action individually and as successors in interest to Silva, the Decedent. *See id*. Minor Plaintiff J.S., by and through her guardian *ad litem*, Adriane Dominguez, brings this action in her individual capacity and as successor in interest to Silva. *See id.*

By their complaint, Plaintiffs seek general, special, compensatory, and punitive damages against all Defendants, including municipal Defendant County of Kern ("the County"), as well as Jeffrey Kelly ("Kelly"), Douglas Sword ("Sword"), Luis Almanza ("Almanza"), Ryan Brock ("Brock"), Ryan David Stephens ("Stephens"), Tanner Miller ("Miller"), Greer ("Greer"), Michael Phillips ("Phillips"), and Michael Bright ("Bright"), each in their individual capacities. *See* SAC, Doc. 78. At all relevant times, Sword was a Sergeant for the KCSO; Kelly, Almanza, Brock, Greer, Miller, and Stephens were KCSO Deputies; and Phillips and Bright were CHP Officers.[3]

The parties do not acknowledge that Defendants Does 1-50 remain unnamed, although the parties have had ample time in which to engage in discovery. *See Gillespie v. Civiletti,* 629 F.2d 637, 642 (9th Cir. 1980) (finding that "the plaintiff should be given an opportunity through

---

[3] Seven of the law enforcement officers involved were at all relevant times employees of the KCSO, though of various ranks, and two responders were CHP Officers. The Court hereinafter refers to the collective group as "Officers."

discovery to identify the unknown defendants."). At this late stage, post-discovery, Plaintiffs have neither named additional defendants—presumably additional officers—nor have they offered arguments or evidence indicating liability against such officers based on the facts alleged in the SAC. As there is no provision in the Federal Rules of Civil Procedure permitting the use of fictitious defendants, the Court, *sua sponte*, **GRANTS** summary judgment in their favor and **DISMISSES** the remaining Doe Defendants in advance of the imminent trial. *See Fifty Assocs. v. Prudential Ins. Co. of Am.,* 446 F.2d 1187, 1191 (9th Cir. 1970); *see also Columbia Steel Fabricators, Inc. v. Ahlstrom Recovery,* 44 F.3d 800, 803 (9th Cir. 1995) (affirming district court's grant of summary judgment in favor of non-appearing defendant).

### B.  Undisputed Facts Leading to Events between Law Enforcement and Silva[4]

This suit is an excessive force claim stemming from events near midnight on May 7, 2013, in Bakersfield, California, where KCSO Deputy Kelly responded to a call to check on an intoxicated man. *JSUMF* ¶¶ 2, 4, 5. Kelly learned from his in-vehicle computer that the reporting party was a security guard with the nearby Kern Medical Center ("KMC" or "the Hospital"). *JSUMF* ¶ 3. Along with Kelly in the car was his K-9 partner, Luke. *JSUMF* ¶¶ 6, 7.

Kelly, dressed in a KCSO uniform and driving a KCSO vehicle, parked his patrol vehicle and turned its spotlight on Silva before walking over to check on him. *JSUMF* ¶ 2, 4, 5, 9; Kelly Dep. 38:14-17, 40:13-41:5. When Kelly first saw Silva, Silva appeared to be lying on the ground by the stop sign on the southeast corner of Flower and Palm, across the street from the Hospital. *JSUMF* ¶ 8. Silva was breathing but not moving, and did not appear to have any injuries on him. Kelly Dep. 39:24-40:1. Kelly did not have a warrant for the intoxicated person's arrest and did not initially have any information that this person needed to be arrested. Kelly Dep. 32:9-12; 32:19-22.

### C.  Disputed Facts in Chronological Phases

#### Phase One: Initial Interaction between Deputy Kelly and Silva

##### *Undisputed*

Kelly identified himself as a deputy to Silva and asked him if he was okay, but Silva did not respond. Kelly Dep. 41:12-22. After approximately five minutes of trying to get a response from

---

[4] The parties filed a Joint Statement of Undisputed Material Facts[4] ("JSUMF," Doc. 124-2).

Silva and getting no coherent response, Kelly performed a sternum rub to try to rouse Silva.[5] *Id.* at 42:1-18, 43:13-44:21, 45:9-22. Kelly knew that a sternum rub would be uncomfortable. *Id.* at 46:15-20. At some point after the sternum rub, Silva started trying to get to his hands and knees. *Id.* at 43:23-44:17, 51:13-24.

*Defendants' Account*

Kelly performed a sternum rub in order to wake Silva to see if Kelly could provide assistance. *Id.* at 42:1-18, 43:13-44:21, 45:9-22. As Silva attempted to get to his hands and knees, he fell on his face between two to four times. *Id.* at 51:25-52:7, 53:14-54:18, 54:25-55:7, 57:2-6. So that Silva would not hurt himself, Kelly attempted to move Silva into a seated position. *Id.* at 56:2-57:1, 57:7-25. Based on his observations, Kelly believed Silva was drunk in public in violation of Penal Code § 647(f). *Id.* at 41:21-22, 42:1-18, 43:13-18, 45:9-22, 53:14-54:18, 56:17-57:25.

*Plaintiffs' Account*

Plaintiffs do not dispute that when Kelly first saw Silva, Silva appeared to be passed out lying on the ground. *Id.* at 39:10-25; 166:2-5. The parties diverge on almost all other key facts. According to percipient witnesses, during the incident, Silva was sitting or lying on the ground but did not fall on his face or suffer self-inflicted injuries, and Kelly did not attempt to aid Silva into a seated position. *See* Land Dep. 40:5-7; Vasquez Dep. 192:21-25. After the sternum rub, Silva started to wake up and attempt to move to his hands and knees. Kelly Dep. 51:9-19. Defendants claim Silva was uncooperative, but Kelly never considered that Silva had become agitated as a result of the sternum rub. Kelly Dep. 50:8-11, 60:1-4. Kelly admits that Silva had not used or threatened force, and Kelly had not been injured. Kelly Dep. 59:8-10. Specifically, Kelly admits that Silva did not punch or kick him. Kelly Dep. 62:21-24. Kelly did not believe that Silva had a weapon or that he had injured someone else. Kelly Dep. 64:5-11.

---

[5] A sternum rub "is a technique used to wake people from unconsciousness by applying pressure with the knuckles to the sternum." *Jones v. Las Vegas Metro. Police Dep't* No. 2:12-CV-01636-APG, 2014 WL 5793853, at *3 (D. Nev. Nov. 6, 2014). A sternum rub is a non-trivial, but less than intermediate, level of force because it can be "painful and cause[] bruising," and may, in some circumstances, be considered excessive. *Malott v. Placer Cty.* No. 2:14-CV-1040 KJM EFB, 2014 WL 6469125, at *1 (E.D. Cal. Nov. 17, 2014).

Kelly testified that, after the sternum rub, it would have been inappropriate to hit Silva with a baton when Silva began to awaken and attempted to get to his hands and knees, because Kelly did not perceive Silva to be a threat and Silva was not resisting. Kelly Dep. 51:9-19, 53:5-13. Based on his observations, Kelly at first intended to detain Silva, but not to arrest him. Kelly Dep. 57:15-20. Kelly admits that as Silva sat on the pavement after Kelly had performed the sternum rub, Silva had not committed a crime other than public intoxication. Kelly Dep. 57:7-25.

### Phase Two: Kelly Uses a K-9 and Baton Strikes against Silva

#### *Undisputed*

Kelly was unsuccessful at handcuffing Silva. PO-KSA-SS ¶ 18. Kelly put out over the radio that he was involved in a "148," a misdemeanor violation of California Civil Code Section 148(a), meaning an officer faced an individual subject to arrest for obstructing or resisting an officer, with a subject later determined to be David Silva. Kelly Dep. 67:21-68:6, 77:15-18, 78:12-24; Miller Dep. 28:11-29:3; Almanza Dep. 27:15-28:23; Sword Dep. 29:12-30:3. At the time of the incident, Kelly was about 6 foot 2 inches tall and weighed approximately 150 to 170 pounds. *JSUMF* ¶ 12; Sword Dep. 57:13-16. Silva weighed 261 pounds and was 5 foot 11 inches tall. *JSUMF* ¶ 11. Kelly used a remote control device to open his car door and release his K-9 partner. Kelly Dep. 70:21-71:19.

#### *Defendants' Account*

As Kelly touched Silva to assist him to a seated position, Silva tensed up, became agitated, attempted to pull away from Kelly, and attempted to stand. Kelly Dep. 58:1-19, 59:11-25, 60:5-9, 61:15-25, 65:12-17; Medina Dep. 31:5-17, 55:14-56:16, 67:14-69:6. Based on Kelly's training and experience, he believed Silva was under the influence of methamphetamine or PCP because of Silva's increasing agitation and aggressiveness in combination with the tensing of his muscles. He also believed that Silva was under the influence of alcohol. Kelly Dep. pp.60:18-61:25, 106:5-107:14. Kelly gave commands to relax, stop resisting, and stop fighting. Kelly Dep. 67:5-20, 130:12-16. Kelly attempted to handcuff Silva using a wrist lock control hold, but Silva was able to

pull away each time. Kelly Dep. 62:1-20, 63:10-64:2, 64:12-19, 64:24-65:7, 66:10-67:4. Kelly attempted a couple of times to put Silva into handcuffs using a rear wrist lock control hold,[6] but Silva was able to "overpower him" and pull away his arms every time.  Kelly Dep. 62:1-20, 63:10-64:2, 64:12-19, 64:24-65:7, 66:10-67:4; Medina Dep. 31:5-17, 55:14-56:16, 67:14-69:6.

Silva was overpowering Kelly, and Kelly warned that he would release his K-9 if Silva did not quit resisting. Kelly Dep. 68:23-69:17, 130:12-16. Silva continued to resist, and Kelly released his K-9, Luke. Kelly Dep. 69:18-71:19. JSUMF ¶ 13; and Kelly Dep. 69:18-71:19. Once released, the dog bit Silva's legs while Kelly continued to attempt to gain control of Silva's arms. Kelly Dep. 71:20-72:18, 76:19-77:1. Silva became more agitated, was screaming, and started choking the dog. Kelly Dep. pp.73:15-19, 75:6-12, 75:25-76:3, 76:9-18, 77:2-14; Sword Dep. 31:9-15, 35:8-21, 37:23-38:13; O'Connor Dep. 38:21-24, 39:15-20, 56:2-24, 107:3-19. Kelly was afraid because the K-9 was not effective in gaining control of Silva, who was bigger and stronger than Kelly. Kelly Dep. 70:12-20, 77:6-14, 79:12-24, 80:14-81:8.

Kelly swung his baton at Silva "about two times." Kelly Dep. 81:25-83:2, 84:8-14, 85:17-87:4, 89:15-21. First, Kelly ordered Silva to stop choking his dog and to stop resisting before striking Silva with a baton once in the left upper leg or thigh area. Kelly Dep. 81:25-83:2, 84:8-10, 85:17-19, 89:15-18, 130:12-16; Sword Dep. 36:20-37:6, 38:23-39:2, 39:25-40:5. Kelly also struck Silva with his baton in the right hip or torso area, after Kelly released the dog and Silva was nearly standing fully upright. Kelly Dep. 84:11-14, 85:20-87:4, 89:19-21. Silva was still resisting and screaming. Kelly Dep. 91:15-92:14. From the time Kelly released the police dog to the time Sword arrived, Kelly was using force to try to get Silva's hands behind his back and keep him on the ground. Kelly Dep. 90:5-17. Once Kelly returned the dog to the patrol car, he had no further physical contact with Silva. Kelly Dep. 119:17-120:10; Miller Dep. 38:10-16; Sword Dep. 55:24-56:2, 69:8-11.

//

---

[6] Such holds are considered "pain compliance techniques." *Tatum*, 441 F.3d at 1097 (finding objectively reasonable the use of control holds to effectuate an arrest of a resistant but nonviolent individual suspected of a minor crime). These are considered a less than significant level of force. *See, e.g., Aranda v. City of McMinnville*, 942 F. Supp. 2d 1096, 1107 (D. Or. 2013).

*Plaintiffs' Account*

After Silva began to awaken in response to the sternum rub, Kelly applied body weight to Silva. Kelly Dep. 65:12-17. Silva had not punched (Kelly Dep. 58:16-19), kicked (58:20-21), resorted to or verbally threaten force. Kelly. *Id.* 58:22-59:7.

Kelly released the dog in response to Silva's noncompliance. Kelly Dep. 70:12-20. Kelly intended for the K-9 to bite Silva. Kelly Dep. 74:16-24. As he released the dog, Kelly continued to apply body weight pressure on Silva. Kelly Dep. 75:21-24. The K-9 bit Silva in the face. Kelly Dep. 71:20-22, Sword Dep. 32:17-23; 36:3-15; 27:24-28:5; 47:22-24. Silva struggled with the dog to try to get the dog to stop biting him. Kelly Dep. 75:6-12. Silva reacted to the dog bites by screaming and becoming more agitated. Kelly Dep. 73:15-19, 108:1-19. However, at no point during this Phase did Silva punch, kick, or verbally threaten Kelly. Kelly Dep. 58:16-19, 58:20-21, 58:22-59:7, 62:21-24.

While the dog was biting Silva, Kelly used his baton to strike Silva. Kelly Dep. 82:16-23. Silva had not punched or kicked Kelly; Silva's only physical response had been to elbow Kelly in response to the pain stimulus of the sternum rub to try to get Kelly off of him. Kelly Dep. 79:25-80:13; Sword Dep. 37:7-22. Kelly struck Silva with a baton before Sword arrived. Kelly Dep. 89:15-25. Striking Silva with the baton made Silva more agitated. Kelly Dep. 108:21-25; 109:2-11. As Silva tried to get up, Kelly used his body weight to prevent it. Kelly Dep. 65:18-24. Plaintiffs dispute the context in which Kelly commanded Silva to stop resisting and stop fighting, as it contradicts that when Silva was attempting to get up, Kelly was using force to push him down and trying to get his hand behind his back to handcuff him. Kelly Dep. 67:14-20.

Kelly struck Silva repeatedly with his baton. Kelly Dep. 82:16-23. Kelly swung the baton each time as hard as he could, with both hands holding it like a baseball bat. Kelly Dep. 92:24-93:51, 63:6-13, 108:21-25, 109:2-11. Silva never reached for Kelly's weapon. Kelly Dep. 81:9-18. Kelly grabbed the dog so it would stop engaging Silva (and also Kelly's ankle where the dog had bit him) because the K-9's attempts to apprehend Silva were not effective, and placed the dog back in the patrol car. Kelly Dep. 113:19-114:6, 115:2-8, 115:21-116:4; Sword Dep. 45:16-20.

//

**Phase Three: Kelly, Sword, and Almanza Use Batons against Silva**

*Undisputed*

Kelly at some point radioed for medical assistance to come to the scene. JSUMF ¶¶ 18, 25.

*Defendants' Account*

Sergeant Sword arrived and yelled commands at Silva to stop resisting, then struck Silva once with his baton. Kelly Dep. 90:1-4, 110:23-112:1, 113-19-114:11, 116:6-18, 21-17:1, 130:12-16; Sword Dep. 36:20-37:6. According to Sword (in an amended statement he made after having a dream in which he claimed to remember new facts),[7] Kelly had dropped his baton when he went to grab his K-9 partner. Kelly Decl. ¶ 4. Sword saw a loose baton on the ground, which Silva reached for; thus, to stop Silva, Sword struck Silva with his baton. Sword Dep. 23:10-23, 57:17-58:22, 63:2-12. Sword hit Silva with his baton "a couple more times" as Silva was grunting, moving toward Sword, and trying to get up. Sword Dep. 45:21-46:2. Silva then got to his knees and appeared to Sword to be lunging at him and Sword thought Silva was going to bite him in the groin. Sword Dep. 46:24-47:18, 57:17-58:22. Sword had also attempted to control Silva with his hands, but was unable to because Silva was rigid and would keep pulling away from him. Sword Dep. 49:24-50:8. When Almanza arrived, both Sword and Almanza commanded Silva to get on his stomach, but he would not comply. Almanza Dep. 42:9-24, 45:19-46:8, 48:23-50:4, 60:6-13, 60:20-61:2; Sword Dep. 57:17-58:22, 68:17-25. Based on Silva's bizarre behavior, slurred speech, loudly yelling unintelligible words, and cursing, Almanza believed Silva was intoxicated or under the influence of PCP Almanza Dep. 59:12-60:13, 61:3-9, 61:24-62:16, 63:1-10. Deputy Almanza struck Silva's right arm two times, but it appeared to have no effect on Silva. Almanza Dep. 65:3-8, 66:11-24, 68:4-6; Sword Dep. 56:7-13. Silva rolled onto his stomach and Almanza had his knee on Silva's left shoulder for approximately less than 15 seconds while attempting to pull Silva's hands out from under his body to put into handcuffs. Almanza Dep. 64:23-65:8, 69:15-24, 70:14-24, 73:22-74:20; Arrieta Dep. 161:22-162:7; Sword Dep. 75:25-76:14, 77:16-78:1, 78:16-79:1.

During this time, Silva was actively resisting by thrashing his body, pulling his arms under

---

[7] According to the Detective involved in interviewing the involved officers in the internal investigation, Detective Rutledge, when Sword claimed to recall additional details about the incident due to a dream he had, Sword gave a second interview to internal investigators. Rutledge Dep. 85:25-89:25.

his body, kicking his legs up and moving his body from side to side. Almanza Dep. pp.73:13-74:10, 76:6-77:3, 80:3-12; Sword Dep. 58:23-59:9.

*Plaintiffs' Account*

According to Plaintiffs, a few days after giving his recorded statement and after talking to Kelly, Sword gave a second recorded statement. Sword Dep., 22:5-14.

Detective Rutledge changed his report to reflect Sword's dream and the newly included the detail about a baton lying on the ground. Rutledge Dep. 90:1-10. Detective Rutledge, who conducted the interviews, testified that Sword included details in his second interview that he did not include in the original interview. *Id.* 90:8-10. For example, in his post-dream interview, Sword gave new reasoning for striking Silva with a baton. *Id.* at 90:11-19. Also, in the second interview, Sword claimed that he had yelled "baton" to alert the other deputies that a baton was on the ground. Sword Dep. 90:20-91:6. However, no other deputy reported to Detective Rutledge that Sword yelled "baton." Rutledge 91:7-11. Other officers, including Greer and Miller, testified that there was no baton lying near Silva. Greer Dep. 36:3-5; Miller Dep. 47:9-12. In contrast to his post-dream interview, when initially asked at the first interview why he used his baton, Sword made no reference in his answers to a baton on the ground. Sword Dep. 23:3-9.

When Sword first saw Silva, he was on the ground lying on his side. *Id.* at 27:20-23. Silva had blood on his face, but the injuries that caused the bleeding occurred before Sword arrived. *Id.* at 28:10-19. Upon Sword's arrival, Kelly was striking Silva with a baton and Kelly's dog was biting Silva. Kelly Dep. 89:15-90:4. Sword did nothing to de-escalate the situation. Sword Dep. 53:13-54:5. When he arrived, Sword did not see Silva with a weapon, and he did not see Silva punch or kick Kelly. *Id.* at 31:19-32:2. Sword thought Silva was possibly mentally ill. *Id.* at 49:2-5. While Kelly was engaged with Silva, Sword did not use pepper spray or a Taser, options he had with him. *Id.* at 40:16-41:19; 41:20-21. Sword is five foot ten and weighed 280 pounds. Sword Dep. 8:17-22.

Before speaking to Kelly, Sword struck Silva with a baton. *Id.* at 53:13-54:5; Kelly Dep. 111:22-112:10. Silva was on his knees when Sword struck him. *Id.* at 45:9-12. As a result, Silva went down to the ground. Kelly Dep. 114:7-11. Sword swung his baton with two hands in a full swing. Sword Dep., 43:7-11. Almanza, who arrived 15-30 seconds after Sword, saw that the lower

half of Silva's body was on the ground, in other words, Silva was not standing. Almanza Dep. 40:7-25; Kelly Dep. 113:3-18. With Almanza's arrival, there were three officers at the scene. *Id.* at 58:21-23. Neither Kelly nor Sword was in any danger when Almanza arrived. *Id.* at 55:2-7. Almanza did not speak to Sword or Kelly about coming up with a plan before physically engaging Silva. *Id.* at 50:14-19. Almanza claims that he was afraid of Silva because he appeared to be large and heavy, was not complying with commands to roll onto his stomach, and appeared to be intoxicated. *Id.* at 57:20-63:15. Before striking Silva with his baton, Almanza did not see Silva punch, kick, or bite anyone. *Id.* at 65:3-18.

Defendants Kelly, Almanza, and Sword all struck Silva multiple times with their batons. Sword Dep. 56:14-57:3. For each baton strike, Kelly swung as hard as he could. Kelly Dep. 92:24-93:5. Sword struck Silva at least 7 to 12 times, holding the baton in two hands and swinging it in a full swing. Sword Dep. 16:20-23; 17:12-20, 43:7-11. Almanza swung his baton with full force, using both hands. Almanza Dep. 66:25-67:10. According to percipient witnesses, while one officer restrained Silva by applying body weight to his back, two other officers hit Silva with batons. Medina Dep. 28:4-7. Witnesses testified that deputies struck Silva in the head with batons a number of times. *See* Land Dep. 27:24-28:10; T.A. Dep. 63:14-19; Vasquez Dep. 104:4-12, 119:3-120:1; S. Quair Dep. 82:8-12, 95:2-14; Melendez Dep. 82:19-83:3. Multiple KCSO Deputies beat Silva with their fists, kicked him, and struck him with batons while Silva yelled and screamed and later gurgled. Land Dep. 22:11-19; Medina Dep. 30:7-21; O'Connor Dep. 41:17-42:5; Dorsett Dep. 22:3-25, 27:1-4, 28:6-11; Arrieta Dep. 44:23-45:10, 112:10-25; T.A. Dep. 19:24-21:11; Vasquez Dep. 113:5-8, 119:3-120:1, 125:3-11; S. Quair Dep. 81:7-15, 95:2-14; Melendez Dep. 79:3-17, 82:19-83:3.

When Deputy Kelly was on top of and had his body weight pressed on Silva, he did not consider getting off Silva to get him to calm down. Kelly Dep. 96:12-19. Sword and Almanza allege they commanded Silva to get on his stomach, and Silva rolled over into a prone position after the officers asked him to do so. Sword Dep. 76:5-14. Almanza then pushed Silva's right shoulder in an attempt to prevent him from standing up. Almanza Dep. 50:5-10. Almanza struck Silva's right arm two times with a baton. Almanza Dep. 65:3-8, 66:11-24, 68:4-6; Sword Dep. 56:7-13.

**Phase Four: Brock, Miller, Stephens, Greer, Phillips and Bright Arrive**

*Undisputed*

Sword, already on the scene, at some point radioed for medical assistance to respond. JSUMF, ¶¶ 18, 26. Sword's call for medical aid occurred before the Decedent was handcuffed. JSUMF ¶ 27. Deputies Brock, Miller, Stephens and Greer arrived at the scene near in time to when Sword placed a call for medical assistance. Stephens Dep. 22:25-23:4, 29:17-31:23; Greer Dep. 23:15-19, 24:11-13, 35:14-24. Two CHP Officers, Phillips and Bright, came after hearing the radio call for back-up and they came to the scene with the location and information that KCSO was involved in a "148," but had no other information. Bright Dep. 26:9-28:13; Phillips Dep. 24:19-26:6. When they arrived on the scene, they saw three KCSO officers engaged in a physical struggle with Silva. *Id.* 31:22-33:12; Phillips Dep. pp. 30:21-31:4. When Brock arrived, Silva was on the ground struggling with officers. JSUMF ¶ 36; Brock Dep. 28:15-29:6. Deputies were telling Silva to "stop resisting," "stop fighting" or words to that effect. Arrieta Dep. 134:1-6, 134:9-11; Greer Dep. 43:24-44:5; Kelly Dep. 130:12-16. Silva was screaming. Arrieta Dep. P 126:21-127:11, 131:21-132:9; Medina Dep. 45:21-22; Vasquez Dep. 106:4-8; Almanza Dep. 44:11-45:6; Bright Dep. 49:21-50:8; Greer Dep. 38:13-23; Melendez Dep. 95:13-15,108:17-109:12, 136:1-17; Miller Dep.45:14-22; Kelly Dep. 98:3-7, 116:13-18.

Phillips and Bright assisted with the handcuffing of Silva. JSUMF ¶ 51. When Stephens arrived, Silva was handcuffed. Stephens Dep. 30:21-25. About 30 seconds after Silva was handcuffed, Sword asked for a hobble[8] and Brock took over for him in the attempt to control Silva's legs. Phillips Dep. 41:5-13; Sword Dep. 89:25-90:2. From that point, Sword had no further physical contact with Silva. Bright Dep. 36:9-10, 48:6-25; Greer Dep. 44:9-17; Miller Dep. 37:23-38:9, 39:2-40:8; Sword Dep. 81:19-82:2, 87:4-11, 89:25-90:2, 92:5-18. Almanza is five foot seven inches tall, and weighed between 165 and 170 pounds. Almanza Dep. 58:3-7; Sword Dep. 57:5-7. Miller weighed 230 pounds. Miller Dep. 51:14-16. Brock is approximately 5 foot 6 inches and weighed 120 pounds. Sword Dep. 88:2-3. Stephens is six feet and one inch tall, and he weighed 260

---

[8] The parties agree that a "hobble" is a nylon leg restraint used to bind a person's ankles. If the hobble is then connected to handcuffs as a person lies prone, the resulting method is known as a "hog-tie."

13

pounds. Stephens Dep. 38:11-15; Sword Dep. 123:1-2. The deputies' equipment weighs between 15 and 20 pounds. Sword Dep. 123:3-6.

*Defendants' Account*

During the handcuffing process, Silva continued to actively resist law enforcement by bucking and twisting his body, and continually thrashing around. Phillips Dep. 34:3-18, 37:19-38:1, 44:22-45:6, 49:19-50:4. Sword was using body weight in an attempt to control Silva's legs. Bright Dep. 35:10-36:5, 47:21-24; Greer Dep. 32:15-33:2, 37:4-6; Sword Dep. 76:20-77:1, 77:7-15. Silva kicked his legs, knocking Sword and Brock off of him. Greer Dep. 32:15-33:2; Sword Dep. 79:6-22, 81:19-82:2, 83:19-84:14. Brock, replacing Sword who was holding Silva's legs, then crossed Silva's legs, controlling them with his hands. Brock Dep. 30:13-31:14; Miller Dep. 39:2-16. Silva continued to resist law enforcement throughout the time Phillips was physically engaged with Silva. Phillips Dep. 30:20-24; 34:3-10; 37:19-38:1; 40:5-18; 44:22-45:6; 49:19-50:4.

When Stephens arrived, a group of deputies and CHP officers were struggling with Silva who was on the ground actively resisting efforts to be taken into custody, by pushing up off the ground, rolling over, and kicking. Stephens Dep. 29:17-30:04, 31:1-17. A large group of deputies and CHP officers were on top of Silva (*id.* 30:11-20) as he lay chest-down on the ground. Stephens Dep. 29:17-20. Silva was trying to push himself up off the ground. Stephens Dep. 29:24-30:1. Stephens put his knee on Silva's right shoulder and used his body weight to hold Silva down and stop Silva from resisting. Stephens Dep. 32:17-25. Stephens had his knee on Silva's shoulder for less than 5 minutes. Stephens Dep. 35:2-17. Deputies did not consistently have their weight placed on Silva's back during the incident. Arrieta Dep. 161:22-162:7.

Greer testified that he never saw Kelly, Almanza or Sword in physical contact with Silva. Greer Dep. 44:9-45:13. Decedent was not struck with a baton or otherwise beaten while Brock, Miller, Stephens and Greer were present at the scene. Stephens Dep. 34:2-4, 34:17-20, 34:21-35:1; Brock Dep. 33:2-7, 36:19-37:9; Greer Dep. 32:22-33:1, Miller Dep. 37:20-38:23. Neither Bright nor Phillips observed any officer or deputy strike Silva with a baton. Bright Dep. 17:15-21, 58:11-12; Phillips Dep. 58:11-12. Phillips did not observe any law enforcement officer use any physical force against Silva except to attempt to hold Silva in place for handcuffing and leg restraint

14

(hobble) deployment. Phillips Dep. 58:3-10. Other than to extract Silva's left arm from underneath his body for handcuffing, Bright did not use any physical force or his own body weight against Silva during the altercation. Bright Dep. 37: 14-21.

*Plaintiffs' Account*

According to witnesses, CHP officers (Phillips and Bright) arrived on the scene, standing outside their vehicles while Deputies were hitting Silva with batons and attempting to hold Silva's arms behind him. Arrieta Dep. 119:5-120:9. Approximately two minutes after Almanza arrived, officers had placed Silva in handcuffs. Kelly Dep. 120:16-21. The handcuffing was a few minutes after Sword's arrival and also after Silva was chest-down (Sword Dep. 86:4-18, 89:19-24; Almanza Dep. 115:20-116:23), and about 30 seconds to a minute after the CHP officers arrived. Phillips Dep. 37:19-24.

When CHP Officers Phillips and Bright arrived, Silva was chest-down on the ground and two deputies were on top of him. Bright Dep. 31:22-32:23; Phillips 30:21-31:4, 31:19-32:19. One deputy was on Silva's upper body, and one was on his legs. Bright Dep. 33:1-8. As Silva was being handcuffed, Sword was on Silva's legs, Almanza was on Silva's left shoulder, and Stephens was on Silva's right shoulder. Sword Dep. 80:8-17. Almanza had his knee on Silva's back and was using body weight to hold him down. Bright Dep. 35:15-36:2. Bright assisted in handcuffing Silva. Bright Dep. 33:21-34:10, Almanza Dep. 79:12-14. As Silva was handcuffed, Brock replaced Sword on Silva's legs and claims he was merely on Silva's legs. Sword Dep. 82:3-21; Brock Dep. 30:23-31:14. However, other testimony supports that Brock was laying on Silva's back, not legs. Kelly Dep. 121:22-122:5, Sword Dep. 88:2-3. Miller applied weight to Brock's back while Brock was in contact with Silva. Miller Dep. 50:17-24. Before and after Silva was handcuffed there were three deputies holding him down. Sword Dep. 109:8-13. Silva was chest-down on the ground when deputies were on top of him. Bright Dep. 31:22-32:23; Phillips 30:21-31:4, 31:19-32:19. Silva remained prone and chest-down when he was handcuffed behind his back. Sword Dep. 81:14-18. After he was in handcuffs, Silva remained chest-down and continued to try to lift up his chest. Sword Dep. 88:15-24. Officers remained holding down Silva's left and right shoulders. Sword Dep. 114:7-15.

15

In contrast to Defendants' estimate that Almanza was on Silva's back for only 15 seconds, Plaintiffs, based on the officers' deposition testimony about estimates of the time it took for specific acts, estimate that officers were pressing weight on Silva's back for approximately eight to ten[9] minutes. *See* Doc. 131-3 at 2 (consolidating the officers' estimates). While being held chest-down on the ground, Silva tried to lift up his upper body. Sword Dep. 79:6-13. Sword testified that after Silva was prone, it took 30 seconds to a minute to get his hands out from underneath his chest. Sword Dep. 79:23-80:11. Sword also testified that during the approximate minute that it took to get Silva's hands out from underneath his chest, Sword was on Silva's legs, Almanza was on Silva's left shoulder, and Stephens was on Silva's right shoulder. Sword Dep. 80:8-17. Plaintiffs dispute Defendants' contention that Silva did not tell or express to Deputies that he could not breathe or was having difficulty breathing, because Silva was screaming and yelling for his life throughout the encounter. For the entire time between when CHP officers arrived but before Silva was handcuffed, Silva was chest-down with weight on his back (Phillips Dep. 37:19-24, 38:5-8), and throughout the altercation, Silva was screaming. Bright Dep. 60:23-61:4. Silva screamed for help, at times yelling out "help," and "help me." Medina Dep. 45:21-22; Vasquez Dep. 106:4-8.

### **Phase Five: More Officers Arrive; Officers Apply Restraints and a Spit Sock**

*Undisputed*

Responding to the scene together, Deputies Greer and Miller were the last Defendant officers to arrive. JSUMF ¶ 43. Greer saw Brock lying on Silva's legs and being pushed backwards. JSUMF ¶ 48. Miller put his hand on Brock's back for approximately 10 seconds to keep Brock from being kicked off Silva's legs. Brock Dep. 49:2-14, 50:1-4; Miller Dep. 33:5-21, 39:2-6, 39:18-40:8, 47:22-48:4, 50:14-51:9.

During the handcuffing process Silva was continually moving by bucking and twisting his body. Phillips Dep. 30:21-24; 34:3-10; 37:19 - 38:1; 44:22-45:6; 49:19-50:4. Phillips did not use

---

[9] The eight-to-ten-minute estimate comes from the officers' testimony (cited above within the appropriate Phase): Sword testified that Silva was chest-down approximately one to two minutes after Sword arrived, and that Silva was handcuffed a "few minutes" after he was first chest-down; Stephens testified that he applied the first hobble about two to three minutes after Silva had been handcuffed; Phillips testified that he applied the second hobble about one to two minutes after the first hobble; Stephens and Sword testified that Silva became unresponsive about two minutes after he was hobbled; Bright testified that the spit-mask was removed after Silva was unresponsive; and Almanza estimated that he rolled Silva on his side less than thirty seconds after the spit-mask was removed.

any physical force or his own body weight to hold Silva in place while he assisted with handcuffing Silva. JSUMF ¶ 52. Silva was kicking and thrashing, trying to throw Brock off. *Id.* Silva kicked Brock 5 to 10 times. Brock Dep. 49:2-14, 50:1-4. Miller used only enough weight to keep Brock from falling. *Id.* Miller had no direct physical contact with Silva. JSUMF ¶ 41.

Brock next assisted a CHP officer by wrapping a nylon restraint (hobble) around one of Silva's legs. *Id.* at ¶¶ 20, 38; Brock Dep. 32:3-32:14. Phillips assisted with deployment of the first nylon leg restraint on Silva by wrapping the safety hook of the nylon leg restraint around the chain of the handcuffs. *Id.* at ¶ 53. Phillips retrieved and assisted with deployment of a second nylon leg restraint on Silva by wrapping the open end of the restraint around one of Silva's ankles or legs, but did not use any physical force or his own body weight to hold Silva in place while he attempted to deploy the first or second nylon leg restraints. *Id.* at ¶¶ 54, 55. While other officers attempted to restrain Silva, Phillips did not use any physical force or his own body weight to hold Silva in place. *Id.* at ¶ 56. Phillips' physical involvement with Silva ended after he partially deployed the second nylon leg restraint and then moved to position himself to steady Silva's head from continuing to move around. Phillips Dep. 49:14-18; p. 60:17-20. Miller requested and received confirmation from dispatch that medical aid had been dispatched to the location in response to Sword's call for medical assistance. Miller Dep. 16:13-19, 52:12-24. Bright never had any subsequent contact with Silva after Bright stepped away to clean his hands. JSUMF ¶ 50.

*Defendants' Account*

After Bright and Phillips arrived, KCSO Sergeant Sword asked for a hobble. Sword Dep. 89:5-16, 89:25-90:8. Both before and after the officers applied the hobble, Silva continued to actively resist officers by bucking and twisting his body, and thrashing his head from side to side. Greer Dep. 41:12-22;  45:14-19; Brock Dep. 28:15-29:6, 30:13-31:14, 49:2-4, 50:1-4, 54:6-12; Stephens Dep. 29:17-30:4, 31:1-17, 33:11-16; Miller Dep. 39:18-40:8; 42:24-43:14, 47:22-48:4; Bright Dep. 59:18-60:6; Phillips Dep. 40:5-18, 44:22-45:6, 49:19-50:4. After other officers completed handcuffing Silva, Bright wrapped the open end of the first nylon leg restraint around one of Silva's legs, and once Bright stepped away to clean his hands, Bright's physical involvement with the incident ended. Bright Dep. 33:21-24; 36: 14-17, 38:8-13. Silva continued to resist law

enforcement at and after the time Bright stepped away to clean his hands. Bright Dep. 32:13-25; 34:24-35:9; 36:22-37:5; 59:18-60:6; Phillips Dep. 34:3-10; 37:19 - 38:1; 40:5-18;  44:22-45:6; 49:19-50:4.

*Plaintiffs' Account*

According to Plaintiffs, after Silva was handcuffed, he did not present a danger to anyone other than himself. Almanza Dep. 81:22-25. Nevertheless, Officers decided to put him into a hobble restraint. Sword Dep. 65:18-19. Sword asked for a hobble restraint about 30 seconds after Silva was handcuffed. *Id.* 89:25-90:2; Phillips Dep. 41:5-13. About 45 seconds to a minute after Silva was handcuffed, Bright went to the trunk of his patrol car to retrieve a hobble restraint, returned, and applied it to Silva's legs. Bright Dep. 36:14-25. In the time it took Bright to retrieve the hobble, Silva remained chest-down. Sword Dep. 91:3-10. While the hobble was being retrieved, Brock was on Silva's legs, Almanza was on his left shoulder, Stephens was on his right shoulder, and a CHP officer was near his head. *Id.* 91:11-19. Two to three minutes passed between the time Stephens arrived and the time the first hobble was applied. Stephens Dep. 33:11-13, 39:7-16. During the two to three minutes before the first hobble restraint was applied, the deputies continued to apply their body weight to Silva. *Id.* 33:11-25, 34:21-35:1.

Although Silva was in handcuffs, deputies continued to use force to hold him down. Phillips Dep. 40:19-21. Almanza, who weighed 170 pounds, was holding down Silva's left shoulder area. Sword Dep. 78:16-24, 57:5-7, Almanza Dep. 58:3-7, Bright Dep. 35:15-36:2. Stephens put his knee on Silva's shoulder to hold Silva down. Stephens Dep. 32:17-25. Brock, who weighs 120 pounds, was laying on Silva's back. Kelly Dep. 121:22-122:5, Sword Dep. 88:2-3. Miller, who weighed 230 pounds, applied some weight to Brock's back while he was in contact with Silva. Miller Dep. 50:17-24, 51:14-16. Sword (280 pounds) was on the back of Silva's legs and his knees. Sword Dep. 69:1-7, 76:20-24. When Silva was handcuffed, Brock replaced Sword on Silva's legs. *Id.* 82:3-21; Brock Dep. 30:23-31:14. The deputies' equipment puts between 15 and 20 additional pounds on each of them. *Id.* 123:3-6.

While Silva was chest-down and handcuffed with weight on his back, Stephens twisted Silva's wrist behind his back so that it was sticking straight up in the air. Stephens Dep. 36:2-23.

18

Stephens had to use all of his strength to lift Silva's arms behind his back in this way. Stephens Dep. 38:2-10. Phillips successfully connected the hobble to the handcuffs. Sword Dep. 93:15-94:1, Phillips Dep. 47:17-21. Connecting a hobble restraint to handcuffs is known as "hog-tying."[10] Almanza Dep. 84:11-14. When the hobble was connected to the handcuffs, Silva was still chest-down. Phillips Dep. 46:15-22. Once nylon leg restraints were applied to Silva, he was not immediately turned onto his side. Bright Dep. 68:5-8; Stephens Dep. 56:4-6.

About two to three minutes passed between the time Stephens arrived and the time the first hobble was applied. Stephens Dep. 33:11-13, 39:7-16. During that time the deputies applied their body weight to Silva. *Id.* 33:11-25, 34:21-35:1. About a minute passed between the request for a hobble and the first hobble being applied. Phillips Dep. 44:22-45:2. Silva was continuously chest-down between the time he was handcuffed and the time he was hobbled, still with weight on his back. *Id.* 45:7-12. Officers applied a second hobble one to two minutes after Silva was hog-tied. *Id.* 49:19-23. Silva was chest-down with weight on his back from the time he was handcuffed to the time a second hobble was applied. *Id.* 49:19-50:8. Silva was still trying to lift his chest. Bright Dep. 59:25-60:6.

During the incident, Silva had blood all over his face. Phillips Dep. 57:14-20. After helping apply the hobble, Bright washed the blood from his hands. Bright Dep. 38:25-39:2. From 60 to 90 seconds after Bright walked away to clean the blood from his hands, Silva appeared to "calm down." *Id.* 40:2-5. When Bright returned his attention to Silva after the 60 to 90 second interval, Silva was still chest-down. *Id.* 40:2-5; 42:23-43:1. Silva was "wailing continuously" until he "calmed down." *Id.* 50:3-8. Sword never saw Silva standing up. Sword Dep. 68:4-6. Silva never hit anyone. Almanza Dep. 80:17-20. According to Phillips, Silva did not threaten anyone's life during the incident. Phillips Dep. 66:15-24.

### **Phase Six: Sword and Greer Apply Spit-Sock to the Prone and "Hog-tied" Silva**

*Undisputed*

Sword requested a spit-sock. Sword Dep., 94:8-19; 95:7-9. A spit mask is made of mesh

---

[10] The parties agree that a "hog-tie" is a method of binding a persons' handcuffed-wrists and hobbled-ankles together behind the back while in a prone position.

material and its purpose is to limit officer exposure to spit, blood and vomit. Greer Dep. 50:8-19. Greer placed the spit-sock to Silva. JSUMF ¶ 44. Approximately 20 to 30 seconds after Greer applied the spit sock to Silva's face, Silva vomited into the mask. *Id.* at ¶ 45; Sword Dep. 115:5-7; Greer Dep. 39:23-25, 40:10-12, 42:7-25. At some point after Silva had vomited, Almanza rolled Silva onto his side. Greer Dep. 40:16-21, 45:14-19; Stephens Dep. 40:5-41:1; Bright Dep. 59:18-60:6, p. 43:23-25; Almanza Dep. 89:1-7, 92:12-24, 93:16-94:6, 95:9-20, 120:7-9; Medina Dep. 38:15-22; Miller Dep. 43:24-44:1. Brock and Almanza checked Silva for a pulse. *Id.* at ¶ 39.

*Defendants' Account*

Greer did not believe that the mask interfered with Silva's breathing. Greer Dep. 50:8-19. Silva never told deputies that he could not breathe or was having difficulty breathing. Kelly Decl. ¶ 5; Sword Decl. ¶ 3. Once Silva stopped fighting and after he had vomited, Silva was rolled onto his side. Greer Dep. 40:16-21, 45:14-19; Stephens Dep. 40:5-41:1; Bright Dep. 59:18-60:6.

*Plaintiffs' Account*

Sword requested a spit mask even though Silva never spit on anyone. Sword Dep. 94:8-19, Sword Dep. 95:7-9. While Greer put the spit mask on Silva (JSUMF ¶ 44), Silva was still chest-down. Almanza Dep. 83:20-25, Greer Dep. 37:21-38:3, 41:23-42:6. This happened one to two minutes after Silva was hog-tied. Phillips Dep. 48:16-24.

After Silva vomited (Greer Dep. 40:22-41:11), officers rolled Silva onto his side. JSUMF, ¶ 46. Greer told other officers that Silva had vomited. Greer Dep. 43:1-7, 49:2-7. Because Greer did not want to contaminate the officers, he did not remove the vomit-filled mask from Silva's face. Greer Dep. 43:1-7, 49:2-7. At the time of the incident, Greer did not have any specific training about the use of a spit mask. Greer Dep. 49:12-15. After the incident, Greer did not receive any training regarding the spit mask. Greer Dep. 49:16-19.

Other officers saw deputies using their body weight to pin Silva's upper body to the ground. Brock Dep. 35:16-36:18. Stephens put his knee on Silva's right shoulder and used his body weight to hold Silva down, and Silva tried to get up because he was asphyxiating. Stephens Dep. 32:17-25; S. Quair Dep. 106:9-23, 107:20-108:1, 111:14-19; Melendez Dep. 134:9-15. Stephens used all of

20

his body weight to keep Silva from lifting himself up. Stephens Dep. 41:17-42:2. Almanza was holding down Silva's left shoulder area. Sword Dep. 78:16-24.

Officers applied weight to Silva's back for approximately 8 to 10 minutes. DeFoe Decl. at 2 (consolidating officers' deposition testimony). Silva was chest-down for approximately fifteen minutes. Arrieta Dep. 161:12-18. Of that time, Officers had their knees on Silva's back for approximately ten minutes. Arrieta Dep. 162:4-7. Sheriff's deputies applied pressure to Silva's back with their knees. S. Quair Dep. 106:9-23, 107:20-108:1, 111:14-19; Melendez Dep. 134:9-15. Almanza admits that the duration of time that Silva was handcuffed to the time he was hobbled was between 10 seconds and 10 minutes. Almanza Dep. 119:4-9. CHP officers are trained that hobbled individuals should be placed on their side so that the restraint does not interfere with the person's breathing. Bright Dep. 66:14-25. However, Silva was not immediately turned onto his side. Bright Dep. 68:5-8; Stephens Dep. 56:4-6. Deputies picked up and dropped Silva two times while he was facedown and hog-tied. Land Dep. 40:22-41:12; S. Quair Dep. 126:19-23; Melendez Dep. 91:14-24. During the incident, no deputy or officer ensured that the restraint was not interfering with Silva's ability to breathe. Greer Dep. 52:17-24. Sword, as the supervisor on the scene, never told the officers to get off Silva. Sword Dep. 132:22-24. At first Silva was moving and screaming and then he became calmer and finally he became unconscious. Bright Dep. 60:23-61:4. About a minute after being placed in the hobble restraint, Silva stopped yelling and moving. Almanza Dep. 102:17-20. Silva abruptly lost consciousness and became unresponsive while he was still chest-down, with weight on his back and a spit sock over his face. Stephens Dep. 40:12-20; Phillips Dep. 51:3-52:8; Brock Dep. 40:12-17. Silva stopped yelling and became unresponsive before Almanza took his pulse. Almanza Dep. 88:15-25. Almanza rolled Silva on his side approximately 30 seconds after the spit mask was removed. Almanza Dep. 120:10-18.

### **Phase Seven: Silva Loses Consciousness and Paramedics Arrive**

#### *Undisputed*

Silva did not have a pulse when paramedics arrived. Almanza Dep. 91:12-15; Miller Dep. 54:8-14.

//

*Defendants' Account*

As Silva was on his side, Almanza checked and found a pulse on Silva one to two times and observed Silva's chest move as if he was breathing. Almanza Dep. pp. 85:25-86:18, 88:9-11, 89:1-90:8, 90:16-91:6, 120:21-23; Bright Dep. pp. 41:20-42:14; Greer Dep. pp. 46:17-24, 47:11-22; Kelly Dep. pp. 158:8-14, 158:24-159:8; Miller Dep. pp. 53:3-14, 55:24-56:1. Almanza checked for a pulse a third time, but did not find one, and at that point he first noticed Silva had stopped breathing. Almanza Dep. pp. 89:8-11, 89:20-22, 90:6-91:8, 91:16-92:11; Almanza Decl. ¶ 3. Paramedics arrived approximately thirty seconds to a minute after Silva became unresponsive. Almanza Dep. pp. 91:9-15; Arrieta Dep. 156:22-157:7; Brock Dep. 39:13-15; Miller Dep. 44:5-23; Sword Dep. 112:17-23; Almanza Dep. 120:24-121:10.

*Plaintiffs' Account*

Almanza took Silva's pulse immediately after he was rolled onto his side. Almanza Dep. 120:21-23. Brock also took Silva's pulse and felt one after Silva became unresponsive and was rolled onto his side. Brock Dep. 43:7-44:4. The officers did not remove the handcuffs or hobble until after Silva was unresponsive. Sword Dep. 115:21-116:3.

After Silva was handcuffed but before the paramedics arrived, Bright walked to his car and switched off the video recording equipment. Bright Dep. 18:11-23. None of the officers attempted CPR on Silva before the paramedics arrived. Kelly Dep. 158:1-4. During the time waiting for paramedics, Almanza monitored Silva's pulse as it faded and he died; Almanza detected a pulse that started out strong, weakened, and then disappeared. Almanza Dep. 89:8-90:8. After the incident where officers encountered Silva, there was blood on the sidewalk. Kelly Dep. 130:25-131:6; Bright Dep. 50:10-14.

**Phase Eight: Investigation—Cause of Death**

*Undisputed*

The autopsy identified no broken bones. *JSUMF* ¶ 57. On or about 1:00 a.m. on May 8, 2013, at the time blood was collected from Silva, he had a 0.095 g/100 mL Blood Alcohol Concentration ("BAC"), 2.9 ng/mL of Clonazepam, 30 ng/mL of Amphetamine, and 210 ng/mL of

methamphetamine in his blood. *JSUMF* ¶ 58. Silva's family members did not know him to have had mental health or emotional problems. *JSUMF* ¶ 59.

*Defendants' Account*

Silvia died as a result of cardiac arrest from Hypertensive heart disease. Dr. Carpenter Dep. pp. 6:17-14:8, 34:24-35:9, 117:5-119:5, 120:19-25, 132:2-133:25, 135:5-15, 151:2-9,154:25-155:4; Dr. Sheridan Dep. pp. 10:15-25, 133:6-134:15, Ex. 1 to Dr. Sheridan Dep. The methamphetamine and Silva's chronic heart disease caused his heart to stop. Dr. Carpenter Dep. pp. 6:17-14:8, 34:24-35:9, 97:5-17, 111:23-112:3, 118:3-12, 135:17-136:3, 141:3-16, 151:2-9, 163:14-24. The baton strikes that hit Silva were in non-lethal locations and did not break any bones. Dr. Carpenter Dep. pp. 6:17-14:8, 34:24-35:9, 104:23-106:12, 128:5-130:25, 132:2-133:3, 141:22 -142:2, 151:2-9, 164:23-165:1. The dog bites on Silva's body were in non-lethal locations. Dr. Carpenter Dep. pp. 6:17-14:8, 34:24-35:9, 151:2-9, 141:18-21, 164:23-165:1.

*Plaintiffs' Account*

Silva's death was a homicide. O'Halloran Decl., ¶ 10. Plaintiffs submit evidence that Silva ultimately died from restraint asphyxia with compression (positional asphyxia). *Id.* at ¶¶ 6-7. Had Silva not been restrained the way he was on the day of the incident he would not have died. *Id.* at ¶ 8. Had Officers recognized earlier and addressed promptly Silva's respiratory distress or his subsequent loss of consciousness, his asphyxia death was preventable. *Id.* at ¶ 9.

Officers struck Silva in the head, thus, although the baton strikes were not the cause of death, some baton strikes were to potentially lethal locations on Silva's body. Land Dep. 27:24-28:10; T.A. Dep. 63:14-19; Vasquez Dep. 104:4-12, 119:3-120:1; S. Quair Dep. 82:8-12, 95:2-14; Melendez Dep. 82:19-83:3. Similarly, the dog bites to Silva's face were not the cause of death, but were in lethal locations. The asphyxia caused loss of consciousness, hypoxic brain damage and cardiac arrest. O'Halloran Decl. ¶ 6. The ultimately fatal asphyxia occurred during a struggle and prone restraint procedure with KCSO deputies and CHP officers. *Id.* Silva's obese habitus with a large, protruding abdomen increased his susceptibility to asphyxia while compressed prone on the sidewalk. *Id.* at ¶ 7. Plaintiffs' forensic pathologist expert does not agree that the death certificate as issued by the Kern County Coroner accurately expresses the appropriate cause and manner of

23

1   Silva's death. *Id.* ¶ 10.

2   **D.  <u>Other Undisputed Facts</u>**

3   At the time of the incident, Kelly was carrying a baton, pepper spray, and Taser (Kelly Dep.

4   32:25-33:1.; 33:2-3) and Sword was carrying a baton, pepper spray, Taser, a firearm, a radio, and

5   handcuffs (Sword Dep. 13:7-13). Officers were unaware cell phone video of the incident existed

6   until they learned of it later through the media. JSUMF ¶ 35, 42, 49. The dog, Luke, had been

7   Kelly's K-9 partner since 2011 and they trained together as a team. Kelly Dep. 20:6-25:17. Officers

8   are trained that people under the influence of methamphetamine are highly unpredictable, have a

9   high pain threshold, and sometimes act out violently. DeFoe Dep. 6:19-7:15, 18:21-21:8, 32:3-8,

10  34:4-35:20, 37:22-38:7, 42:2-22.

11  The KCSO has a policy on the use of force. JSUMF ¶ 60; and Deposition of Lance Grimes,

12  17:25-20:10, Policy F-100 (Exhibit 2 attached to deposition of Lance Grimes). KSCO Policy F-100

13  permits only that amount of force necessary under the circumstances confronting the deputy.

14  JSUMF ¶ 61. All KCSO deputies are trained on Policy F-100. *Id.* at ¶ 62. The KCSO has a policy

15  on the uses of hobbles (*id.* at ¶ 63) and batons (*id.* at ¶ 66). *See also* Grimes Dep. 17:25-20:10;

16  33:19-35:13; Ex. 4 (Policy F-600, batons); Ex. 3 (Policy F-350, hobbles). Per policy F-600, use of

17  batons is appropriate when lower levels of force are ineffective. Grimes Dep. 37:13-24. Per policy

18  F-600, use of batons is appropriate if the individual is assaultive or combative. Grimes Dep. 38:18-

19  21. All KCSO deputies are trained on Policy F-600. JSUMF ¶ 67. KCSO deputies are trained to

20  avoid head strikes with a baton. Grimes Dep. 34:21-35:6. All KCSO Deputies that carry a hobble

21  are required to undergo training on Policy F- 350. JSUMF ¶ 64. KCSO Policy F-350 is available to

22  all KCSO deputies. *Id.* at ¶ 65. A deputy can assist an officer who carries a hobble, in its

23  application of a hobble without training on Policy F-350. Grimes Dep. 62:4:20. KCSO Policy F-

24  350 requires deputies to roll a person onto their side as soon as possible if the individual is not

25  actively resisting. Grimes Dep. 32:17-22, Policy F-350. KCSO Policy F-350 is available to all

26  KCSO deputies. JSUMF ¶ 65.

27  KCSO deputies are trained on policies through new hire orientation and advanced officer

28  training. KCSO deputies receive training on restraint techniques. Grimes Dep. 52:2-25; 46:2 - 48:4.

24

KCSO Sergeant Sword and Deputies Kelly, Almanza, Stephens, Brock, Miller and Greer went through new hire orientation. Mahoney Decl. (KCSO custodian of records); Individual Training Activity Logs. KCSO Sergeant Sword and Deputies Kelly, Almanza, Stephens, Brock, Miller and Greer went through advanced officer training and received training on use of force, batons, handcuffs, and restraint/takedown techniques. *Id.*; Individual Training Activity Logs; Brock Dep. 19:13-22:21, 60:23-25, 78:12-80:7; Greer Dep. 19:24-20:4, 20:12-25, 21:1-14, Stephens Dep. 18:22-22:4, Miller Dep. 22:22-23:25, 24:11-13, 24:17-19; Kelly Dep. 20:6-21:15; Almanza Dep. 96:10-97:13; Sword Dep. 85:5-86:3. KCSO deputies receive training on the restraint of a person in a prone position. Grimes Dep. 53:2-8. Training includes hands-on classes taught by the KCSO defensive tactics team. *Id.* at 54:18- 57:5. KCSO deputies are taught to roll the person onto their side as soon as possible. F. Wheeler Dep. 21:24-22:18. KCSO deputies are trained to roll a person onto their side as soon as possible when handcuffed. *Id.* at 23:4-8. KCSO deputies are trained to roll a person onto their side as soon as possible when handcuffed and hobbled. *Id.* at 23:20-25.

The custom and practice of the KCSO is to investigate in-custody deaths. B. Wheeler Dep. 72:22-73:19. The custom and practice of the KCSO is to determine whether conduct during an in-custody death comports with policy. *Id.* at 72:22-73:19. There is no evidence in the record that officers were disciplined or re-trained in any way; no officer was found to have violated County policy; and neither the KCSO nor the County made any determination whether the deputies' conduct during the incident violated policy. *Id.* at 50:24-51:6. The Silva incident went through an informal review by the KCSO and County Counsel instead. *Id.* at 77:14-78:20.

### *Plaintiffs' Account*

Silva's family members did not know Silva to have mental health or emotional problems. Garlick Dep. pp. 91:5-18, 103:5-8, 174:23-25, 175:7-10; C. Silva Dep. pp. 62:12-16, 62:22-63:6, 124:23-125:1; J. Silva Dep. pp. 52:5-7, 77:25-78:3; M. Silva Dep. pp. 103:21-24,173:19-21, 173:25-174:2.

Plaintiffs dispute Defendants' account of their policies to the extent that Plaintiffs allege that the County of Kern deliberately refuses to actually enforce these policies in practice. For example, after a court in an earlier case (the "Lucero case") found Greer to have used excessive

force and awarded a $4.5 million settlement, Greer was told that his conduct in that case was "well within policies of the Kern County Sheriff's Department." Greer Dep. 59:9-23. Greer was never told that his conduct relevant to the Lucero case was not within policy. Greer Dep. 61:5-7. After the incident in this case, Greer did not receive any retraining regarding restraint asphyxia, positional asphyxia, hobble restraints, or preventing in-custody deaths. Greer Dep. 62:3-24.

### E.  **Disputed Familial Relationship between Silva and Garlick**

*Undisputed*

Silva was never married. JSUMF ¶ 69. Tara Garlick was not married to Silva. *Id.* ¶ 68. Silva's mother, Merri Silva, never considered Tara Garlick to be her daughter-in-law. *Id.* ¶ 70. Garlick and Silva never jointly prepared or jointly filed Federal or State tax information. *Id.* ¶ 71. Garlick held her own separate checking account to which Silva was never a signatory. *Id.* ¶ 72. Silva held his own separate checking account to which Garlick was never a signatory. *Id.* ¶ 73. Silva had a debit card for his own separate checking account one month prior to his death, which Garlick never used. *Id.* ¶ 74. Silva held his own separate credit account one month prior to his death, which Garlick was neither authorized to use nor did use, prior to Silva's death. *Id.* ¶¶ 75, 76.

*Defendants' Account*

In addition to the separate nature of their financial lives, Plaintiff Garlick and Silva rarely socialized together with others or outside the house. Garlick Dep. 129:8-10.

*Plaintiffs' Account*

Silva and Garlick were in a romantic and intimate relationship for approximately 11 years before Decedent was killed on May 8, 2013. *Id.* at 21:4-6; 111:10-16. As part of their intimate and romantic relationship, Silva and Garlick had four children together (Plaintiffs M.K.S., C.J.S., C.R.S., and E.Z.S.). *Id.* at 60:19-64:3. Even before their first child, M.L.S. was born, Silva and Garlick shared everything. *Id.* at 25:20-23. The couple lived together throughout their entire relationship. *Id.* at 17:4-7; 21:11-13; 111:10-16;112:10-12; 159:25-160:19; 168:2-9; J. Silva Dep. 44:12-45:16; 47:15-48:12. The couple never separated. *Id.* at 159:25-160:19; 168:2-9. They made efforts to stay a family unit. For example, in 2009 or 2010, soon after having their third child together, in an effort to stay a family unit, Silva and Garlick with their children moved into

26

Bethany's Homeless Shelter and stayed there for a few months. *Id.* at 48:7-9; 13-17; 51:7-13; 168:2-9; J. Dep. 45:22-46:2, 48:7-9; 168:2-9; J. Silva Dep. 74:6-11, 49:22-25; 51:7-13. Next, they moved into a home on South Real Road, where the couple held a joint lease in both of their names. *Id.* at 50:1-3; 114:13-15. While living there, Silva and Garlick had their fourth child (E.Z.S.). *Id.* at 51:12-14. Throughout their relationship, Silva and Garlick jointly signed five leases for their various residences. *Id.* at 113:13-15; 120:16-121:15.

Together, the couple raised their four children at their home on South Real Road. *Id.* at 50:1-3, 51:12-14. They attended their two older daughters' (M.L.S. and C.J.S.) parent teacher conferences. Doc. 131-5, Ex. 26. They helped their two older daughters with their homework every night. *Id.* They attended the children's school functions together. Garlick Dep. 74:20-75:2; 136:3-9. Together, they took their children to church. *Id.* 152:22-153:4. They regularly took their youngest children on walks together, went to the store, and to the park. *Id.* at 136:3-10; 143:3-12. They all went grocery shopping together and to the children's appointments together. For at least the three years before his passing, Silva and Garlick attended their children's birthday parties. J. Silva Dep. 94:6-10. Silva, Garlick, and their minor children M.L.S., C.J.S., C.R.S., and E.Z.S. were a family. Garlick Dep. 79:14-22; 136:3-10. As parents, Garlick and Silva each had important roles in their children's lives: Silva was their friend and made them smile and Garlick taught them morals and values. *Id.* at 135:24-136:2.

Family members considered that Silva and Garlick were parents to their children. J. Silva Dep. 70:3-21. To Decedent's Aunt, Judy Silva, Silva and Garlick appeared to be in a "couple relationship," and partners. *Id.* at 70:3-21; Garlick Dep. 158:11-23. When Plaintiff Garlick's shoulders were hurting, Silva would wash her hair for her (Garlick Dep. 158:11-16), cook (*id.* 158:11-19), or do the dishes for the family (*id.* 158:11-17). At the time Silva died, he and Garlick shared an Electronic Benefits Transfer Card on which Silva was listed as the second signatory. *Id.* at 117:19-22. Silva also listed Garlick as his beneficiary on his checking account. *Id.* at 116:18-21.

## II.    PROCEDURAL HISTORY

Plaintiffs filed suit on July 8, 2013 (Doc. 1), followed by a First Amended Complaint on May 9, 2014 (Doc. 55). On September 24, 2013, the Court granted Garlick's withdrawal as

guardian *ad litem* for the minor plaintiffs (M.L.S., C.J.S., C.R.S., and E.Z.S.) and in her place appointed Judy Silva as guardian *ad litem* for these minor plaintiffs.[11] *See* Doc. 19. Plaintiff J.S., individually and as a successor in interest to Silva, by and through her guardian *ad litem* Adriane Dominguez, filed suit against the same Defendants. *See* Case No. 1:14-CV-00419-LJO-JLT. On June 9, 2014, the Court ordered the two actions be consolidated under the above-captioned case number. *See* Doc. 64.

Certain Defendants filed motions to dismiss, which on its June 27, 2014 Order (Doc. 75), the Court granted in part, with leave to amend. After Defendants filed statements of non-opposition, the Court issued an order on July 6, 2015 (Doc. 113), granting Plaintiffs' motion pursuant to Rule 25 to substitute Chris Silva as successor in interest to Plaintiff Salvador Silva, deceased.

On July 16, 2014, Plaintiffs collectively filed the Second Amended Complaint ("SAC," Doc. 78), which Defendants answered on August 5-6, 2014 (Docs. 80-82). In the SAC, the operative complaint, Plaintiffs allege eleven causes of action. The thrust of all of Plaintiffs' claims is that Defendants' actions constituted excessive force which resulted in Silva's death, which violated Silva and Plaintiffs' constitutional rights and caused Plaintiffs to suffer damages. On December 2, 2015, on joint stipulation, the Court dismissed with prejudice all actions against Defendant Youngblood. *See* Doc. 126.

Eleven causes of action remain for: (1) violations of the Fourth Amendment based upon three theories of excessive force (first cause of action), (2) excessive force based upon integral participation in constitutionally violative conduct (second cause of action), excessive force based upon failure to intervene (third cause of action); (4) violation of the Fourth Amendment based upon a denial of medical care (fourth cause of action); (5) violation of the Fourteenth Amendment right to due process (fifth cause of action); (6) municipal liability based upon inadequate training (sixth cause of action); (7) municipal liability for ratification of unconstitutional conduct (seventh cause of action); (8) municipal liability based upon unconstitutional customs, practices, or policies (eighth cause of action); (9) state law battery/wrongful death (ninth cause of action); (10) state law

---

[11] The Court subsequently denied Garlick's request to be reappointed as the minor plaintiffs' guardian ad litem. *See* Doc. 102. Judy Silva remains the guardian *ad litem* for minor plaintiffs M.L.S., C.J.S., C.R.S., and E.Z.S. *Id.*

negligence/wrongful death (tenth cause of action); and, (11) a state law Civil Code § 52.1 ("the Bane Act") claim (eleventh cause of action). The first, second, third, fourth, ninth, tenth, and eleventh causes of action are survival claims brought by the child Plaintiffs as successors in interest to the Decedent. The fifth, sixth, seventh, and eighth causes of action are brought by all Plaintiffs.

**III.     LEGAL STANDARD**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. *See id.* at 255; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249-50. A fact is "material" if its proof or disproof is essential to an element of a plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (internal citation omitted).

The moving party bears the initial burden of informing the Court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323. If the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(c); *Liberty Lobby, Inc.*, 477 U.S. at 250.

**DISCUSSION**

Defendants' summary judgment motion primarily argues that Defendants' conduct was objectively reasonable as a matter of law. While the parties agree on the material facts leading to

the encounter between Silva and law enforcement, the parties' accounts diverge at nearly every Phase. As detailed below, genuine issues of material fact exist whether Defendants' alleged use of force was objectively reasonable under the circumstances. On most claims, Plaintiffs demonstrate that genuine issues of material fact preclude summary judgment; therefore, the Court denies in part and grants in part the instant motions.

## I.    SECTION 1983 CLAIMS

42 U.S.C. §1983 provides a cause of action for the deprivation of "rights, privileges, or immunities secured by the Constitution or laws of the United States" by a person acting "under color of any statute, ordinance, regulation, custom, or usage." *Gomez v. Toledo,* 446 U.S. 635, 639 (1980). To succeed in asserting the Section 1983 claims, Plaintiffs must demonstrate that the action (1) occurred "under color of state law," and (2) resulted in the deprivation of a constitutional or federal statutory right. *Leer v. Murphy,* 844 F.2d 628, 632-33 (9th Cir. 1988) (citations omitted); *see also West v. Atkins,* 487 U.S. 42, 48 (1988). As the moving party, Defendants bear the initial burden on summary judgment of pointing out "an absence of evidence to support [Plaintiffs'] case." *Celotex,* 477 U.S. at 325. It is also Defendants' burden to prove that they are entitled to qualified immunity. *Moreno v. Baca,* 431 F.3d 633, 638 (9th Cir.2005).

Here, the parties agree that Defendants acted under color of state law, but dispute whether they violated the Decedent's Fourth Amendment rights.

### A.   FOURTH AMENDMENT CLAIMS

Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno,* 500 U.S. 248, 250 (1991) (citations omitted); *see also United States v. Chan-Jimenez,* 125 F.3d 1324, 1326 (9th Cir. 1997) ("For purposes of the Fourth Amendment, a seizure occurs when a law enforcement officer, by means of physical force or show of authority, in some way restrains the liberty of a citizen.").

The Fourth Amendment requires law enforcement officers making an arrest to use only an amount of force that is objectively reasonable in light of the circumstances facing them. *Tennessee v. Garner,* 471 U.S. 1, 7-8 (1985). To determine the objective reasonableness of a particular use of force is a three-step inquiry. *Glenn v. Washington Cty.,* 673 F.3d 864, 871 (9th Cir. 2011); *see Graham v. Connor*, 490 U.S. 386, 396 (U.S. 1989). In the *Graham* analysis, a court must "first assess the quantum of force used to arrest [the plaintiff] by considering 'the type and amount of force inflicted.'" *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001)).

The second step is to determine the government's countervailing interests at stake. *Graham,* 490 U.S. at 396. "Relevant factors to this inquiry include, but are not limited to, 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) (quoting *Graham,* 490 U.S. at 396). The most important of these three factors is whether the suspect poses an immediate threat to the safety of the officers or others. *Id.* The *Graham* factors, however, are not exhaustive. *George v. Morris,* 736 F.3d 829, 837-38 (9th Cir. 2013). Because "there are no per se rules in the Fourth Amendment excessive force context," *Mattos v. Agarano,* 661 F.3d 433, 441 (9th Cir. 2011) (en banc), courts are to "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham.*'" *Bryan v. MacPherson,* 630 F.3d 805, 826 (9th Cir.2010) (quoting *Franklin v. Foxworth,* 31 F.3d 873, 876 (9th Cir. 1994)). "Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given[,] and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn,* 673 F.3d at 872 (citations omitted).

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396 (1989) (citing *Terry v. Ohio,* 392 U.S. 1, 20-22 (1968)); *see id.* at 396-97, ("'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' ... violates the Fourth Amendment.") (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir. 1973)). This is

because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*

Finally, a court must weigh in balance "whether the degree of force used was warranted by the governmental interest at stake." *Deorle*, 272 F.3d at 1282. In this way, a court may determine whether the force used was "greater than is reasonable under the circumstances." *Santos v. Gates,* 287 F.3d 846, 854 (9th Cir. 2002); *see also Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011) (a court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion to determine whether it was constitutionally reasonable." (quoting *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003)). But "even where some force is justified, the amount actually used may be excessive." *Id.* at 853. The question in all cases is whether the use of force was "objectively reasonable in light of the facts and circumstances confronting" the arresting officers. *Graham,* 490 U.S. at 397 (internal quotation marks omitted). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396 (internal citations and quotations omitted). Indeed, "it is the *need* for force which is at the heart of the *Graham* factors." *Branscum v. San Ramon Police Dep't*, 606 F. App'x 860, 863 (9th Cir. 2015) (citing *Blankenhorn*, 485 F.3d at 480 (internal quotations omitted) (quoting *Liston v. County of Riverside,* 120 F.3d 965, 976 (9th Cir. 1997))).

"[T]he reasonableness of force used is ordinarily a question of fact for the jury." *Liston,* 120 F.3d at 976 n. 10. "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Avina v. United States,* 681 F.3d 1127, 1130 (9th Cir. 2012) (internal quotations and citations omitted). The Ninth Circuit has cautioned that excessive force cases pose "a particularly difficult problem," especially where cases involve an in-custody death, because "the witness most likely to contradict [an officer's] story" is not available to testify. *Gonzalez v. City of*

*Anaheim*, 747 F.3d 789, 794-95 (9th Cir.) *cert. denied sub nom. Wyatt v. F.E.V.*, 135 S. Ct. 676 (2014) (citing *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). In such cases the evidence should be carefully examined "to determine whether the officer's story is internally consistent and consistent with other known facts." *Id.* at 794-95 (citing *Long v. Johnson,* 736 F.3d 891, 896 (9th Cir. 2013) (explaining that "we must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts" (internal quotation marks and brackets omitted))). The Ninth Circuit has held that "summary judgment should be granted sparingly" in such cases. *See id.* (citing *Glenn,* 673 F.3d at 871).

## B. FOURTH AMENDMENT CLAIMS—ANALYSIS

### 1. <u>First Cause of Action: Excessive Force</u>

According to Plaintiffs' version of the subject incident,[12] the individual officers applied the following particular uses of force: (1) Phase One: sternum rub (Kelly); (2) Phase Two: control hold, K-9 attack, and baton strikes (Kelly); (3) Phase Three/Four: impact blows—such as baton strikes, punches, kicks (Kelly, Sword, Almanza); (4) Phases Four through Six: chest-down restraint and prolonged application of body-weight pressure to a prone suspect's back (Sword, Almanza, Brock, Stephens, Miller) as the suspect was "hog-tied," handcuffed and in hobble restraints (Sword, Brock, Stephens, Phillips, Bright); and, (5) Phase Six: a spit sock (Sword and Greer).

Of these applications of force, the bases of Plaintiffs' excessive force action is limited to the following conduct, as alleged by Plaintiffs in their SAC: (1) that Defendants Kelly, Sword, and Almanza used batons, in tandem, to strike Silva's head and body; (2) that Defendants Sword, Almanza, Brock, Stephens, and Miller applied body weight to Silva as he lay prone, for a prolonged period; and, (3) that, post-handcuffs, Defendants Sword, Brock, Stephens, Phillips, and Bright placed the handcuffed Silva in various restraints, including, including two hobbles, and a hog-tie restraint. To make clear the individual officers' exposure to liability, the Court evaluates an individual officers' use of force in the context of its specific "Phase."

---

[12] The Court acknowledges that for the purposes of summary judgment, a court must take the nonmoving parties' facts as true (*see Anderson,* 477 U.S. at 255), and draw all reasonable inferences that may be inferred from the record evidence presented in favor of the nonmoving party, *Matsushita,* 475 U.S. at 587.

1

**Excessive Force Analysis of Alleged Use of Impact Force (Phases Two through Four:
Kelly, Sword, Almanza)**

2

### A. *Graham* Analysis

3

First, the district court "must assess the severity of the intrusion on the individual's Fourth

4

Amendment rights by evaluating 'the type and amount of force inflicted.'" *Espinosa v. City & Cty.*

5

*of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (quoting *Miller v. Clark Cty.,* 340 F.3d 959,

6

964 (9th Cir. 2003)). "[E]ven where some force is justified, the amount actually used may be

7

excessive." *Santos,* 287 F.3d at 853. Second, a court must evaluate the government's interest in the

8

use of force. *Glenn*, 673 F.3d at 871 (citing *Graham,* 490 U.S. at 396). Finally, a district court must

9

"balance the gravity of the intrusion on the individual against the government's need for that

10

intrusion." *Miller,* 340 F.3d at 964.

11

### (1) Nature and Quality of Intrusion

12

The Court's *Graham* inquiry begins with an assessment of "the quantum of force used."[13]

13

*Davis v. City of Las Vegas,* 478 F.3d 1048, 1055 (9th Cir. 2007) (quoting *Deorle*, 272 F.3d at 1279-

14

80). According to Plaintiffs' account of Phase Two, after Silva woke from the pain of a sternum

15

rub, Kelly used a K-9[14] attack and a baton to strike Silva in the head.[15] According to Plaintiffs'

16

account of Phase Three, as Silva was on the ground surrounded by three officers (Kelly, Sword, and

17

Almanza), they struck Silva with batons multiple times, in concert (Sword admits hitting Silva

18

seven to 12 times), holding the batons with two hands and swinging using their full force.

19

Witnesses saw officers land several blows to Silva's head. At some point, Almanza got on Silva's

20

shoulder and pressed him to the ground as Kelly and Sword continued to strike Silva with their

21

22

---

[13] Such details provide the foundation of the analysis and must be set forth "because the factors articulated in *Graham,*

23

and other factors bearing on the reasonableness of a particular application of force are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure." *Id.* (internal quotation and citation omitted).

[14] While Plaintiffs do not bring an excessive force claim on the basis of Kelly's use of a K-9, the Court here includes

24

information about the relative level of force of a K-9 attack for context. Where a law enforcement officer uses a trained police dog, the level of force, whether intermediate or deadly force, is determined based upon the unique factual

25

circumstances of the case. *See Smith,* 394 F.3d at 705-07. Here, deferring to Plaintiffs' facts, Kelly intended for the dog to bite Silva, and it engaged Silva's head by biting his face. Where a police dog engaged a suspect's head, the Court finds

26

that such force creates a substantial risk of "serious bodily injury," thus is considered "lethal force." *See Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010) (citing *Smith*, 394 F.3d at 705-07 (the definition of "lethal force "is force

27

that creates a substantial risk of death or serious bodily injury."); *see also Chew*, 27 F.3d at 1441). That Kelly allegedly used force in this way is relevant to the Court's analysis, *infra*, under the provocation doctrine.

[15] Plaintiffs in their first cause of action do not specifically allege that Kelly's use of the sternum rub, control hold, or K-9

28

constitutes excessive force. *See* Doc. 78 at ¶ 16-17.

batons. Witnesses testified that the deputies continued to beat, punch, and kick Silva as he lay on the ground screaming and begging for help.

The definition of "lethal force" is that which "creates a substantial risk of death or serious bodily injury." *Bryan*, 630 F.3d at 825 (citing *Smith v. City of Hemet*, 394 F.3d 689, 705-07 (9th Cir. 2005)). Viewing the facts in the light most favorable to Plaintiffs for the purposes of summary judgment, the alleged various uses of impact blows constitute lethal force. *See id.* at 825 n. 7.

There is no dispute that baton strikes are generally considered "intermediate force," and such blows are "capable of inflicting significant pain and causing serious injury. As such, [an officer's use of a baton is] regarded as 'intermediate force' that, while less severe than deadly force, nonetheless present[s] a significant intrusion upon an individual's liberty interests." *Young*, 655 F.3d at 1161-62 (citing *Smith,* 394 F.3d at 701-02).

Baton blows to the head, however, are recognized as deadly force. The standard issue baton "is a deadly weapon that can cause deep bruising as well as blood clots capable of precipitating deadly strokes," and, "batons should therefore be used only as a response to aggressive or combative acts." *Mattos*, 661 F.3d at 454 (quoting *Young,* 655 F.3d at 1162 ("[h]ead strikes with an impact weapon are prohibited unless circumstances justify the use of deadly force.")); *Cf. Thompson v. City of Chicago,* 472 F.3d 444, 451 & nn. 18-19 (7th Cir. 2006) (describing Chicago Police Department policies limiting the use of "impact weapons" such as batons to "high-level, high-risk assailants" who "pose [ ] a threat of serious bodily injury or death to officers and the public."). Here, the record evidence shows that the KCSO has a policy on the use of batons (*JSUMF* ¶ 66), and that KCSO deputies are trained to avoid head strikes with a baton. Grimes Dep. 34:21-35:6. A reasonable jury could conclude that the alleged baton blows to the head constitute deadly force.

Generally, impact blows by punching or kicking are considered "significant force." *See, e.g., Blankenhorn*, 485 F.3d at 480. Punching or kicking are "broadly characterized as [a] non-lethal levels of force," but could in some circumstances "be employed in a manner that creates a substantial risk of death or serious bodily injury." *Wade v. Fresno Police Dep't*, No. 1:09-CV-0599

AWI-BAM, 2012 WL 253252, at *13 (E.D. Cal. Jan. 25, 2012) *aff'd*, 529 F. App'x 840 (9th Cir. 2013) (citing *Bryan,* 630 F.3d at 825 n. 7).

### (2) Government Interest

The next step in the *Graham* analysis is to evaluate the government's interests by assessing (a) the severity of the crime; (b) whether the suspect posed an immediate threat to the officers' or public's safety; and (c) whether the suspect was resisting arrest or attempting to escape. *Id.; Graham,* 490 U.S. at 396.

#### a.   Severity of crime

The parties agree that Kelly at some point put out a call that he was involved with a "148," meaning an officer faced an individual subject to arrest for resisting an officer, a violation of California Civil Code Section 148(a), a misdemeanor. *See also* Cal. Pen. Code § 17(b) (defining misdemeanor offenses under California law). Defendants do not allege that Silva committed a "crime of violence." *See, e.g., United States v. Valdovinos-Mendez*, 641 F.3d 1031, 1035 (9th Cir. 2011) (for example, assault with a deadly weapon or by force likely to produce great bodily injury is categorically a "crime of violence") (citing *United States v. Grajeda,* 581 F.3d 1186, 1189-92 (9th Cir. 2009)). Resolving any factual disputes in favor of Plaintiffs, the Court assumes for the purposes of summary judgment that the severity of the crime at issue is a nonviolent misdemeanor. Defendants do not allege that over the course of the incident the severity of the underlying crime changed.

#### b.   Immediate threat to officers

Of the *Graham* factors, the "most important" is whether the suspect posed an "immediate threat to the safety of the officers or others." *Bryan,* 630 F.3d at 826-28 (citing *Smith,* 394 F.3d at 702). The parties dispute whether Silva posed an immediate threat to Kelly in Phase Two, or to Kelly, Sword, or Almanza in Phase Three, and ultimately that will be a factual determination to be made by the trier of fact.

##### *Whether Silva Posed Threat Prior to Kelly's Using a Baton*

Plaintiffs demonstrate a genuine dispute of material fact whether Silva posed an actual immediate threat. According to Plaintiffs' account of Phase Two, Silva's movements were instinctive responses to the K-9 attack, dog bites, and resulting pain. Resolving the Phase Two facts

in the light most favorable to Plaintiffs, given that the K-9 undisputedly bit Silva, the dog attack could be considered "provocative conduct" which may give Silva a "limited right to offer reasonable resistance." *Young*, 655 F.3d at 1164 (recognizing "that an officer's 'provocative conduct' can trigger an individual's 'limited right to offer reasonable resistance'" where an officer unexpectedly pepper sprayed a suspect on he sat on a curb) (quoting *Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 921 (9th Cir. 2001)). Here, too, accepting Plaintiffs' facts as true, a reasonable jury could find that, rather than an actual immediate threat, Silva's movements away from Kelly or attempts to get the dog to stop biting him were reasonable defensive responses. *See id.* (citing *Blankenhorn,* 485 F.3d at 479-80).

It is also in dispute whether Silva's level of cooperation or disobedience could constitute an immediate threat. In a factually similar case, *Young*, 655 F.3d at 1164, an individual suspected of a misdemeanor refused an officer's instructions to get back in his car, instead insisting on sitting on the curb in direct defiance of the officer's order. There, the court found that the suspect's "disobedience of a police officer takes the form of passive noncompliance that creates a minimal disturbance and indicates no threat, immediate or otherwise, to the officer or others." *Id.* at 1165.

Similarly here, according to Plaintiffs' version of the incident, Silva was sitting or lying on the ground, and noncompliant with Kelly's commands in that he did not move how or where Kelly wanted him. Otherwise, according to Plaintiffs, Silva was nonviolent, not fleeing, did not assault any officer, and his physical resistance, if any, was a brief response to pain stimulus. Crediting Plaintiffs' version of events, a reasonable jury could find that, as in *Young*, Silva's alleged conduct did not amount to an immediate threat. *See id.* Determining whether Silva's conduct constituted a threat requires a trier of fact to weigh credibility, thus Plaintiffs demonstrate a genuine dispute of material fact.

*Whether Silva Posed Threat Prior to Kelly, Sword, or Almanza Using Batons in Tandem*

According to Plaintiffs' account, Kelly, Sword, and Almanza struck Silva with their batons, in concert, nearly simultaneously and without pause, landing blows to Silva's head as he knelt or lay on the ground. Plaintiffs support their allegations with eye witness testimony. Defendants dispute that any officer hit Silva in the head. Otherwise, it is undisputed that in Phase Three Kelly,

Sword, and Almanza used batons to strike Silva on his body: Kelly admits that he struck Silva multiple times, Sword admits seven to twelve times, and Almanza admits to striking Silva at least two times. It is undisputed that in Phase Three that the officers outnumbered Silva three to one. The parties dispute whether in Phase Three Silva posed an actual immediate threat to the officers prior to their use of the force as alleged.

Making a determination about whether Silva posed an immediate threat to officers in Phase Three hinges in part on the resolution of the same disputed material facts relevant in Phase Two. Based on the record evidence, a reasonable jury could find that rather than an actual immediate threat to the officers, Silva's efforts, if any, to move away from the officers' baton strikes or his noncompliance by inaction could be considered a reasonable defensive response. *See Young*, 655 F.3d at 1164 (in certain circumstances misdemeanor suspects have a "limited right to offer reasonable resistance") (citing *Blankenhorn,* 485 F.3d at 479-80). Resolving the factual disputes require some measure of fact-finding.[16]

Taking Plaintiffs' facts as true, when Sword arrived, he saw that Silva was on the ground, had blood on his face, the dog was biting him, and Kelly was using his baton. Sword neither saw Silva with a weapon nor saw him resort to any violence against Kelly. Before talking to Kelly, Sword joined in striking Silva (who either was on his hands and knees or attempting to move to that position) with his baton, both officers holding their batons in two hands and swinging with full force. As a result of Sword's blow, Silva went to the ground. Silva screamed in pain. Almanza testified that when he arrived, seconds after Sword, Silva was on the ground and officers were in no immediate danger. Without speaking with Kelly or Sword, Almanza also began striking Silva with his baton. Before doing so, Almanza had not seen Silva punch, kick, bite, or otherwise physically threaten anyone.[17] Taking the totality of evidence in the light most favorable to Plaintiffs, the

---

[16] Defendants submit that the officers were afraid of Silva because of his size and because he seemed tense. Based on their training and experience they believed he was possibly high on an illicit substance. However, "a simple statement by an officer that he fears for his safety or the safety of others is not enough [to demonstrate an actual immediate threat]; there must be objective factors to justify such a concern. In short, an officer's use of force must be objectively reasonable based on his contemporaneous knowledge of the facts." *Deorle,* 272 F.3d at 1281. Viewing the record evidence in a light most favorable to Plaintiffs, the Court finds that a jury could find that the officers' fears were based on speculation, not contemporaneous knowledge.

[17] Almanza testified as to his beliefs and underlying intent. However, the objective reasonableness inquiry is whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation and without the "20/20 vision of hindsight." *Graham,* 490 U.S. at 396.

record evidence puts in genuine dispute whether Silva posed an immediate threat to Kelly, Sword, or Almanza before they allegedly used lethal force. Assuming the truth of Plaintiffs' facts, a reasonable jury could find that Silva posed no such threat.

### c. Resisting Arrest and Other Considerations

The parties dispute whether Silva was passively or actively resistant. "[R]esistance" is not "a binary state," it is better understood as a spectrum "from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer." *Bryan*, 630 F.3d at 830 (citing *Forrester,* 25 F.3d at 805; *Headwaters Forest Def. v. County of Humboldt,* 276 F.3d 1125, 1130-31 ("*Headwaters II*") (9th Cir. 2002).

Taking Plaintiffs' facts as true, Silva remained on the ground and unarmed; never got to his feet; was not fleeing; did not attack any officer; moved defensively; and his physical resistance, if any, was brief. Plaintiffs produce evidence showing a genuine issue of material fact whether Silva's noncompliance constitutes "passive resistance." *Bryan*, 630 F.3d at 829-30. Ample case law exists on the spectrum of resistance. *See Smith,* 394 F.3d at 703 (where the suspect did not flee, was nonviolent, did not attack the officers, and his physical resistance lasted only for a brief time, the court found his resistance "minor," despite that he "continually ignored" commands to put his hands behind his back and disobeyed orders not to go inside his house); *see also Bryan*, 630 F.3d at 30 (concluding that although the suspect was noncompliant with orders and behaved strangely, "such noncompliance does not constitute active resistance supporting a substantial use of force," and that "his conduct does not constitute resistance at all") (citing *Smith,* 394 F.3d at 703); *see also Nelson v. City of Davis,* 685 F.3d 867, 881 (9th Cir. 2012) (cases dating to before 2001 established that a passively resistant, nonviolent suspect's "failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force."); *see also Young*, 655 F.3d at 1164 (finding that direct disobedience of an officer's order did not amount to active resistance, but constitutes "passive noncompliance"). On that basis, Plaintiffs demonstrate a genuine issue of material fact whether Silva's noncompliance was passive, not active resistance.

An analogous case, *Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007), is instructive. There, the officers reasonably believed that Blankenhorn was a misdemeanor suspect for trespassing. *Id.* at 468-69. When the officers confronted him, Blankenhorn became angry and agitated, but was nonviolent. *Id.* The officers ordered him to his knees to be handcuffed, but he did not comply. *Id.* In response, three officers gang-tackled him, took him to the ground, and after the officers were on top of him an officer punched him in the head and body. *Id.* at 469-70. The officers handcuffed Blankenhorn and put him in hobble restraints. *Id.* at 469. The circuit court held that the officers' conduct "gang-tackling," use of post-restraint impact blows, and the hobble restraints violated Blankenhorn's Fourth Amendment rights, and the conduct was contrary to "clearly established law." *Id.* at 481.

In a more recent case involving a misdemeanor suspect, *Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011), the Ninth Circuit explicitly found that the misdemeanor suspect, Young, had a "limited right to offer reasonable resistance" when an officer unexpectedly pepper sprayed him as he sat on the curb. *Id.* at 1164 (citing *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921 (9th Cir. 2001)).

Here, given that it is undisputed that Silva woke up from Kelly's use of an undisputedly painful sternum rub and Kelly also used a K-9 against Silva, a reasonable trier of fact could find one or both of these actions "provocative" under the circumstances and, thus, could also find that Kelly's actions gave rise to a "limited right to offer reasonable resistance" such that Silva's moving his arms or pulling away could be considered a reasonable defensive response within his rights. *See, e.g., Blankenhorn*, 485 F.3d at 479-80 (reasoning that officers' provocation triggered the misdemeanor suspect's "limited right to reasonable resistance and thus making their later use of the hobble restraints unreasonable"). Thus, even if, as Defendants contend, Silva elbowed Kelly or pulled away from him after the sternum rub and before Kelly's alleged baton use, this alone may be insufficient to show that Silva's actions amounted to active resistance where the sternum rub or use of the K-9 could be considered "provocative." *See id.* at 479-80; *see also Young*, 655 F. 3d at 1164.

In sum, according to Plaintiffs' version of Phase Two of the incident, Silva was on the ground, unarmed, nonviolent, not fleeing, did not assault any officer, and his physical resistance, if

40

any, was a brief response to pain stimulus. Crediting Plaintiffs' version of events, a reasonable jury could find that Silva was likewise noncompliant, like the suspects in *Smith, Bryan*, and *Young*, but that such disobedience constitutes passive, not active, resistance. *See, e.g., Smith*, 394 F.3d at 703 (finding a genuine issue of material fact remained whether multiple officers' conduct constituted "excessive force by spraying [the passively noncompliant suspect] with pepper spray four times, slamming him down onto porch, dragging him off the porch face down, and ordering a canine to attack and bite him three times," despite the officers' having only speculative, though reasonable, on-the-scene concerns about a heightened probability of danger relative to a misdemeanor suspect); *see also Bryan*, 630 F.3d at 829-30; *see also Young v*, 655 F.3d at 1164.

In Phase Three, according to Plaintiffs' account of events, Silva was on the ground, surrounded by three officers, and was passively noncompliant. Based on the officers' admission that they struck Silva multiple times (for instance, Sword 7 to 12 times), a reasonable jury on these facts could conclude that Silva's movements on the ground were instinctive reactions to pain, not active resistance. *See, e.g., Lopez v. City of Imperial* No. 13-CV-00597-BAS WVG, 2015 WL 4077635, at *12 (S.D. Cal. July 2, 2015) (collecting cases) (concluding "a jury could find that a reasonable officer should have determined that [an arrestee] did not pose an immediate or serious threat" when his physical response could plausibly have been "an instinctive effort to protect himself from injury") (quoting *Aranda v. City of McMinnville*, 942 F. Supp. 2d 1096, 1106 (D. Or. 2013)).

As to other considerations, law enforcement is "required to consider what other tactics if any were available to effect the arrest." *Headwaters Forest Def. v. Cty. Of Humboldt*, 240 F.3d 1185, 1204 (9th Cir. 2000) *vacated on other grounds*, 534 U.S. 801 (2001) ("*Headwaters I*") (quoting *Chew v. Gates,* 27 F.3d 1432, 1443, 1441 n. 5 (9th Cir. 1994) (finding "the availability of alternative methods of capturing or subduing a suspect may be a factor to consider")). Whether a law enforcement officer gave a warning or failed to do so "is a factor to be considered in applying the *Graham* balancing test." *Deorle,* 272 F.3d at 1284 ("[W]arnings should be given, when feasible, if the use of force may result in serious injury."). Here, Defendants do not with specificity address available practical options or warnings between baton strikes. They argue that Kelly, Sword, and

41

Almanza, each "tried several alternatives which proved unsuccessful before escalating their use of force." Doc. 124-1 at 13:5-10. But the record presented on summary judgment does not bear this out. While true that before his baton Kelly used a K-9 attack, such force is also considered "severe" and, in some circumstances, could be considered lethal force. *See Chew*, 27 F.3d at 1441. Moreover, Sword and Almanza concede that they started using baton strikes in concert with other officers before using or considering alternative methods. Although Sword and Almanza testified that they later used control holds, according to Plaintiffs the baton force was first.

### (3) Balancing Level of Intrusion Against the Government Interest

"To determine the constitutionality of a seizure '[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Garner*, 471 U.S. at 8 (quoting *United States v. Place,* 462 U.S. 696, 703 (1983)).

Where a suspect is passively noncompliant, as Plaintiffs here allege Silva was, it is well-established in the Ninth Circuit that such conduct, without more, does not justify using significant force. *See, e.g., Booke v. Cty. of Fresno*, 98 F. Supp. 3d 1103, 1119 (E.D. Cal. 2015) ("The non-violent violation of § 148(a)(1) 'will not, without more, give rise to a significant governmental interest in the use of significant force.'") (quoting *Young*, 655 F.3d at 1165). Indeed, violations of § 148 "will tend to justify force in far fewer circumstances than more serious offenses, such as violent felonies." *Id.* (citing *Young,* 655 F.3d at 1165).

Weighing the quantum of force against the government's countervailing interests, the Court concludes that the circumstances as alleged by Plaintiffs outweigh the government's need to use "significant" or "lethal force," as officers allegedly used here. *See, e.g., Young*, 655 F.3d at 1166 (officer was not justified in use of "significant force" against a nonviolent individual suspected of a misdemeanor); *see also Blankenhorn*, 485 F.3d at 479-80 (finding that where a suspect defied an officer's order to kneel down to be handcuffed, the officers' need for force did not overcome the passively resistant misdemeanor suspect's right to be free from excessive force); *see also Lalonde v. Cty of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000) (finding that the suspect resisted arrest, but that the force used may have been excessive where the underlying crime was "relatively minor" and

the force resulted in injury); *Robinson v. Solano Cty.*, 278 F.3d 1007 (9th Cir. 2002) (finding that where suspect was an apparently unarmed man suspected of a misdemeanor was insufficient to justify officers' action of drawing gun at close range and pointing it at the suspect's head, and concluding that the presently unarmed suspect's earlier use of a weapon was still insufficient, without more, to justify the intrusion to his person). Similarly here, on the evidence presented to the Court on summary judgment, a reasonable jury could conclude that the alleged lethal force used— specifically, the alleged impact blows—would not be justified against a nonviolent misdemeanor suspect. *See Garner*, 471 U.S. at 8, 11 (where "the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."). Because Plaintiffs demonstrate that genuine issues of material fact persist, summary judgment is inappropriate.

Accordingly, the Court **DENIES** Defendants' motion for summary judgment as to Plaintiffs' first cause of action for excessive force to the extent that it relates to Defendants Kelly, Sword, or Almanza's alleged use of impact blows such as baton strikes, punches, or kicks. Because Plaintiffs do not allege that Defendants Brock, Stephens, Miller, Greer, Phillips or Bright used impact force against Silva, the Court **GRANTS** the instant motions to the extent that Plaintiffs' first cause of action is based on such conduct by these Defendants.

### B.  Qualified Immunity Analysis: Alleged Impact Blows[18]

Qualified immunity is an affirmative defense that "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan,* 555 U.S. 223, 244 (2009). The doctrine "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 231 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). Further, it "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield

---

[18]  For the purposes of a qualified immunity analysis, the Court must use the injured party's facts. *Mueller v. Auker*, 576 F.3d 979, 1006 (9th Cir. 2009). In other words, "a court generally just adopts the version of the facts set forth by the party challenging immunity." *Id.* (citing *Scott*, 550 U.S. at 381 n.8 (holding that the dispositive question in the first step of *Saucier*—whether those facts establish a constitutional violation—"is a pure question of law")).

officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

"The protection of qualified immunity applies regardless of whether the government official's error

is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.*

Because qualified immunity is an affirmative defense, the defendant bears the burden of

establishing entitlement to it. *Gomez,* 446 U.S. at 640. The burden shifts to Plaintiffs to prove "that

the right allegedly violated was clearly established at the time of the official's allegedly

impermissible conduct." *Camarillo v. McCarthy,* 998 F.2d 638, 640 (9th Cir. 1993).

To determine whether officers are entitled to qualified immunity is a two-step inquiry. "The

threshold inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true,

establish a constitutional violation." *Wilkins v. City of Oakland,* 350 F.3d 949, 954 (9th Cir. 2003)

(citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001)). If the alleged conduct would not be considered

violative, the inquiry stops and the defense of qualified immunity applies. *See id.*

"Second, if the plaintiff has satisfied this first step, the court must decide whether the right

at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson,* 555 U.S.

at 231. To be a clearly established constitutional right, a right must be sufficiently clear "that every

reasonable official would [have understood] that what he is doing violates that right." *Reichle v.*

*Howards,* ⸺ U.S. ⸺, 132 S.Ct. 2088, 2093 (2012) (citation and internal quotation marks

omitted). "[T]he relevant, dispositive inquiry in determining whether a right is clearly established is

whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he

confronted." *Saucier,* 533 U.S. at 202; *see also Walker v. Gomez,* 370 F.3d 969, 978 (9th Cir.

2004). This inquiry "must be undertaken in light of the specific context of the case, not as a broad

general proposition." *Id.* at 201. "This is not to say that an official action is protected by qualified

immunity unless the very action in question has previously been held unlawful, but it is to say that

in the light of pre-existing law the unlawfulness must be apparent." *Anderson,* 483 U.S. at 640.

Because the answer to the second question may be dispositive, a court may address it first. *See*

*Pearson,* 555 U.S. at 242.

The Court has already determined, as discussed above, that for the purposes of summary

judgment Plaintiffs have established the violation of a constitutional right. Thus, the Court turns to

the second prong, whether the right was clearly established. *See id*. Prior to May 7, 2013, the date of the subject incident, clearly established case law existed that gave Defendants fair notice that using the force described above against a nonviolent misdemeanor suspect would be unconstitutional. *See Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013) ("The right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established <u>prior to 2008</u>." ) (original emphasis) (citing *Nelson,* 685 F.3d at 881 (same)). Moreover, because when viewing the facts as alleged in the light most favorable to the injured party the alleged force may constitute deadly force, Plaintiffs meet their burden to demonstrate that prior to the subject incident, clearly established case law existed that gave Defendants fair notice that using lethal force against a nonviolent misdemeanor suspect would be unconstitutional unless "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Garner*, 471 U.S. at 3. Accordingly, to the extent it is predicated Kelly, Sword, or Almanza's use of impact blows, the Court **DENIES** Defendants' motion for summary judgment on the basis of qualified immunity as to Plaintiff's first cause of action.

### Excessive Force Analysis of Alleged Use in Phases Four and Five of Prolonged Body-Weight Force (Sword, Almanza, Brock, Miller, Stephens) and Post-Handcuff Restraints (Sword, Brock, Stephens, Phillips, and Bright)

Plaintiffs assert that Defendants Sword, Almanza, Brock, Stephens, and Miller alleged prolonged use of body-weight on Silva's back, and Defendants Sword, Brock, Stephens, Phillips, and Bright's use of hobble restraints and a "hog-tie" constitute excessive force. Defendants move for summary judgment on the basis that their actions were objectively reasonable.

### A. *Graham* Analysis

Assuming for purposes of summary judgment the truth of Plaintiffs' facts, when Deputies Brock, and Stephens, as well as CHP Officers Phillips and Bright, and then Deputies Miller and Greer arrived (in that order), Silva was on the ground and unarmed, surrounded by deputies. Other than what they knew from the radio call about a request for a backup on a "148," these newly arriving back-up officers had no information about what happened before they arrived. The three officers already at the scene, Kelly, Sword, and Almanza, were yelling at Silva to stop resisting or

stop fighting as Silva lay on the ground, begging for them to stop and screaming for help.[19] The Court turns to the officers' efforts to restrain Silva.

### (1) Nature and Quality of Intrusion

#### (a) Handcuffing (Phillips and Bright)

Defendants Bright and Phillips admit they handcuffed Silva, who remained chest-down. Handcuffing, even without hogtying, is nontrivial and may in some circumstances constitute excessive force. *See, e.g., LaLonde*, 204 F.3d at 960. The Court includes the conduct for context but Plaintiffs do not assert an excessive force action based on the officers' use of handcuffs.

#### (b) Prolonged Application of Weight on Silva's Back (Sword, Almanza, Stephens, Brock, and Miller)

Accepting Plaintiffs' facts, before the application of handcuffs, Silva had been prone on the ground and chest-down for some minutes with deputies on his back. According to Plaintiffs, when CHP Officers Phillips and Bright arrived, Sword (280 pounds) and Almanza (170 pounds) were both applying body weight to keep Silva chest-down. Officers remained on top of Silva and applying their body weight pressure to his back both before and after Silva was handcuffed. After Silva was handcuffed and once Stephens joined the group, Silva, who was still face- and chest-down on the ground, had Stephens (over six feet tall, 260 pounds) on his right shoulder, Almanza (170 pounds) on his left shoulder, Brock (120 pounds) on his back, and Miller (230 pounds) pushing down on Brock. Each officer wore approximately 15-20 pounds of equipment on his belt. In all, according to Plaintiffs' calculations, Silva was chest-down for approximately fifteen minutes, and of that time, he was restrained and prone on the ground for approximately eight to ten minutes with four officers applying body-weight pressure to his back.

Prevailing precedent in the Ninth Circuit is that law enforcement officers' use of body weight to restrain a "prone and handcuffed individual[] in an agitated state" can cause suffocation "under the weight of restraining officers," therefore, such conduct may be considered deadly force.[20] *Drummond*, 343 F.3d at 1056-67; *see also Arce v. Blackwell*, 294 Fed. Appx. 259, *1-2 (9th

---

[19] Based on the other officers' testimony and eye witness testimony, the Court notes an apparent inconsistency with Kelly's testimony that he had no further contact with Silva after he returned the dog to the car.

Cir. 2008). "Known as 'compression asphyxia,' prone and handcuffed individuals in an agitated state have suffocated under the weight of restraining officers." *Id.* (collecting cases).

Here, rather than a few seconds, the officers allegedly applied approximately ten minutes of pressure to Silva's back. The Ninth Circuit case, *Drummond*, makes plain that multiple officers' use of prolonged body-weight pressure to a suspect's back is known to be capable of causing serious injury or death. *See* 343 F.3d at 1056. The conduct need not have actually caused serious injury or death to be considered lethal force; it is the risk of that result that turns the screw. *See Bryan*, 630 F.3d at 825 (the definition of lethal force "is force that creates a substantial risk of death or serious bodily injury.") (citing *Smith,* 394 F.3d at 705-07); *see also Chew*, 27 F.3d at 1441. Where officers apply approximately eight to ten minutes of body-weight pressure to a suspect's back, under *Drummond*, the conduct as alleged constitutes lethal force. *See* 343 F.3d at 1056.

> ### (c) Hobbles and "Hog-tie"(Sword, Stephens, Brock, Phillips, Bright)

Under Plaintiffs' facts, about 30 seconds after officers handcuffed Silva, Sword asked for a hobble. Silva was groaning and making sounds. Approximately a minute after Bright and Phillips had handcuffed Silva, Bright got the first hobble from a patrol vehicle. Throughout the hobble application, Silva remained chest-down with deputies on top of him applying weight to his back. After moving away from Silva's legs, Sword had no further direct physical contact with Silva, but remained at the scene overseeing the hobble and hogtying deployment. Upon Sword's direction Brock, Phillips, and Bright applied the hobbles. Stephens twisted Silva's wrist behind his back so it was sticking straight up in the air, then Phillips connected the hobble to the handcuffs, a restraint method known as "hogtying." Silva still tried to lift his chest up. One to two minutes after Silva was hog-tied, Phillips applied a second hobble while the same officers described above continued to apply body-weight pressure to Silva's back. While Silva was hog-tied and prone, officers twice picked him up and dropped him face-down on the ground. Silva had blood all over his face and Greer applied a spit-mask. After Bright assisted with applying the hobble, he walked away to wash blood from his hands. Approximately one to two minutes after Bright stepped away, Silva went

---

[20] Rather than the more recent circuit court case, *Drummond*, Defendants argue that a nearly twenty-year old out-of-district case, *Price v. Cty. of San Diego*, 990 F. Supp. 1230, 1239 (S.D. Cal. 1998), should control. This argument is unpersuasive.

quiet. This conduct as alleged, if found to be true by a trier of fact, "supports the finding that some of the force used by defendants was unreasonably excessive or brutal." *Walker v. Jones* No. C-08-0757 CRB-PR, 2010 WL 3702659, at \*4 (N.D. Cal. Sept. 16, 2010) (examining similar officer conduct in an Eighth Amendment context) (citing *Hudson v. McMillian,* 503 U.S. 1, 9-10 (1992); *see also LaLonde*, 204 F.3d at 960 (finding that tight handcuffing, even without hogtying, though nonlethal, is nontrivial and may constitute excessive force); *Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993)(same).

### (2) Government interest

#### a. Severity of crime

Based on the allegations, according to Plaintiffs' version of the incident the underlying crime remained a violation of California Civil Code Section 148(a), a misdemeanor. *See also* Cal. Pen. Code § 17(b) (defining misdemeanor offenses under California law). Again at this Phase, Defendants do not allege that Silva committed any "crime of violence" (*see, e.g., Valdovinos-Mendez*, 641 F.3d at 1035), thus the severity of the underlying crime is a nonviolent misdemeanor.

#### b. Immediate threat to officers

According to Plaintiffs, once Silva was handcuffed he no longer posed a potential threat to officers. Plaintiffs emphasize that although Defendants assert that Silva was kicking his legs, the officers testified that Silva never hit, punched, kicked, or threatened violence against an officer. Defendants' allegations about the officers' concerns about Silva's size, apparent intoxication (alcohol or illicit substances), and general actions or noncompliance, are insufficient factual bases for the Court to conclude that Silva was an actual immediate threat, post-handcuffing, where a reasonable jury could also conclude that such conduct poses no such threat. *See, e.g., Smith*, 394 F.3d at 702-3; *see also Young v*, 655 F.3d at 1164. This cuts against a need in Phases Four and Five to use "significant force." *Id.*

#### c. Resisting Arrest and Other Considerations

According to Plaintiffs, Silva's continued attempts to lift his chest demonstrated that he was asphyxiating. *See* DeFoe Decl. (Docs. 129-2, 131-3); DeFoe Dep. (Doc. 125-14); O'Halloran Decl. (Docs. 129-3, 130-3, 131-4); Pl. Expert Report (Docs. 129-3 Ex. 1, 130-3, Ex. 1; 131-4 Ex. 1).

Plaintiffs further allege that the officers' weight on Silva's back restricted his breathing and that Silva's movements trying to lift his chest and kicking his legs were not resistance but a sign of his struggle to breathe. *Id.* Similar cases turn on the fact-finder's determination of where on the spectrum of resistance a misdemeanor suspect falls. *See, e.g., Bryan*, 630 F.3d at 30 ("noncompliance does not constitute active resistance supporting a substantial use of force"); *see also Nelson,* 685 F.3d at 881 ("failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force"); *see also Young*, 655 F.3d at 1164 (direct disobedience is "passive noncompliance" not active resistance). As alleged, Plaintiffs' facts raise a critical genuine issue of material fact whether Silva was passively, not actively, resistant. Also, there is no specific evidence presented that the involved officers considered less intrusive alternatives. *See, e.g., Bryan*, 630 F.3d at 831.

### (3) Balancing Level of Intrusion Against Government Interests

According to Plaintiffs, Silva remained chest-down on the ground before and after he was in handcuffs, hobbles, and was hog-tied, a total of approximately eight to ten minutes, which caused him to asphyxiate. Reviewing similar allegations in another case, the Ninth Circuit found:

> Whether or not the evidence in the record establishes liability on the part of the defendants depends on the resolution of disputed questions of fact and determinations of credibility, as well as on the drawing of inferences, all of which are manifestly the province of a jury. *United States v. Goode,* 814 F.2d 1353, 1355 (9th Cir. 1987). Here, the officers admit to having applied force when restraining Santos. A jury might find believable the officers' contentions that they did so gently, and accordingly might return a verdict in their favor. Alternatively, a jury might find the officers' testimony that they were restrained in their use of force not credible, and draw the inference from the medical and other circumstantial evidence that the plaintiff's injuries were inflicted on him by the officers' use of excessive force. After all, broken backs do not ordinarily result from the type of gentle treatment described by Officer Lee.

*Santos*, 287 F.3d at 852. Similarly here, a reasonable trier of fact could find that Silva's alleged conduct does not rise to the level to justify the use of significant or lethal force. *See Drummond*, 343 F.3d at 1057. If Plaintiffs prove these facts at trial, a reasonable jury could find that the involved officers in the alleged application of force as described above in Phases Four and Five (Sword, Almanza, Brock, Stephens, Miller, Phillips, and Bright), had no justifiable interest in responding as they did. *Id.*; *see also Garner*, 471 U.S. at 11*; see also Bryan*, 630 F.3d at 825; *see*

1   *also Young v*, 655 F.3d at 1166.Accordingly, the Court **DENIES** Defendants Sword, Almanza,

2   Brock, Stephens, Miller, Phillips, and Bright's motions for summary judgment as to Plaintiff's first

3   cause of action, to the extent it is predicated on their conduct in Phases Four and Five.

4          The Court notes that Plaintiffs do not bring an excessive force claim on the basis of Greer's

5   application of the spit-sock. Because there is no allegation that Greer applied any force to Silva's

6   back, the Court **GRANTS** Defendant Greer's motion for summary judgment in this limited way as

7   to Plaintiffs' first cause of action.

8          **B.  Qualified Immunity Analysis: Phases Four and Five[21]**

9          Having demonstrated that Plaintiffs have established an alleged violation of a constitutional

10   right, the Court now turns to the second prong, whether the right was clearly established. *See*

11   *Pearson*, 555 U.S. at 242. Again, the Supreme Court case, *Garner*, 471 U.S. 1 (1985), is sufficient

12   to demonstrate that prior to May 7, 2013, clearly established case law existed to give Defendants

13   fair notice that using lethal force against a nonviolent misdemeanor suspect would be

14   unconstitutional. Plaintiffs also cite to *Drummond*, a Ninth Circuit case from 2003, which

15   demonstrates that prior to the incident the law was clearly established that multiple officers' alleged

16   use of prolonged body-weight pressure to a suspect's back was known to be capable of causing

17   serious injury or death. *See* 343 F.3d at 1056; *see also Sandoval v. Hish*, 461 F. App'x 568, 569

18   (9th Cir. 2011) (finding that the use of physical restraints "would have violated the decedent's

19   clearly established right to be free from excessive force at the time of the incident … " and thus,

20   defendants were not entitled to qualified immunity) (citing *Drummond,* 343 F.3d at 1061-62; *see*

21   *also Motley v. Parks,* 432 F.3d 1072, 1088 (9th Cir. 2005)). Moreover, *Drummond* is sufficiently

22   similar to the specific context of this case that it clearly warned officers that when a suspect is

23   handcuffed and prone on the ground, further restraint measures, if applied as alleged here, would be

24   unconstitutional. *See Drummond*, 343 F.3d at 1059; *see also Blankenhorn,* 485 F.3d at 479-80

25   (reasoning that where officers' conduct triggered misdemeanor suspect's limited right to resistance,

26   such conduct made officers' later use of hobble restraints unreasonable).

27

28   [21] In a qualified immunity analysis, a court adopts the injured party's facts. *See Mueller*, 576 F.3d at 1006 (citing *Saucier*, 533 U.S. at 201).

1     Finding relevant law clearly established, the Court thus concludes that Defendants Sword,

2   Almanza, Brock, Stephens, Miller, Phillips, and Bright are not entitled to qualified immunity as to

3   Plaintiffs' first cause of action to the extent it is predicated on the officers' alleged prolonged

4   application of body weight to Silva's back, use of hobble restraints, or a "hog-tie" after Silva was

5   handcuffed. Accordingly, as to this aspect of Plaintiffs' first cause of action the Court **DENIES**

6   Defendants motions for summary judgment on the basis of qualified immunity. In all other ways,

7   Defendants' motions for qualified immunity relevant to the officers' conduct in Phases Four and

8   Five are **DENIED**.

9     Three questions remain for trial relevant to Plaintiffs' first cause of action, whether the

10   following conduct constitutes excessive force: (1) Defendants Kelly, Sword, and Almanza's alleged

11   use of batons to strike Silva's head and body, either individually or in tandem; (2) Defendants

12   Sword, Almanza, Brock, Stephens, and Miller's alleged use of prolonged body-weight pressure to

13   Silva's back; and, (3) Defendants Sword, Stephens, Brock, Phillips, and Bright's use of hobbles and

14   a hog-tie restraint. Under Plaintiffs' first theory of excessive force, the officers' individual exposure

15   to liability is limited in this way.

16       **2.  Second Cause of Action: Excessive Force—Integral Participation**

17     A plaintiff may hold multiple law enforcement officers liable based on an "integral

18   participant" theory of liability when at least one officer violates the plaintiff's constitutional rights.

19   *Chuman v. Wright,* 76 F.3d 292, 295 (9th Cir. 1996). To make such a determination the court

20   evaluates whether an officer was a "'full active participant'" in the alleged constitutional violation.

21   *Boyd v. Benton Cty.,* 374 F.3d 773, 780 (9th Cir. 2004) (quoting *Melear v. Spears,* 862 F.2d 1177,

22   1186 (5th Cir. 1989)). An officer is an "integral participant" where he or she "participated in some

23   meaningful way" in the actions which gave rise to the constitutional violation. *Id.* at 781.

24     Plaintiffs argue that Defendant Officers at each Phase acted unconstitutionally and, although

25   individual officers did not necessarily participate in every application of excessive force,[22]  they

26   ───────────────
[22] Plaintiffs allege that Plaintiffs contend that Defendant Officers used eight types of force against Silva: (i) sternum rub;
27   (ii) control holds; (iii) K-9 bites; (iv) impact blows (baton strikes first by a single officer then by officers in concert,
    punches, and kicks); (v) chest-down restraint and prolonged application of body weight pressure to a prone suspect's
28   back; (vi) "hogtying" and hobble restraints; (viii) forcing suspect to wear a vomit-filled spit sock while prone on the
    ground.

were fundamentally involved in the altercation with Silva and thus are liable under the integral participation doctrine. *See Jones v. Williams*, 297 F.3d 930, 936 (9th Cir. 2002) (integral participation requires *some fundamental involvement* in the conduct that allegedly caused the violation) (emphasis in original). Plaintiffs argue that not only is there underlying violative conduct, for all the reasons addressed at length above, the doctrine of integral participation "extends liability to those actors who were integral participants in the constitutional violation, even if they [did] not engage in the unconstitutional conduct themselves." *Hopkins v. Bonvicino*, 573 F.3d 752, 770 (9th Cir. 2009); *see also Boyd*, 374 F.3d 773 at (9th Cir. 2004) ("[I]ntegral participation does not require that each officer's actions themselves rise to the level of a constitutional violation.") (9th Cir. 2004) (internal quotation marks omitted)).

### A. Defendants Kelly, Sword, and Almanza

Defendants Kelly, Sword, and Almanza address integral participation in passing and state that "the other deputies" merely "assisted in bringing the actively resisting and violently thrashing Silva under control by placing him into handcuffs and securing his feet with hobbles," the objectively reasonable conduct cannot support an integral participant claim. Doc. 124-1 at 14:20-28. Because these Defendants do not address their own conduct, they fail to show that no genuine issues of material fact exist for trial. The Court concludes that summary judgment as to these Defendants on Plaintiffs' second cause of action is unwarranted. Accordingly, the Court **DENIES** Defendant Kelly, Sword, and Almanza's motion for summary judgment on Plaintiffs' second cause of action—integral participation.

### B. Defendants Brock, Stephens, Miller, and Greer

Similarly, Defendants Brock, Stephens, Miller, and Greer do not brief this issue other than generally stating that "the key question in all cases is whether the use of force was 'objectively reasonable in light of the facts and circumstances confronting' the arresting officers." Doc. 125 at 8:12-15. Their implicit argument is that they were not integral participants in any conduct violative of the Decedent's Fourth Amendment rights. *See, generally,* Doc. 125 at 8-9. While true that Plaintiffs' second cause of action is derivative of their first, the Court found, *supra*, that genuine issues of material fact persist for trial on Plaintiffs' excessive force action. Therefore, Defendants'

argument fails. As they do not otherwise support their motion with law or fact, the Court concludes that these Defendants are not entitled to summary judgment as to Plaintiffs' second cause of action. Accordingly, the Court **DENIES** Defendant Brock, Stephens, Miller, and Greer's motion for summary judgment on Plaintiffs' second cause of action—integral participation.

### C. Defendants Phillips and Bright

The Court likewise finds unpersuasive Defendant Phillips and Bright's argument that Plaintiffs' integral participation claim must fail because the first cause of action fails in the first instance. It does not. The Court found, *supra*, that genuine issues of material fact persist for trial on whether the officers' alleged use of force was objectively reasonable. But Phillips and Bright also argue that they are not liable for any alleged violative conduct that may have occurred before they arrived, or alternatively, for any alleged conduct that may have happened before they were participants. They argue that their presence alone does not make them "integral participants." *See Blankenhorn*, 485 F.3d at 481 n. 12.

It is undisputed that in Phase Four, Defendants Kelly, Sword, and Almanza, and Brock arrived in that order, then the CHP officers Phillips and Bright arrived together in their patrol car. The parties dispute exactly when it is that the CHP Officers' presence at the scene ripened to integral participation. Phillips and Bright admit that when they arrived they saw three KCSO deputies engaged in a physical struggle with Silva and two or three deputies were on top of him. According to their testimony, as they stood near their patrol vehicle, they had not yet physically engaged with Silva but watched the altercation unfold between other law enforcement and Silva. Plaintiffs do not dispute this, but add a detail from eye witness testimony that two CHP officers stood at their car and watched as other deputies beat Silva and struck him with batons. As to Phillips and Bright's argument that they did not observe any baton strikes, the Court must resolve genuine disputes of fact in Plaintiffs' favor. The eye witness testimony is that the other officers' impact blows continued even after officers apparently had restrained Silva on the ground and/or had handcuffed Silva. Moreover, the allegedly prolonged use of body weight occurred, according to Plaintiffs, both before and after Silva was handcuffed and in restraints. Phillips and Bright admit

that Silva was not handcuffed when they arrived, and they assisted with handcuffing him. Phillips admits that he assisted to deploy both leg restraints.

An officer present at a scene as a "mere bystander" and not engaged in the allegedly violative conduct is not subject to liability. *Hopkins,* 573 F.3d at 770; *see also Chuman*, 76 F.3d at 294-95. In contrast, where officers provide armed backup for another officer who performs violative conduct, the backup officer is liable under an integral participant theory because serving as armed backup shows that an officer "participated in some meaningful way." *Boyd,* 374 F.3d at 780 (holding liable officers who served as armed backup as another officer unconstitutionally entered a suspect's home). Reviewing law enforcement officers' possible integral participation during an altercation, in *Blankenhorn*, the Ninth Circuit found:

> Kayano's help in handcuffing the prone Blankenhorn was, of course, meaningful participation in the arrest. It is true that Blankenhorn does not claim Kayano used excessive force in handcuffing him, and Ross, not Kayano, placed the ripp-hobbles on Blankenhorn's wrists and ankles. But Kayano's own declaration indicates that his help in handcuffing Blankenhorn was instrumental in the officers' gaining control of Blankenhorn, which culminated in Ross's application of hobble restraints. Therefore, Kayano's participation was integral to the use of the hobble restraints. *See id.*
>
> It follows that Gray, who ordered Ross to use the hobble restraints, and Nguyen and South, who tackled Blankenhorn, also participated in an integral way in the application of the hobble restraints. Accordingly, Gray, Nguyen, Ross, South, and Kayano may be held liable for this particular alleged use of excessive force. *See Chuman,* 76 F.3d at 294-95.

485 F.3d at 481.

Like the officers in *Blankenhorn*, Defendants Phillips and Bright admit that they assisted with handcuffing and applying hobbles to Silva, and also admit that they assisted wrapping the nylon leg restraint around the handcuffs and connecting the leg restraints to the handcuffs in a hog-tie. Phillips and Bright concede that they arrived before Silva was in restraints. Moreover, they admit that they came to the scene in response to a call for backup and arrived at the scene serving in that capacity. Therefore, taking Plaintiffs' facts as true that officers used impact blows and prolonged body-weight pressure to Silva's back *after* he was restrained, on the ground, and handcuffed, a reasonable jury could infer from the circumstances that Phillips and Bright were

integral participants during the time when one or both of the allegedly violative applications of force occurred. As genuine disputes of material fact remain for a trier of fact, summary judgment is inappropriate. Accordingly, the Court **DENIES** Defendant Phillips and Bright's motion for summary judgment on Plaintiffs' second cause of action—integral participation. In all other ways, the Court **DENIES** Defendants' motions as to Plaintiffs' second cause of action for excessive force—integral participation.

### 3.  <u>Third Cause of Action: Excessive Force—Failure to Intervene</u>

"[P]olice officers have a duty to intercede when their fellow officers violate the constitutional right of a suspect or other citizen." *Cunningham v. Gates,* 229 F.3d 1271, 1289 (9th Cir. 2000). "[T]he constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows." *United States v. Koon,* 34 F.3d 1416, 1447 n. 25 (9th Cir. 1994) *rev'd in part on other grounds,* 518 U.S. 81 (1996). If an officer fails to intervene when fellow officers use excessive force, despite not acting to apply the force, he would be responsible for violating the Fourth Amendment. *Id.* This is so, however, only if the officer had "a realistic opportunity" to intercede. *Cunningham,* 229 F.3d at 1289.

Defendants move for summary judgment on Plaintiffs claims against all Defendants for failure to intervene to prevent violations of Silva's Fourth and Fourteenth Amendment rights.[23] *See* SAC, Doc. No. 78, ¶¶104-112.

Under Plaintiffs' facts, discussed at length above, it is reasonably possible that a trier of fact could find that each individual officer integrally participated in the applications of force at various points in the events which allegedly led to Silva's death. Taking Plaintiffs' presentation of facts as true, the Court finds that a reasonable jury could conclude that the officers' application of body-weight to Silva's back continued for approximately ten minutes, thus, during that time, officers had a realistic opportunity to intervene in the allegedly violative conduct within the time Silva was restrained. Because a reasonable jury could make this inference, the Court concludes that a genuine issue of material fact persists for trial. *See Cunningham*, 229 F.3d at 1289.

---

[23] Defendants Brock, Stephens, Miller, and Greer move for summary judgment, generally, on Plaintiffs' first cause of action but do not brief the failure to intervene theory.

1    Accordingly, the Court **DENIES** Defendants' motions for summary judgment on Plaintiffs'

2    § 1983 claim against all Officer Defendants as to Plaintiffs' third cause of action for excessive force

3    —failure to intervene.

4    **4.  Fourth Cause of Action: Denial of Medical Care**

5    Defendants contend that they are entitled to summary judgment on Plaintiffs' fourth cause

6    of action for denial of medical care because officers met their obligations under the law. *See* Doc.

7    125 at 9:4-14. Plaintiffs argue that Defendants unconstitutionally failed to provide timely medical

8    treatment, resulting in his death.

9    The Fourth Amendment requires law enforcement officers to provide objectively reasonable

10   post-arrest care to an apprehended suspect. *Tatum*, 441 F.3d 1099. For example, "a police officer

11   who promptly summons ... necessary medical assistance has acted reasonably for purposes of the

12   Fourth Amendment[.]" *Id.* at 1098-99 (the Fourth Amendment is the proper analytical framework

13   in which to evaluate such a claim, following the decision in *Graham*, 490 U.S. 386); *see also City

14   of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 245 (1983) ("Whatever the standard may be, [the

15   defendant] fulfilled its constitutional obligation by seeing that [the apprehended person] was taken

16   promptly to the hospital that provided the treatment necessary for his injury.").

17   In this case, it is undisputed that Kelly and Sword called for medical assistance and that at

18   least one call was made before Silva had been handcuffed. Additionally, another officer called for

19   confirmation. It is also undisputed that paramedics arrived soon after officers had hogtied Silva.

20   Defendants are correct that "the critical inquiry is not whether the officers did all that they could

21   have done, but whether they did all that the Fourth Amendment requires." *Tatum*, 441 F.3d at 1099

22   (holding that a police officer who promptly summons the necessary medical assistance, even if the

23   officer does not in the meantime administer CPR, has acted reasonably for purposes of the Fourth

24   Amendment). Thus, even accepting Plaintiffs' facts as true, the Court concludes that because

25   officers promptly summoned medical care to attend to Silva, they met the minimum standard of

26   reasonableness for purposes of the Fourth Amendment. *See id.* Therefore, Defendants are entitled to

27   summary judgment as to Plaintiffs' fourth cause of action for denial of medical care. Accordingly,

28

the Court **GRANTS** Defendants' motions for summary judgment as to Plaintiffs' fourth cause of action.

## C.  FOURTEENTH AMENDMENT—SUBSTANTIVE DUE PROCESS CLAIMS

Merri Silva, Chris Silva (Salvador Silva's successor in interest), the child Plaintiffs, and Garlick each bring a substantive due process claim against all Officer Defendant. Defendants move for summary judgment on these claims.[24]

### 1.  Fifth Cause of Action: Substantive Due Process

Plaintiffs' fifth cause of action for loss of familial relationship is governed by the substantive due process clause of the Fourteenth Amendment, which protects against "government power arbitrarily and oppressively exercised." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (citing *Daniels v. Williams,* 474 U.S. at 331).

### a.  Threshold Issue: Standing

As the Decedent's parents, Merri and Salvador Silva have cognizable substantive due process claims. *See Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (citing *Porter v. Osborn,* 546 F.3d 1131, 1137 (9th Cir. 2008)). The Ninth Circuit has recognized that "parents have a liberty interest in the companionship of their adult children and have a cause of action under the Fourteenth Amendment when the police kill an adult child without legal justification." *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1106 (9th Cir. 2014) (citing *Porter,* 546 F.3d at 1136; *Curnow ex rel. Curnow v. Ridgecrest Police,* 952 F.2d 321, 325 (9th Cir. 1991)). Generally, siblings do not possess a constitutionally protected liberty interest in this way. *See, e.g.*, *Ward v. City of San Jose*, 967 F.2d 280, 284 (9th Cir. 1992). However, the Decedent's father, Salvador Silva, passed before this stage of the litigation. Therefore, Plaintiff Chris Silva has a cognizable claim on the basis that he, as Salvador Silva's son, is his successor in interest.

The minor Plaintiffs, Silva's surviving children, M.L.S., C.J.S., C.R.S., E.Z.S., by and through their guardian *ad litem*, Judy Silva, and J.S., by and through her guardian *ad litem*, Adriane Dominguez, also have cognizable substantive due process claims. Children may assert Fourteenth

---

[24] Defendants argue that Plaintiffs' claims for substantive due process fail because the action is derivative of failed excessive force claims. This is not so. The Court has determined, *supra*, that genuine issues of material fact preclude summary judgment on Plaintiffs' first cause of action.

Amendment substantive due process claims if official conduct deprives them of their liberty interest in the companionship and society of their parent. *Lemire v. Cal. Dep't of Corr. & Rehab.,* 726 F.3d 1062, 1075 (9th Cir. 2013).

Defendants Phillips and Bright argue that Garlick's substantive due process claim must fail because she was not married to Silva, thus, she did not have any constitutionally protected right violated by Silva's death. Doc. 122 at 17-18. Plaintiffs concede that Silva and Garlick were not married and had not inextricably linked their finances, but counter that the couple had an intimate spousal-like relationship as longtime cohabitants who together parented their four biological children.

The Constitution protects "certain kinds of highly personal relationships." *Roberts v. United States Jaycees,* 468 U.S. 609, 619-20 (1984). "The protection is not restricted to relationships among family members."[25] *Quiroz v. Short*, 85 F. Supp. 3d 1092, 1108 (N.D. Cal. 2015) (citing *Board of Directors of Rotary Int'l,* 481 U.S. at 545). The "the relationships protected by the fourteenth amendment are those that attend the creation and sustenance of a family and similar highly personal relationships." *IDK, Inc. v. Clark Cty.*, 836 F.2d 1185, 1193 (9th Cir. 1988) (quoting *Roberts,* 468 U.S. at 618-19) (at one end of the spectrum, "an escort and client are the smallest possible association," but finding that companions "involved in procreation, raising and educating children, cohabitation with relatives, or the other activities of family life," may have developed deep attachments or commitments worthy of Fourteenth Amendment protections). Individuals demonstrate this intimate association by their deep attachment and commitment to each other "as a result of their having shared each other's thoughts, beliefs, and experiences." *Id.* To determine whether a particular association can claim due process protections, a court also may consider other factors, such as "the group's size, its congeniality, its duration, the purposes for which it was formed, and the selectivity in choosing participants." *Id.*

Garlick provides undisputed supporting evidence of a deep familial association with Silva. She testified that together she and Silva were a romantic couple and intimate partners, lived

---

[25] As this Court explained in a previous Order, it cannot find "any binding authority that hold that claims for loss of familial relationships are limited" as Defendants suggest, thus Garlick's relationship "may receive Fourteenth Amendment protections," if sufficient facts about the relationship support that finding. *See Garlick v. Cty. of Kern* No. 1:13-CV-1051-LJO-JLT, 2014 WL 2930831, at *3 (E.D. Cal. June 27, 2014).

together for years, have four young children, celebrated family birthdays, took the children to

appointments, went on walks to the park and grocery store, and that they made significant life

decisions to remain living together through difficult circumstances. This kind of cohabitating

partnered relationship is the kind of tie that "ha[s] played a critical role in the culture and traditions

of the nation by cultivating and transmitting shared ideals and beliefs." *IDK, Inc.*, 836 F.2d at 1192

(quoting *Roberts*, 468 U.S. at 618-19). The Court concludes that for the purposes of summary

judgment Garlick has demonstrated that together she and Silva had sufficient time to develop a

highly personal bond. A reasonable jury could conclude that the relationship was one of deep

attachment and commitment. Such an intimate association between cohabitating, single adults is

protected by the fourteenth amendment. *See id.* at 1193. The Court thus declines to grant summary

judgment on the basis.

### b.  Substantive Due Process—Analysis

A substantive due process action arises under the Fourteenth Amendment's Due Process

Clause, which "was intended to prevent government officials from abusing [their] power, or

employing it as an instrument of oppression." *Lewis*, 523 U.S. at 840 (internal quotations omitted)

(quoting *DeShaney v. Winnebago County Dept. of Social Servs.,* 489 U.S. 189, 196 (1989), in turn

quoting *Davidson v. Cannon,* 474 U.S. 344, 348 (1986)). "[T]he Due Process Clause is violated by

executive action only when it can be properly characterized as arbitrary, or conscience shocking, in

a constitutional sense." *Id.* at 845-47; *see Lemire,* 726 F.3d at 1075. A cognizable substantive due

process claim of an abuse of power is that which "shocks the conscience" or "violates the decencies

of civilized conduct." *Id.* at 846. Claims grounded in negligence or tort are not cognizable as

substantive due process actions. *Id.* at 849.

To succeed in a substantive due process claim, Plaintiffs must demonstrate that an officer's

conduct "shocks the conscience." *Tatum v. Moody*, 768 F.3d 806, 820-21 (9th Cir. 2014) *cert.*

*denied*, 135 S. Ct. 2312 (2015) (citing *Gantt v. City of Los Angele*s, 717 F.3d 702, 707 (9th Cir.

2013)). A plaintiff can satisfy the standard in either of two ways, (1) by showing that the officer

acted with "deliberate indifference," or (2) "the more demanding showing that he acted with a

purpose to harm." *Porter*, 546 F.3d at 1137; *see also Tatum,* 768 F.3d at 820-21 (distinguishing

"conduct that either consciously or through complete indifference disregards the risk of an unjustified deprivation of liberty") (citing *Gantt,* 717 F.3d at 707).

Plaintiffs assert that the officers' alleged conduct shocks the conscience, and, as between the two standards, the deliberate indifference standard should apply. *See Hayes v. Cty. of San Diego,* 736 F.3d 1223, 1230 (9th Cir. 2013) ("Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience.") (citing *Wilkinson,* 610 F.3d at 554). Defendants move for summary judgment, evaluating the claim under the purpose to harm standard.[26] *See* Doc. 122 at 24-25; Doc. 124-1 at 22-24; Doc. 125 at 17-18.

*Two Possible Legal Standards: Deliberate-Indifference or Purpose-to-Harm*

"Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Tatum,* 768 F.3d at 821 (citing *Gantt,* 717 F.3. at 707 (quoting *Wilkinson*, 610 F.3d at 554)). "On the other hand, where a law enforcement officer makes a snap judgment[27] because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.* To determine whether the official conduct using deadly force "shocks the conscience," a court first asks "whether the circumstances are such that actual deliberation [by the officer] is practical." *Porter*, 546 F.3d 1131 at 1137 (quoting *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998), *as amended* (Nov. 24, 1998) (internal quotations omitted)). The Ninth Circuit set out "that a denial of due process is to be tested by an appraisal of the totality of facts in a given case." *Id.* (quoting *Lewis,* 523 U.S. at 850).

"A court may determine at summary judgment whether the officer had time to deliberate (such that the deliberate indifference standard applies) or instead had to make a snap judgment because he found himself in a quickly escalating situation (such that the purpose to harm standard applies), 'so long as the undisputed facts point to one standard or the other.'" *Chien Van Bui v. City*

---

[26] Defendants Kelly, Sword, and Almanza seem to assert that some piece of Plaintiffs' fifth cause of action for a loss of familial association is duplicative of the Plaintiffs' first cause of action for excessive force and is likewise governed by the Fourth Amendment. This is incorrect. While true that an excessive force claim and an alleged violation of the right to family integrity are both subject to remedy under § 1983 (*see Kelson v. City of Springfield*, 767 F.2d 651, 654-55), "[t]he substantive due process right to family integrity or to familial association is well established" and is guaranteed by the Due Process Clause of the Fourteenth Amendment. *See Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011).

[27] So called because it is made during a situation that escalates "so quickly that the officer must make a snap judgment." *Porter*, 546 F.3d at 1137 (citing *Lewis*, 523 U.S. at 851).

*& Cty. of San Francisco*, 61 F. Supp. 3d 877, 901 (N.D. Cal. 2014) (citing *Duenez v. City of Manteca,* No. CIV. S-11-1820 LKK/KJN, 2013 WL 6816375, at *14 (E.D.Cal. Dec. 23, 2013)). "'By its nature,' though, 'the determination of which situation [the officer] actually found himself in is a question of fact for the jury, so long as there is sufficient evidence to support both standards.'" *C.E.W. v. City of Hayward* No. 13-CV-04516-LB, 2015 WL 1926289, at *13 (N.D. Cal. Apr. 27, 2015) (citing *Duenez,* 2013 WL 6816375, at *14).

The Court proceeds to evaluate whether, at each relevant Phase, deliberation was practical for the nine individual officers involved and how the appropriate standard may change over the course of events.[28] The Ninth Circuit acknowledged that "courts reviewing deadly force in response to a supposed public safety threat are presented with a 'factbound morass,' especially when on first glance an officer's use of deadly force appears disproportionate to the nature of the threat." *Porter*, 546 F.3d at 1141 (quoting *Price v. Sery*, 513 F.3d 962, 974, 978 (9th Cir. 2008)). Even if the undisputed evidence does not establish as a matter of law which standard applies, however, if upon accepting Plaintiffs' facts as true no jury could conclude that the alleged conduct meets the deliberate-indifference standard, then, summary judgment is appropriate. *See id.* at 1137; *see also Tatum*, 768 F.3d at 820-21.

### **Phase Two: Before Kelly Used a Trained K-9 and Baton**

#### *(1) Whether Deliberation Was Practical*

Defendants generally assert that Kelly is entitled to summary judgment because he had no time to deliberate and there is no showing that he had a purpose to harm. However, Kelly concedes that at the start of his encounter with Silva five minutes elapsed during which he could not rouse Silva. Taking Plaintiffs' facts as true, as it must, the Court finds that after the sternum rub, Silva was still on the ground, passively noncompliant, and instinctively reacting to pain stimulus. Kelly concedes that Silva did not verbally threaten him, hit, kick, or otherwise use violence against him.

---

[28] The other Officer Defendants do not adequately brief this issue, but Phillips and Bright contend that the "purpose to harm" standard is appropriate. The Court disagrees that it applies at every Phase. As the Court discussed above in the excessive force—integral participation section, a reasonable jury could conclude that officers had time to intervene. On the same record evidence, the Court finds that a reasonable jury could conclude that deliberation was practicable at various points in the altercation.

1    Based on the evidence presented, a reasonable jury could find Kelly for this period had time to

2    deliberate about how to deal with Silva at this early stage.

3         Moving to Phase Two, although they diverge after this point, the parties agree that Kelly

4    released the K-9 and Silva reacted in pain as the dog bit him in the face before Kelly used his baton.

5    Sword testified that when he arrived the dog appeared to be biting Silva and Silva had blood on his

6    face. According to Plaintiffs' facts, the dog was prevailing in its struggle with Silva, but there can

7    be no argument that the scene was rapidly evolving in a short period of time and Kelly's K-9

8    partner-involvement presented Kelly with "obligations that tend to tug against each other." *Porter*,

9    546 F.3d at 1139 (quoting *Lewis,* 523 U.S. at 853). This approximately five- to seven- minute

10   altercation between the dog, Kelly, and Silva, which ended with Kelly using a baton, was fast-

11   evolving and prompted Kelly to make a split-second decision. *Id.* (citing Lewis, 523 U.S. at 851;

12   *see also Bingue v. Prunchak,* 512 F.3d 1169, 1176 (9th Cir. 2008)).

13        In other words, because the undisputed evidence points to Kelly making a snap-judgment,

14   the Court finds that, after the K-9 was involved, the application of the purpose-to-harm standard

15   applies as a matter of law. *Id.* The parties treat all Defendants in the purpose to harm analysis as if

16   the law treats them the same. It does not. *See id.* at 1139-41. In *Porter*, the Ninth Circuit explained

17   how a court must evaluate an officer who may have unnecessarily provoked an escalation of

18   force—as Plaintiffs allege Kelly did by using the K-9 on a passively noncompliant misdemeanor

19   suspect[29]—differently from officers who are responding to an emergency. *See id.* (collecting cases).

20   The Court clarified this distinction, explaining that "[w]hen an officer creates the very emergency

21   he then resorts to deadly force to resolve, he is not simply responding to a preexisting situation. His

22   motives must then be assessed in light of the law enforcement objectives that can reasonably be

23   found to have justified his actions." *Id.* at 1141.

24              ### *(2) Applying Purpose to Harm and Provocation Doctrine*

25        The question becomes whether, in the step before using baton force, Kelly was objectively

26   reasonable in releasing the trained K-9, which Plaintiffs allege provoked Kelly's use of excessive

27

28   ---
     [29] Plaintiffs do not premise their excessive force claims on the K-9 attack, but specifically allege in their substantive due
     process claim that the K-9 attack was a disproportionate response that plays a role in the officers' liability.

force. *Porter v. Osborn,* 546 F.3d 1131 (9th Cir. 2008) provides a helpful example. There, plaintiffs alleged an unconstitutionally disproportionate response to a suspect's noncompliance with an officer's command to exit his vehicle. *Id.* at 1142. The officer responded to the suspect's noncompliance by spraying the suspect with pepper spray, an act which the Ninth Circuit found "could be viewed as punishing or harassing when it is unclear whether [the suspect] even knew he was dealing with law enforcement." *Id.* at 1142. There, the court found that the evidence suggested that the suspect's attempt to drive away from the officer, after his use of pepper spray, may have been in an effort to escape further harm or injury, making the officer an "active participant" in provoking the suspect's noncompliance and flight. *Id.* The Court found that the "most important" factor for the court to consider was that the officer responded with lethal force (in that case, multiple gunshots), "where [the suspect's] only violation was non-compliance." *Id.* With these factors in mind, the Ninth Circuit remanded the case for further consideration as to whether summary judgment was appropriate under the purpose to harm standard. *Id.*

In the instant case, after the sternum rub, Silva was generally non-compliant (to what extent is disputed) with Kelly's order to stay down and instead tried to move or get on his hands and knees. Kelly allegedly responded to Silva's noncompliance by releasing his K-9 partner, which the Ninth Circuit recognizes as "severe" force. *See Chew*, 27 F.3d at 1441. Thus, Kelly's responding to Silva's noncompliance by releasing the dog to bite Silva, like the pepper spray in *Porter*, could be viewed as punishing or harassing where Plaintiffs allege Silva was passive and responding to pain stimulus from the sternum rub and had just moments before been unresponsive and incoherent. *See* 546 F.3d at 1142. Taking the totality of evidence in the light most favorable to Plaintiffs, Silva's initial violation was non-compliance, like the suspect in *Porter*. And Kelly, like the officer in *Porter*, allegedly responded with severe or lethal force—an alleged K-9 attack and baton strikes to the head. Viewing the record evidence in the light most favorable to Plaintiffs, a reasonable jury could find that Kelly's actions triggered Silva's noncompliance, to which Kelly allegedly responded by releasing the K-9 and using baton strikes to Silva's head. *Id.* at 1142.

In sum, accepting Plaintiffs' facts as true for the purposes of summary judgment, it is possible that a reasonable trier of fact could find that Kelly's use of "severe force" to get Silva to

comply with a command provoked the situation Kelly resorted to lethal force to resolve. *See id.* at 1142. Because Plaintiffs provide evidence upon which a reasonable trier of fact could conclude that the provocation doctrine applies based on the alleged conduct, Plaintiffs demonstrate genuine disputes of material fact, under *Porter*, whether Kelly's conduct shocks the conscience. Accordingly, the Court **DENIES** Defendant Kelly's motion for summary judgment as to Plaintiff's fourth cause of action.

### Phases Three and Four: Kelly, Sword, and Almanza Use Baton Force

#### *(1) Whether Deliberation Was Practical*

##### *(a) Whether Deliberation Was Practical Before Sword Used Baton Force*

Accepting Plaintiffs' facts as true, Sword arrived at the scene where Silva was on the ground reacting in pain, the K-9 was upon him, and Kelly was using his baton. Sword admits that when he first used his baton, Silva was on his knees. *See* Sword Dep. 45:9-12. Sword specifically testified that he never saw Silva get to standing. *Id.* at 68:4-6. Taking the totality of the facts in the light most favorable to Plaintiffs, if the trier of fact believes Plaintiffs' allegation that Silva was passively noncompliant and already on the ground when Sword arrived, they could infer that at arrival Sword had time to deliberate before using baton force as alleged.[30] However, on these same facts, a jury could find that Sword came upon a chaotic scene and did not have time to deliberate before using baton force. In sum, a reasonable trier of fact could find that the facts alleged could support either standard. In the face of genuine disputes of material fact, the Court is not compelled to find which of the standards applies as a matter of law. *See Porter*, 546 F.3d at 1137; *see also Duenez,* 2013 WL 6816375, at *14.

##### *(b) Whether Deliberation Was Practical Before Almanza Used Baton Force*

According to Plaintiffs' account, Almanza arrived to the scene within seconds after Sword. Almanza admits that upon his arrival, the officers were a group of three. *See* Almanza Dep. 58:21-23. Almanza testified that when he arrived neither Kelly nor Sword were in danger (*id.* at 55:2-7), but concedes that he struck Silva's right arm two times. *Id.* 65:3-8, 66:11-24, 68:4-6. Almanza

---

[30] After Sword first applied baton force, he admits that Silva fell to the ground. *See* Kelly Dep. 114:7-11. Sword also admits that he struck Silva 7 to 12 times. *See* Sword Dep. 16:20-23; 17:12-20.

testified that before Silva with his baton, he did not see Silva hit (*id.* at 80:17-20) punch, kick, or bite anyone. *Id.* at 65:3-18. Deferring to Plaintiffs' version of events, while a jury could conclude that the scene was chaotic and Almanza used snap-judgment in a fast-evolving situation, it could on the same facts find Plaintiffs' version credible (that two other officers were already on the scene and Silva was already on the ground), and thus find that Almanza had time to deliberate whether he should also use his baton. As material issues of fact are in dispute, the Court is not directed to determine the appropriate standard to apply. *See Porter*, 546 F.3d at 1137; *see also Duenez,* 2013 WL 6816375, at *14.

### *(2) Whether Conduct "Consciously or Through Complete Indifference Disregards the Risk of an Unjustified Deprivation of Liberty"*

For purposes of the remainder of this analysis on summary judgment, in light of the reasoning above, the Court assumes that the standard more favorable to Plaintiffs applies here: deliberate indifference. "Deliberate indifference occurs when an official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Solis v. County of Los* Angeles, 514 F.3d 946, 957 (9th Cir. 2008); *see also Farmer v. Brennan,* 511 U.S. 825, 837 (1994) (a finding of deliberate indifference requires that the "official knows of and disregards an excessive risk"); *see also Bd. of Cty. Com'rs of Bryan Cty., Okl. v. Brown,* 520 U.S. 397, 415 (1997) (same). "Government officials are, of course, justified in using force—even deadly force—in carrying out legitimate governmental functions. But, when the force is … used without justification or for malicious reasons, there is a violation of substantive due process." *P.B. v. Koch*, 96 F.3d 1298, 1303 (9th Cir. 1996).[31] "Whether [officers] had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence … and a factfinder may conclude that [an] official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (citing *Cf. LaFave & Scott* § 3.7, p. 335 ("[I]f the risk is obvious, so that a reasonable man would realize it, we might well infer that [the defendant] did in fact realize it; but the inference cannot be conclusive, for we know that

---

[31] The Court here quoted *Sinaloa Lake Owners Ass'n v. City of Simi Valley,* 882 F.2d 1398, 1408 (9th Cir. 1989), *cert. denied,* 494 U.S. 1016 (1990), which was overruled in part by *Armendariz,* 75 F.3d at 1326, but on other grounds.

people are not always conscious of what reasonable people would be conscious of")). Therefore, to determine whether Plaintiffs have alleged sufficient facts to support their allegations that Kelly, Sword, and Almanza had the requisite culpable mental state, the Court reviews whether it is possible for a reasonable trier of fact to make that inference from the circumstantial record evidence presented. *Id.* Accepting Plaintiffs' facts as true, Kelly, Sword, and Almanza continued to use batons or other impact blows, in concert, to hit Silva with their full force, and continued to do so despite his passive resistance, his pleas for help, and allegedly continued to do so after Silva was restrained either by weight of other officers or handcuffs. Taking Plaintiffs' version of events as true, Kelly, Sword, and Almanza hit Silva in the head with batons, and continued to use batons despite knowledge of a substantial risk of harm, and Sword, as the supervising officer, failed to intervene in the deputies' baton force.[32]

Because Plaintiffs demonstrate genuine issues of material fact are in dispute, the alleged uses of force are enough to satisfy the deliberate indifference standard's requisite culpable mindset. *See, e.g., Morales v. City of Delano*, 852 F. Supp. 2d 1253, 1274 (E.D. Cal. 2012) (concluding that where genuine disputes of material fact exist whether the underlying conduct was unconstitutional, viewing the facts in the light most favorable to plaintiffs, defendants knew or should have known that the alleged conduct would be considered violative thus such a showing served as sufficient evidence of the requisite culpable mindset for a substantive due process claim, and on that basis defendants were not entitled to summary judgment). In a similar case, a district court concluded:

> Viewing the evidence in the light most favorable to plaintiff, a reasonable jury could find that the responding officer defendants used excessive force against plaintiff after plaintiff was subdued and handcuffed. Even if plaintiff's actions created a need for the responding officer defendants to use force to handcuff and/ or otherwise control him, punching and hitting

---

[32] "A person deprives another of a constitutional right, where that person does an affirmative act, participates in another's affirmative acts, or omits to perform an act which that person is legally required to do that causes the deprivation of which complaint is made." *Dietzmann v. City of Homer*, 2010 WL 4684043, *18 (D. Alaska 2010) (quoting *Hydrick v. Hunter*, 500 F.3d 978, 988 (9th Cir. 2007) (citing *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978))). The "requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1078 (9th Cir. 2013) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)). Here, though Kelly, Sword, and Almanza dispute the context, they each concede that they personally used baton force.

66

> plaintiff while plaintiff was handcuffed and on his stomach supports the
> inference that the responding officer defendants used force for the
> malicious and sadistic purpose of causing harm. *See Hudson,* 503 U.S. at
> 9-10; *accord Watts v. McKinney,* 394 F.3d 710, 712-13 (9th Cir. 2005)
> (finding that kicking genitals of prisoner who was on the ground and in
> handcuffs during an interrogation was "near the top of the list" of acts
> taken with cruel and sadistic purpose to harm another).

*Green v. Taylor*, No. C 12-5933 CRB (PR), 2014 WL 6693865, at *4 (N.D. Cal. Nov. 26, 2014).

In sum, Plaintiffs demonstrate a genuine issue of material fact whether the underlying uses of force were constitutional and that defendants should have known as much. *See, e.g., Santos*, 287 F.3d at 853 (finding a jury could properly find a Fourth Amendment violation where officers allegedly took a passively noncompliant individual suspected of public intoxication to the ground such that he suffered a broken vertebra, pain, and immobility). In addition, Plaintiffs demonstrate a genuine issue of material fact whether officers knew of and disregarded an excessive risk of serious injury or death. This constitutes a sufficient showing of deliberate indifference for Plaintiffs to survive summary judgment. *See Farmer,* 511 U.S. at 837. Despite Defendants Kelly, Sword, and Almanza moving for summary judgment on the substantive due process claim, they offer no factual analysis or legal authority to support their motion under a deliberate indifference standard. The entirety of their argument is that "Kelly, Sword, and Almanza did not act with deliberate indifference and there is no evidence to support the contention that they acted with a purpose to harm unrelated to a legitimate law enforcement purpose." (Doc. 124-1 at 24:24-28). Absent factual or legal support for their conclusion, the Court finds that they have not met their burden to show that there are no relevant genuine disputes of fact.

Accordingly, to the extent that Plaintiffs' fifth cause of action is based on Defendant Kelly, Sword, or Almanza's alleged impact blows subsequent to Silva being in restraints, the Court **DENIES** Defendants Kelly, Sword, and Almanza's motion for summary judgment (Doc. 124).

### Phases Four and Five: Sword, Almanza, Brock, Stephens, Miller, and Greer

#### *(1) Whether Deliberation Was Practical During Alleged Prolonged Application of Body-Weight*

According to Plaintiffs' version of the incident, Silva was chest-down on the ground and restrained by the weight of several officers for approximately ten minutes of the approximately

twenty minute encounter, which in Phases Four and Five included all officers. The undisputed record evidence indicates that the incident had de-escalated. Specifically, Sword, Almanza, Brock, Stephens, and Miller admit that they held Silva down on the ground with their knees or hands on his back or shoulders. Bright and Phillips testified that several officers were on top of Silva when they arrived, and also admit that they participated in handcuffing Silva while other officers restrained him with body weight on his back, shoulders, and legs. Defendants admit that the officers successfully handcuffed Silva. Based on officer testimony about the approximate time spent subduing, handcuffing, and hogtying Silva, the record evidence supports that officers applied weight to Silva's back for approximately eight to ten minutes. For example, Defendants concede that they held Silva down in this way both before and after he was in handcuffs. Once Silva was in handcuffs, Bright and Phillips estimated that Silva was in hobbles and hogtied after another two or three minutes. Based on these undisputed facts, once Silva was in handcuffs the circumstances had de-escalated and officers could deliberate whether to continue applying weight to his back. Therefore, the deliberate indifference standard applies. *See, e.g., Porter*, 546 F.3d at 1137 (the "critical consideration [is] whether the circumstances are such that actual deliberation is practical"); *see also Wilkinson*, 610 F.3d at 554.

### *(2) Whether the Alleged Conduct Meets the Deliberate Indifference Standard*

Viewing the record evidence in the light most favorable to Plaintiffs, a reasonable trier of fact could conclude from Sword, Almanza, Brock, Stephens, and Miller's alleged conduct pressing body-weight on Silva's back for a prolonged period that these officers were deliberately indifferent to the risk posed by their conduct to Silva's unjustified deprivation of liberty.

The Ninth Circuit, in *Drummond ex rel. Drummond v. City of Anaheim,* 343 F.3d 1052, 1059 (9th Cir. 2003), held that although officers were justified in using some force to restrain a mentally ill individual necessary to prevent him from injuring himself or officers, once the individual was actually handcuffed and on the ground, the officers who continued to kneel and press their weight on his back despite his requests for help used excessive force. The circuit court made explicit:

*//*

> The officers—indeed, any reasonable person—should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable.

*Id.* Applied to the instant case, more than a decade after *Drummond*, if a jury believes Plaintiffs' account of events that once Silva was handcuffed, on the ground, not resisting officers but exhibiting breathing difficulty, screaming for help, trying to lift his chest, and held prone in this way for eight to ten minutes, as Plaintiffs allege he was, a reasonable jury could find that in that context the officers were on notice that they could not continue to apply pressure to his back. A reasonable jury could also find from the circumstantial evidence (where officers did not remove the pressure from Silva's back under these alleged conditions) that this inaction supports the inference that the officers were deliberately indifferent to the risk of serious injury or death posed by their conduct.

Defendants Brock, Stephens, Miller, and Greer do not analyze the record evidence under the deliberate indifference standard. The entirety of their argument is that: "Nothing these moving defendants did to Silva even remotely approaches conduct that shocks the conscience, or violated the civilized standards of decency, necessary to establish a Fourteenth Amendment claim." (Doc. 125 at 17-18). This conclusory statement does not show that no factual disputes remain.

Defendants Phillips and Bright likewise fail to present factual or legal support relevant to the application of the deliberate indifference standard. Phillips and Bright rely instead on the argument that the fifth cause of action fails because it is derivative of a failed excessive force claim. To the contrary, the Court determined, *supra*, that Plaintiffs' first cause of action for excessive force survives summary judgment and that a reasonable jury could find that Phillips and Bright were integral participants in the alleged violative conduct. The Court therefore declines to grant summary judgment on that basis. Otherwise, Phillips and Bright do not substantively address how the genuine factual disputes may impact the substantive due process analysis if the deliberate-indifference standard applies, and, thus, do not carry their burden on summary judgment. Accordingly, the Court **DENIES** this aspect of Defendant Sword, Brock, Stephens, Miller, and Greer's motion for summary judgment on Plaintiffs' fifth cause of action.

**Phase Six: Greer Applies a Spit-Mask**

*(1) Whether Deliberation Was Practical During Alleged Spit-Mask Deployment*

Defendants do not dispute that in Phase Six Sword requested a spit-sock mask be deployed. Greer admits that he placed the mask on Silva. There can be no dispute that when Silva was restrained as described above, Sword and Greer had time to deliberate whether to apply a spit-sock mask to Silva. When Bright, facing the same circumstances, had time to wash his hands, no reasonable jury could disagree that they also had time to deliberate about whether to continue using significant force against Silva. Therefore, relative to the Phase Six Conduct, the deliberate indifference standard applies as a matter of law. *See Wilkinson*, 610 F.3d at 554.

*(2) Whether the Alleged Conduct Meets the Deliberate Indifference Standard*

Silva's rights while in custody derive from the Due Process clause under the Fourteenth Amendment. *See Gibson v. Cty. of Washoe,* 290 F.3d 1175, 1187 (9th Cir. 2002). Because in Phase Six there can be no dispute that Silva was in custody, Silva had "the established right to not have officials remain deliberately indifferent to their serious medical needs.'" *Id.* at 1187 (quoting *Carnell v. Grimm,* 74 F.3d 977, 979 (9th Cir. 1996)).

Here, Greer admits that he placed the mask on Silva. Moreover, Greer admits that he was aware that, approximately 20 seconds later, Silva vomited into the mask. Greer also concedes that neither he nor any other officer removed the mask. It is undisputed that Silva was face-down, wearing the mask, and that such a mask is impervious to liquid so as to prevent officers from exposure to a suspect's bodily fluids. A trier of fact could infer from Plaintiffs' account of events that the requisite subjective state of mind to demonstrate deliberate indifference is present if it can be implied from circumstances that the risk of substantial harm is obvious. *See Farmer*, 511 U.S. at 842. Here, taking the totality of facts in the light most favorable to Plaintiffs, a reasonable jury could find that by not removing the mask from Silva's face the officers exhibited a conscious or deliberate choice to follow a course of action that meant exposing Silva to the serious risk of being unable to breathe, and therefore, a reasonable trier of fact could conclude that Greer was aware of a substantial risk of serious harm to Silva, absent a reasonable justification for the deprivation in spite of the risk. Thus, a reasonable jury could ultimately conclude that Greer was deliberately indifferent

70

to Silva's serious medical needs. For that reason, the Court concludes that Plaintiffs raise a genuine issue of material fact whether the alleged conduct was deliberately indifferent. Accordingly, the Court **DENIES** the Defendants' motions for summary judgment on Plaintiffs' fifth cause of action.[33]

### D.  MONELL CLAIMS

Plaintiffs bring three claims against the County under *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691 (1978), which provides that municipalities may be liable for unconstitutional acts under § 1983. "A *Monell* claim may be stated under three theories of municipal liability: (1) when official policies or established customs inflict a constitutional injury; (2) when omissions or failures to act amount to a local government policy of deliberate indifference to constitutional rights; or (3) when a local government official with final policy-making authority ratifies a subordinate's unconstitutional conduct." *Rodelo v. City of Tulare*, No. 1:15-cv-1675-KJM-BAM, 2016 WL 561520, at *3 (E.D. Cal. Feb. 12, 2016) (citing *Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232, 1249-50 (9th Cir. 2010)). Plaintiffs assert the County is liable under all three theories. The County moves for summary judgment on the entirety of the claim.

### 1.  <u>Eighth Cause of Action: Municipal Liability—Unconstitutional Policy, Practice, or Custom</u>

A *Monell* claim premised on an allegedly unconstitutional municipal policy requires the plaintiff to establish:

> (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy [was] the moving force behind the constitutional violation.

*Berry v. Baca*, 379 F.3d 764, 767 (9th Cir. 2004) (citations and quotation marks omitted). "A policy can be one of action or inaction," *Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006), and can be formal or informal. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 131 (1988).

---

[33] To the extent that the Defendants argue that they are entitled to qualified immunity on Plaintiffs' substantive due process claims, Defendants generally repeat their arguments from above that these rights were not clearly established. Having already found that these rights were clearly established prior to the subject incident, the Court **DENIES** Defendants motions for summary judgment on the basis of qualified immunity as to Plaintiffs' fifth cause of action.

Plaintiffs do not point to any unconstitutional formal policy[34] that the County expressly adopted and followed as official policy, but they do argue the County had unconstitutional informal policies. An informal policy under *Monell* "exists when a plaintiff can prove the existence of a widespread practice that, although not authorized by an ordinance or an express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Castro v. Cty. of Los Angeles*, 797 F.3d 654, 671 (9th Cir. 2015) (citation and quotation marks omitted), *reh'g granted*, 809 F.3d 536 (9th Cir. 2015). Accordingly, municipal liability for an informal policy must be founded upon practices of sufficient duration, frequency, and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates,* 99 F.3d 911, 918 (9th Cir. 1996) *holding modified on other grounds by Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001).

Plaintiffs' unconstitutional informal policy theory of *Monell* liability is presented in an overly general manner. Distilled, the theory is premised on two things: (1) the County's alleged failure to act after the Silva incident and (2) the County's alleged failure to act with respect to Greer after his involvement in the Lucero incident.

With regard to the first part of their theory, Plaintiffs assert that "the County's cover-up and refusal to take action" after Silva's death demonstrates that the County has an unconstitutional "policy of inaction with respect to in-custody deaths." Doc. 130 at 28. Briefly summarized, Plaintiffs contend that the County's policy of inaction is evidenced by the fact that, after the Silva incident, the County did not: (1) investigate the incident; (2) make official factual findings as to whether the deputies violated policy even though it is customary for in-custody deaths for there to be an investigation that results in findings and determinations as to whether deputies violated policy; (3) question or scrutinize the deputies' accounts of the incident; or (4) re-train, reprimand, or discipline any deputies in any way. *See id.*; *see also id.* at 14-17.[35] Plaintiffs further assert the County's policy of inaction is evidence by its making false statements to the press about its internal

---

[34] "A formal policy exists when a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Castro v. Cty. of Los Angeles*, 797 F.3d 654, 670-71 (9th Cir. 2015) (citation and quotation marks omitted), *reh'g granted*, 809 F.3d 536 (9th Cir. 2015).

[35] The County does not dispute any of these facts.

investigation of the Silva incident, ignoring citizen complaints about the incident, and assisting the deputies "in concocting a false narrative of what happened." *Id.* at 28.

Even assuming the truth of these assertions and that the County has a policy of inaction with respect to in-custody deaths like the one Plaintiffs allege, Plaintiffs do not argue that this policy caused any constitutional injury here, which is fatal to this aspect of their *Monell* claim. "[A] local government may be held liable 'when implementation of its official policies or established customs *inflicts* the constitutional injury.'" *Clouthier*, 591 F.3d at 1249 (quoting *Monell*, 436 U.S. at 708 (emphasis added)).

Plaintiffs' claim is problematic for other reasons. First, it appears internally inconsistent with Plaintiffs' assertion that "[w]hen the County … has an in-custody death, it is customary for there to be an investigation that results in factual findings and determinations as to whether policies were violated." Doc. 130 at 16. This suggests not only that the County has a policy of inaction regarding in-custody deaths, but that its custom of investigating in-custody deaths was not followed in Silva's case. What is more problematic with Plaintiffs' theory, however, is that it falls far short of asserting (much less establishing) that the County had a widespread or longstanding policy/custom of inaction. Again assuming the County's post-incident conduct in this case was unconstitutional and occurred according to Plaintiffs' account, there is no evidence that the County has acted similarly in other cases of in-custody deaths. Plaintiffs have not provided any evidence that could support a finding that the County's alleged policy of inaction exists on such a pervasive basis that it could be found to constitute a County policy. Accordingly, the Court **GRANTS** the County's motion for summary judgment on this aspect of Plaintiffs' *Monell* claims.

### 2. Sixth Cause of Action: Municipal Liability—Policy of Inaction/Inadequate Training

With regard to the County's alleged failure to act with respect to Greer, it is undisputed that: (1) in 2010, Greer was involved with an in-custody death of an individual, Jose Lucero; (2) Greer struck Lucero 15 times with his baton during the incident; (3) a jury returned a verdict for Lucero; and (4) Greer was not disciplined or re-trained following the incident or the lawsuit. *Id.* at 29.[36]

---

[36] Plaintiffs contend the jury found Greer had used excessive force in the Lucero case, which the County disputes. *See* Doc. 141 at 10.

Plaintiffs argue the County had a policy of not doing anything after an in-custody death, including Lucero's, and that policy ultimately led to Silva's death. *Id.* at 29-30. Plaintiffs further argue that Silva's chances of surviving the encounter with the County's deputies would have been better had Greer been disciplined or terminated for the Lucero incident or had received training on how to avoid in-custody deaths after the incident. *Id.* at 29.

The Court has observed that "[t]he line between 'isolated or sporadic incidents' and 'persistent and widespread conduct' is not clearly delineated." *Warkentine v. Soria*, No. 1:13-CV-1550-LJO-MJS, 2014 WL 2093656, at *6 (E.D. Cal. May 19, 2014). However, in *Meehan v. Cty. of Los Angeles*, the Ninth Circuit held that "[p]roof of [two] unconstitutional assaults" by county officers separated by three months, "standing alone, does not support a finding of liability against the County." 856 F.2d 102, 107 (9th Cir. 1988) (citations omitted). Although Plaintiffs do not cite to any evidence that Greer used excessive force in the Lucero case,[37] even assuming he had done so, it appears that two incidents are not sufficient to establish a custom for *Monell* liability.[38] *See Trevino*, 99 F.3d at 918 (describing *Meehan* as holding that "two incidents not sufficient to establish custom"); *accord Bradford v. City of Seattle*, 557 F. Supp. 2d 1189, 1203 (W.D. Wash. 2008) (holding one or two incidents of unconstitutional conduct is insufficient to survive summary judgment on a *Monell* custom/practice claim).

Plaintiffs state, without any explanation, that the Lucero incident was "part of a string of other recent in-custody deaths." Doc. 130 at 29. To support this assertion, Plaintiffs point to the declaration of their expert, Scott DeFoe, who states that "Plaintiffs' *complaint* in this case contains a list of [three] other in-custody deaths." *Id.* (citing DeFoe Decl. at ¶ 10(g) (emphasis added). DeFoe then summarizes the cases in one or two sentences. *See* DeFoe Decl. at ¶ 10(g). There is no

---

[37] Although Greer, along with at least three other officers, was involved in the Lucero incident and a jury returned a verdict in favor of Lucero, Plaintiffs do not cite to any evidence that supports their assertion that the jury found Greer used excessive force on Lucero. The only evidence Plaintiffs point to in support is Greer's testimony, *see* Doc. 130 at 29 (citing Greer Dep. at 58:10-24); however, when asked whether the jury found that he had used excessive force, Greer testified that he was not aware of any such finding. *See* Greer Dep. at 58:25-59:8.

[38] Two incidents of unconstitutional conduct may be sufficient for *Monell* liability if there is evidence that the incidents occurred pursuant to an existing formal policy that was officially adopted and implemented by official municipal policymakers. *See City of Oklahoma v. Tuttle*, 471 U.S. 808, 823-23 (1985). Plaintiffs, however, do not argue Defendants acted according to any formal policy.

indication that DeFoe had personal knowledge of the facts of those cases beyond what the SAC alleged. The SAC is not evidence.

Even assuming the SAC's allegations of three in-custody deaths or DeFoe's citing to them were admissible and competent evidence at this stage in the litigation, Plaintiffs do not explain how the deaths, or the officers' actions that allegedly caused the deaths, are similar to the facts of this case. For this string of in-custody deaths to be evidence supportive of a *Monell* claim, Plaintiffs must demonstrate that they constitute "a pattern of *similar incidents* in order for the factfinder to conclude that the alleged informal policy was so permanent and well settled as to carry the force of law." *Castro*, 797 F.3d at 671 (emphasis in original). The deaths are described at such a level of generality that the Court cannot assess whether they are similar beyond their being in-custody deaths, which is insufficient to support a *Monell* custom/practice claim. *See Trevino*, 99 F.3d at 918 (*Monell* claim for unconstitutional custom/practice requires "consistency" between unconstitutional acts); *see also Gregoire v. Cnty. of Sacramento*, No. 2:13-cv-1857-TLN-DAD, 2016 WL 304614, at *8 (E.D. Cal. Jan. 26, 2016) (holding that multiple cases of K-9 use did not establish custom because cases were not factually analogous). Likewise, there is insufficient evidence concerning the Lucero incident for any meaningful comparison between that incident and this case.

Finally, to the extent Plaintiffs argue the County is subject to *Monell* liability for failing to train Greer after the Lucero incident, the Court disagrees. A municipality may be liable for its failure to train only when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390. Plaintiffs argue in a wholly conclusory fashion without any evidentiary support that it is more likely that Silva would have survived his encounter with the deputies had Greer been re-trained after the Lucero incident. *See* Doc. 130 at 29. There is no record evidence, however, that (1) the need to retrain Greer was obvious; (2) the failure to do so was likely to cause further constitutional violations; (3) County policymakers were aware of any deficiencies in Greer's training and deliberately decided not to re-train him; or (4) had Greer been re-trained, Silva would have survived or otherwise fared better.

In sum, Plaintiffs have failed to provide evidence that could support a finding of an unconstitutional custom, policy, or practice of inaction that caused Silva's death or otherwise violated his or Plaintiffs' constitutional rights. Accordingly, the Court **GRANTS** the County's motion for summary judgment on Plaintiffs' sixth and eighth causes of action for *Monell* liability.

### 3.   Seventh Cause of Action: Municipal Liability—Ratification

Finally, Plaintiffs contend the County is liable because it ratified the deputies' unconstitutional conduct. Doc. 130 at 30. A municipality may be liable under *Monell* for the unconstitutional conduct of its employees when a municipal official with final policymaking authority knows of the constitutional violation and approves it. *See Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004); *Praprotnik*, 485 U.S. at 127. "There must, however, be evidence of a conscious, affirmative choice on the part of the authorized policymaker." *Clouthier*, 591 F.3d at 1250 (citation and quotation marks omitted). "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Praprotnik*, 485 U.S. at 127.

The County moves for summary judgment on this *Monell* claim, arguing that the County never ratified its deputies' conduct because "no official determination has been made with respect to [their] conduct." Doc. 125 at 25. Plaintiffs counter only by stating that Greer testified that he was told that his conduct was within County policy. *See* Doc. 130 at 30.

Plaintiffs do not cite to any portion of Greer's testimony to support this contention. The only seemingly relevant aspect of his testimony that the Court can locate, however, does not support Plaintiffs' position. When asked whether anyone had discussed his conduct in the *Lucero* incident with him, Greer testified that he was told that he "was well within policy and procedures of the Kern County Sheriff's Department." Greer Dep. at 59:9-19. When asked whether anyone had discussed his conduct in the Silva incident with him, however, Greer testified that he had not spoken to anyone about it. *See id.* at 61:1-7.

Simply put, Plaintiffs have not provided any evidence that suggests the County ratified the deputies' conduct. Accordingly, the Court GRANTS the County's motion for summary judgment on Plaintiffs' seventh cause of action for *Monell* liability.

## II.    STATE LAW CLAIMS

In addition to Section 1983 claims, Plaintiffs raise state law claims for battery (fourth cause of action), negligence and wrongful death (fifth cause of action), negligent infliction of emotional distress (sixth cause of action), and violation of California's Bane Act (California Civil Code § 52.1) (seventh cause of action). Defendants move for summary judgment.

### A.  <u>Ninth Cause of Action: Battery</u>

Defendants move for summary judgment on Plaintiffs' survival action brought by Plaintiffs for state law battery based on the fatal shooting. *See* Doc. 78; SAC. State law claims for battery are coextensive with claims for excessive force under the Fourth Amendment. *See Sanders v. City of Fresno,* 551 F. Supp. 2d 1149, 1179 (E.D. Cal. 2008) *aff'd,* 340 F. App'x 377 (9th Cir. 2009) (citing *Munoz v. City of Union City,* 120 Cal. App. 4th 1077, 1102 n. 6 (2004); *Susag v. City of Lake Forest,* 94 Cal. App. 4th 1401, 1412-13 (2002); *Edson v. City of Anaheim,* 63 Cal. App.4th 1269, 1274 (1998)).

As Plaintiffs' fourth cause of action for battery is the counterpart of the federal claim for excessive force, Defendants Kelly, Sword, Almanza, Brock, Stephens, Miller, Phillips, and Bright's summary judgment motions relative to the state law battery claim fails, and Greer's succeeds, for the same reason. *See Young,* 655 F.3d at 1170 (holding that "the Fourth Amendment violation alleged by [plaintiff] also suffices to establish the breach of a duty of care under California law"); *Brown v. Ransweiler,* 171 Cal. App. 4th 516, 527 (2009) ("A state law battery claim is a counterpart to a federal claim of excessive use of force. In both, a plaintiff must prove that the peace officer's use of force was unreasonable."). Accordingly, the Court **DENIES** Defendants Kelly, Sword, Almanza, Brock, Stephens, Miller, Phillips, and Bright's motions and **GRANTS** Defendant Greer's motion for summary judgment on Plaintiffs' ninth cause of action.

### B.  <u>Tenth Cause of Action: Negligence—Wrongful Death</u>

Defendants move for summary judgment on Plaintiffs' negligence claim for wrongful death, which arises under Cal. Civ. Proc. Code § 377.60, "which is simply the statutorily created right of an heir to recover for damages resulting from a tortious act which results in the decedent's death," *Gilmore v. Superior Court,* 230 Cal. App.3d 416, 420 (1991) (citations omitted). Defendants again

argue that because Plaintiffs' §1983 claims fail in the first instance, Plaintiffs' negligence claims should likewise fail. However, Defendants' argument fails because the Court, *supra*, decided that genuine issues of material persist for trial on Plaintiffs' § 1983 claims.

Thus, the Court turns to the merits of the tenth cause of action. In order to show negligence, a plaintiff must establish "(1) a legal duty to use due care; (2) a breach of that duty; and (3) injury that was proximately caused by the breach." *Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1164 (N.D. Cal. 2009) (citing *Ladd v. Cty. of San Mateo*, 12 Cal. 4th 913, 917 (1996)). Under California law, "police officers have a duty not to use excessive force." *Id.* (citing *Munoz v. City of Union City,* 120 Cal. App. 4th 1077, 1101 (2004)).

"The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs." *Quiroz v. Seventh Ave. Center,* 140 Cal. App. 4th 1256, 1264 (Cal. Ct. App. 2006). The California Supreme Court has held that "an officer's lack of due care can give rise to negligence liability for the intentional shooting death of a suspect." *Munoz v. Olin,* 24 Cal.3d 629, 634 (1979) (citing *Grudt v. City of Los Angeles,* 2 Cal.3d 575, 587 (1970)). To succeed in this claim, a plaintiff must show that the officer violated his "duty to use reasonable force under the totality of the circumstances." *See Brown v. Ransweiler,* 171 Cal.App. 4th 516, 526 n.10 (2009). Indeed, rather than mirroring the federal standards, California's negligence law "is broader than federal Fourth Amendment law," in that "[l]aw enforcement personnel's tactical conduct and decisions preceding the use of deadly force are relevant considerations under California law in determining whether the use of deadly force gives rise to negligence liability." *Hayes v. Cty. of San Diego*, 57 Cal.4th 622, 639 (2013); *see also Chien Van Bui,* 61 F. Supp. 3d at 903 ("where the officer's [pre-force] conduct did not cause the plaintiff any injury independent of the injury resulting from the shooting, the officer's [pre-force] conduct is properly 'included in the totality of circumstances surrounding [his] use of deadly force.'") (quoting *Hayes,* 57 Cal.4th at 632).

At bottom, Defendants' conclusory argument asserts the reasonableness of the officers' conduct. While Defendants are correct that this claim swings on the reasonableness determination, it is one which the Court is precluded at this stage from making because genuine issues of material

fact persist. As the Court found above in its discussion of Plaintiffs' excessive force causes of action (the first through third), Defendant Greer is exposed to liability under two theories of excessive force (integral participation and failure to intervene), and Defendants Kelly, Sword, Almanza, Brock, Stephens, Miller, Phillips, and Bright are exposed to liability on all three (excessive force, integral participation, failure to intervene). This is relevant to the instant claim because the same issues of genuine issues of material fact preclude summary judgment on Plaintiffs' tenth cause of action. *See Hayes*, 57 Cal.4th at 639 (finding California law broader than federal Fourth Amendment protections). Accordingly, the Court **DENIES** the instant motions as to Plaintiffs' tenth cause of action.

## C. Eleventh Cause of Action: California Civil Code 52.1

Plaintiffs' final cause of action arises under California Civil Code section 52.1 ("the Bane Act"). The Bane Act authorizes individual civil actions for damages and injunctive relief by individuals whose federal or state rights have been interfered with by threats, intimidation, or coercion. *See* Cal. Civ. Code § 52.1(a) (proscribing interference "by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state ..."); *see also Jones v. Kmart Corp.,* 17 Cal.4th 329, 338 (1998) (California Supreme Court equates "interferes" with "violates"). First, Defendants argue that the force used was reasonable. Defendants also contend that Plaintiffs offer no evidence that Defendants interfered with or attempted to interfere with Silva's constitutional rights by threatening or committing violent acts. Defendants argue that Plaintiffs' claim omits the requisite showing of coercion separate from the alleged violative conduct. *See id.* (citing *Shoyoye v. County of Los Angeles,* 203 Cal. App. 4th 947 (2012)).

Contrary to Defendants' assertion, this Court has found that if a plaintiff makes factual allegations showing a constitutional violation based on excessive force, a plaintiff need not, in addition, introduce independent evidence showing threats, intimidation, or coercion. *See, e.g.*, *Rodriguez v. City of Modesto* No. 1:10-CV-01370-LJO, 2015 WL 1565354, at *22 (E.D. Cal. Apr. 8, 2015) (citing *Akey v. Placer Cty., Cal.*, No. 2:14-CV-02402-KJM, 2015 WL 1291436, at *10

(E.D. Cal. Mar. 20, 2015)); *Johnson v. Shasta Cnty.* No. 14-01338-KJM-EFB, 2015 WL 75245, at *13 (E.D. Cal. Jan. 6, 2015) ("Where Fourth Amendment unreasonable seizure or excessive force claims are raised and intentional conduct is at issue, there is no need for a plaintiff to allege a showing of coercion independent from the coercion inherent in the seizure or use of force.") (quoting *Dillman v. Tuolumne Cty.* No. 13-CV-00404-LJO, 2013 WL 1907379, at *21 (E.D. Cal. May 7, 2013)); *see also Sangraal v. City & Cty. of San Francisco,* 2013 WL 3187384, at *9 (N.D. Cal. June 21, 2013).

Considering Plaintiffs' factual allegations of Defendants Kelly, Sword, Almanza, Brock, Stephens, Miller, Greer, Phillips, and Bright's conduct, the Court found, *supra*, that Plaintiffs present triable issues of fact on their excessive force claims; that the parties dispute whether Silva presented an immediate threat to officers; and, whether the officers provoked the violent confrontation. The resolution of these genuine issues of material facts impact the resolution of the eleventh cause of action and result in the same outcome. As resolution of the disputed facts calls for a measure of fact-finding, summary judgment is inappropriate. Accordingly, the Court **DENIES** the Defendants instant motions for summary judgment as to Plaintiffs' eleventh cause of action.

## III.   CONCLUSION AND ORDER

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendants' Motions for Summary Judgment (Docs. 122, 124, and 125) are **GRANTED IN PART** and **DENIED IN PART**, as specifically set forth above.


IT IS SO ORDERED.

Dated:   __**March 8, 2016**__               ____/s/ Lawrence J. O'Neill____
                                             UNITED STATES DISTRICT JUDGE