LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq. (SBN 144074)
dalekgalipo@yahoo.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Telephone: (818) 347-3333
Facsimile: (818) 347-4118

CHAIN | COHN | STILES
David K. Cohn, Esq., SBN 68768 | dcohn@chainlaw.com
Neil K. Gehlawat, Esq., SBN 289388 | ngehlawat@chainlaw.com
1371 Chester Avenue
Bakersfield, CA 93301
Telephone: (661) 323-4000 | (661) 324-1352

*Attorneys for Plaintiffs M.L.S., C.J.S., C.R.S., and E.Z.S., minors, by and through their guardian ad litem, Judy Silva, in each case individually and as successor in interest to David Silva, deceased; MERRI SILVA, and SALVADOR SILVA*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TARA GARLICK, individually; M.L.S., C.J.S., C.R.S., and E.Z.S., minors, by and through their guardian *ad litem*, Judy Silva, in each case individually and as successors in interest to David Silva, deceased; J.S., individually and as successor in interest to David Silva, by and through her guardian *ad litem* Adriane Dominguez; MERRI SILVA, individually; and SALVADOR SILVA, individually,<br><br>      Plaintiffs,<br>vs.<br><br>COUNTY OF KERN, a municipality; DONNY YOUNGBLOOD, an individual; DOUGLAS SWORD, an individual; RYAN GREER, an individual; TANNER MILLER, an individual; JEFFREY KELLY, an individual; LUIS ALMANZA, an individual; BRIAN BROCK, an individual; DAVID STEPHENS, an individual; MICHAEL PHILLIPS, an individual, MICHAEL BRIGHT, an individual; DOES 1-10, inclusive;<br><br>      Defendants;<br>and consolidated action. | Lead Case No.1:13-CV-01051-LJO-JLT<br><br>**NOTICE OF MOTION AND MOTION IN LIMINE #5 TO EXCLUDE DEFENSE EXPERTS STEVEN KARCH, M.D., THEODORE CHAN, M.D., AND FRANK SHERIDAN, M.D., BY PLAINTIFFS M.L.S., C.J.S., C.R.S., E.Z.S., MERRI SILVA, AND CHRIS SILVA**<br><br>Date: April 25, 2016<br>Time: 1:30 p.m.<br>Courtroom: 4 (LJO)<br><br>Action Filed: July 8, 2013<br>Trial Date: May 12, 2016 |

1  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2      PLEASE TAKE NOTICE THAT Plaintiffs M.L.S., C.J.S., C.R.S., E.Z.S.,
3  Merri Silva, and Chris Silva (for the purposes of this motion, "Plaintiffs") hereby
4  move *in limine* for an order excluding the testimony of three defense experts,
5  namely Dr. Theodore Chan, Dr. Frank Sheridan, and Dr. Steven Karch.

6      Plaintiffs contend that the opinions of these experts in this case are "junky."
7  *See*, *generally*, *Kumho Tire Co., Ltd v. Carmichael*, 526 U.S. 137, 159 (1999)
8  (Scalia, J., concurring). While Plaintiffs do request a formal *Daubert* hearing to
9  determine the admissibility of the disputed experts' opinions, Plaintiffs submit that
10 the instant motion should be granted without such a hearing. *See United States v.*
11 *Alatorre*, 222 F.3d 1098 (9th Cir. 2000) (trial courts are not compelled to conduct
12 pretrial hearings in order to discharge the gatekeeping function under *Daubert* as to
13 expert testimony).

14     This Motion is based on this Notice of Motion, the Memorandum of Points
15 and Authorities, the attached declaration and exhibits, the records and files of this
16 Court, and upon such other oral and documentary evidence as may be presented at
17 the time of the hearing. A proposed order is submitted herewith.

18     Respectfully Submitted,

19 Dated:    March 25, 2016        CHAIN | COHN | STILES

                                                    /s/
                                                    _____
                                                    David K. Cohn
                                                    Neil K. Gehlawat
                                                    *Attorneys for Plaintiffs M.L.S., C.J.S.,*
                                                    *C.R.S., and E.Z.S. by and through their*
                                                    *guardian ad litem Judy Silva; MERRI*
                                                    *SILVA;*

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

This case arises from the in-custody death of David Silva. The Plaintiffs, David Silva's family members, contend that the individual defendants used excessive force in violation of David Silva's constitutional rights.

Defendants have retained three expert witnesses whose opinions are that during the encounter with the individual defendants (in which Silva was struck with batons, bitten by a dog, restrained, hogtied, and compressed for as long as 10 minutes with multiple defendants' weight on his back) he spontaneously died of unrelated or natural causes. Plaintiff contends that these opinions are "junky." *See*, *generally, Kumho Tire Co., Ltd v. Carmichael*, 526 U.S. 137, 159 (1999) (Scalia, J., concurring).

This motion in limine targets the opinions of these experts under *Daubert* principles and contends that they should not be permitted to testify at trial. The three disputed experts are: Dr. Theodore Chan, Dr. Frank Sheridan, and Dr. Steven Karch. Plaintiffs' rationales are more fully set forth below.

## II. LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The district court has a "gatekeeping role" to screen expert testimony and judges have discretion to determine whether such testimony is admissible, depending on its reliability and relevance. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-97 (1993); *Kumho Tire Co., Ltd. v. Carmichael*,

526 U.S. 137, 147 (1999). "[T]he law grants the [court] broad latitude" in analyzing and determining the reliability of proffered expert witness testimony. *Kumho*, 526 U.S. at 139, 142. "The inquiry [under Rule 702] is a flexible one[,]" and its focus "must be solely on principles and methodology, not on the conclusions [the expert] generate[s]." *Daubert*, 509 U.S. at 594-95. Reliability is determined by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid," whereas relevance depends upon "whether [that] reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–593. The *Daubert* court set forth four non-exclusive factors to aid in the determination of whether an expert's methodology is reliable: (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community. *Id.* at 593-94. This is a flexible test, however, and these enunciated factors do not constitute a "definitive checklist or test," but must be tailored to the facts of a particular case. *Kumho*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 593).

**III.   ANALYSIS**

   **A.   Dr. Chan**

Dr. Chan is an expert witness that specializes in "refuting" or "disproving" the concept of restraint asphyxia, and in specifically cases where people are alleged to have been asphyxiated while being forcefully restrained by law enforcement. He has testified in around 25 cases involving alleged restraint asphyxia, most of which involved death. Chan Dep., 19:3-5. However, he has never testified that restraint asphyxia was the cause of death. Chan Dep., 19:11-14.

Dr. Chan does not "believe Mr. Silva's death was caused by positional or restraint asphyxia as a result of his prone or hobble restraint position or the application of the restraint." Chan Dep., 23:8-11. Instead, Dr. Chan believes that

Silva "died from a sudden cardiac arrest." Chan Dep., 26:5-6. This opinion, like the opinions of the other two disputed experts, is supposed to absolve the individual defendants of responsibility in this case, since according to Chan, Silva spontaneously died of unrelated causes during his encounter with the police. Plaintiffs contend that this is nothing more than an attempt to bewilder and confuse the jury in this case with pseudo-science.

Plaintiffs contend that, under the *Daubert* analysis, Dr. Chan's "cardiac arrest" theory is utterly unscientific, since as a matter of fact restraint asphyxiation involves cardiac arrest. Specifically, Dr. Chan admits that stress can cause a cardiac arrest. Chan Dep., 25:18-25. This is because physical and psychological stress can increase catecholamines, which in turn can cause a disturbance in the heart that can result in cardiac arrest. Chan Dep., 27:11-19. He admits that Silva's statement during the beating, "help," which was heard by bystanders, may be an indication of psychological stress. Chan Dep., 38:4-12. He admitted that Silva was prone and chest down with weight on his back during the struggle. Chan Dep., 39:12-19. Finally, he admitted that asphyxiation itself (as in the example of someone drowning) would result in reduced oxygen levels in the blood, which in turn could cause a cardiac arrest. Chan Dep., 92:14-93:3. Thus, Chan's "cardiac arrest" theory turns out to be a red herring.

Another of Dr. Chan's opinions "refuting" the diagnosis of restraint asphyxia is the absence of observable petechial hemorrhages after Silva passed away. (A petechial hemorrhage is a tiny pinpoint red mark on the body.) Dr. Chan claims that petechial hemorrhages are correlated with asphyxia, and he claims that studies have shown this correlation, but he admits that there was no margin of error on the studies

1  he referenced. Chan Dep., 51:15-18. [1]

2  Dr. Chan has been involved in a number of studies that purport to disprove that restraint asphyxia happens, and these studies should also be excluded at trial in this case. As a preliminary matter, none of his studies involved spit masks (or spit masks filled with vomit) being placed over the heads of the test subjects. Chan Dep., 51:15-18. Nor were dogs used to bite the test subjects during the experiments. Chan Dep., 51:15-18. It goes without saying that test subjects were not beaten with batons by groups of participants in the study, with the participants swinging the batons as hard as they could.[2]

As for Dr. Chan's studies themselves, they were funded by the City of San Diego, and the funding was arranged by San Diego city attorney Ricky R. Sanchez while the city was confronting at least one lawsuit based on restraint asphyxia. Chan Dep., 67:9-68:21. The Ninth Circuit has urged courts in this district to consider, as part of the *Daubert* analysis, whether an expert's proposed theory and conclusions were developed for the purposes of litigation or whether they grew out of scientific pursuits wholly unrelated to litigation.

> "One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying. That an expert testifies for money does not necessarily cast doubt on the reliability of his testimony, as few experts appear in court merely as an eleemosynary gesture. But in determining whether proposed expert testimony amounts to good science, we may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office."

---

[1] None of the experts that are the subject of this motion could point to a peer-reviewed scientific study that showed that petechial hemorrhages and asphyxiation were observed together 100 percent of the time.

[2] Indeed, Plaintiffs contend that any studies that attempted to replicate the circumstances of this case would be illegal and violate the Nuremberg Code, since the test subjects would likely asphyxiate and die.

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995). Plaintiffs contend that Dr. Chan's studies are an example of "the best scientific results money can buy." The studies have been prepared for a tendentious and one-sided purpose, namely to confuse jurors in civil rights cases against police departments. They should not be admitted in this case.

In Dr. Chan's first study, obese people were excluded as test subjects. Chan Dep., 63:24-64:1. Presumably, this is because they would have asphyxiated during the experiment.

In fact, the data from that first study – which did not involve any weight on a test subjects' back – showed dramatic decreases in multiple indexes that attempted to measure whether the person was able to breathe. According to the study, the subjects could breathe at a rate of 165.0 liters of air per minute in a sitting position, and that number went down to 131.1 in a prone and restrained position. Chan Dep., 71:12-20. The study saw a 23 percent impairment of breathing for people in a prone restrained position versus a sitting position (without weight on the back). Chan Dep., 72:3-6.  Dr. Chan agreed that this represented a change in this index from the sitting to the prone position. He also agreed that there was a 14 percent reduction in a measure of a person's ability to forcefully exhale air. Chan Dep., 73:8-22.

Plaintiffs contend that Dr. Chan does not even apply the scientific principles in his own studies to the facts of this case, and he deliberately misinterprets his own data to skew it in favor of police officers accused of killing individuals with improper restraints. Dr. Chan conducted another study in which a person's ability to breathe, as measured in terms of volume of air over time, dropped by 44 percent in a study in which the person was exercised and weight was applied to the person's back, as applied to a baseline resting position. Chan Dep.,  86:10-19.

The first study concluded with the caveat, "This study did not attempt to duplicate exact field conditions under which restraint positional deaths have

1  occurred." Chan Dep., 76:5-12. The study also noted that it did "not attempt to
2  reproduce the effects of trauma and psychological stress." Chan Dep., 79:11-15.
3  Finally, the study noted, "It is possible that a combination of factors, including
4  underlying medical condition, intoxication, agitation, delirium, and struggle as well
5  as body position, may result in respiratory compromise that would not be detected
6  by our study." Chan Dep., 79:16-23. The actual conclusion of the study was only the
7  modest statement that a person cannot asphyxiate as "a direct result of body restraint
8  position in the healthy, awake, non-intoxicated individuals with normal
9  cardiopulmonary function." Chan Dep.,  81:6-15. Plaintiffs contend that an honest
10 application of that science to this case yields the conclusion that restraint asphyxia
11 cannot be ruled out in this case, since the studies do not describe the situation in this
12 case.
13     Dr. Chan also admitted that "trauma from struggle," "physiologic stress," and
14 "catecholamine stimulation," among other factors, may play a role in deaths
15 attributed to restraint asphyxia. Chan Dep., 87:20-25. Thus, Plaintiffs contend that
16 with respect to Dr. Chan's opinions, it is not correct that "the expert has reliably
17 applied the principles and methods to the facts of the case." Rule 702. Plaintiffs
18 contend that, based on the above, Dr. Chan's opinions would not be helpful to the
19 jury in this case and they should be excluded.
20     **B.     Dr. Sheridan**
21     Plaintiffs submit that Dr. Sheridan represents an expert correctly stating in
22 some ways the principles applicable within his field, but then mis-applying these
23 principles to the facts of this case.
24     Dr. Sheridan admits that people can die from weight applied to their back.
25 Sheridan Dep., 27:21-23. In fact, he has testified when retained by plaintiffs in civil
26 rights cases that the cause of death was restraint asphyxia. Sheridan Dep., 28:5-9. In
27 such cases, "compression of the chest is the essential point, to the point where the
28 person cannot breathe properly." Sheridan Dep., 29:23-25. Dr. Sheridan defined

"compressional asphyxia" as a situation "where there's oxygen in the air, the nose and mouth are open, the airway's open, but the person is unable to breathe because of excessive pressure on their chest." Sheridan Dep., 51:1-5. Compression asphyxia "could occur if there's weight applied to the back, and the person is chest down." Sheridan Dep., 54:11-13. Dr. Sheridan agreed that this phenomenon is well documented in essential treatises. Sheridan Dep., 56:3-22. Plaintiffs generally agree with this description of the basic principles of restraint asphyxia.

Cases of asphyxia, Dr. Sheridan admitted, "are not typically associated with petechial hemorrhages. Sheridan Dep., 57:5-16 (contradicting Dr. Chan, above). Dr. Sheridan admitted that he has seen autopsy reports where the medical examiner "found death by compressional asphyxia when there were no petechial hemorrhages." Sheridan Dep., 62:15-17

However, in this case, Dr. Sheridan claims that it is not possible to diagnose compressional asphyxia without petechial hemorrhages. Sheridan Dep., 67:7-68:6. Plaintiffs submit that this is the same scientific error committed by Dr. Chan, above, since there is no medical literature that suggests that these two phenomena are correlated 100 percent, such that one cannot occur without the other and vice versa.

In general, in order to reach his opinion that restraint asphyxia was not involved in Silva's death, Dr. Sheridan ignores facts and deposition testimony to help put together his one-sided factual narrative. He claims, "I never saw any indication that anybody, at any time, was actually right on top of the decedent with their body weight on the chest." Sheridan Dep., 114:11-14. In terms of body weight on the decedent, he claimed, he saw in the record "certainly nothing that struck me as significant" in terms of weight on the decedent's back. Sheridan Dep., 114:21-115:2. Plaintiffs submit that Sheridan is basing his opinions on a hypothetical scenario that does not correspond to anything resembling the actual facts of this case. Even the officers themselves admit that they put weight on Silva's back while he was chest down. For example, citing Defendant Bright's deposition, the Court

denying the summary judgment motion noted that "Almanza had his knee on Silva's back and was using body weight to hold him down." Doc. No. 157, at *15. Citing the testimony of Defendants Sword and Kelly, the Court further noted, "other testimony supports that Brock was laying on Silva's back." *Id.* at *15. Citing Defendant Bright's testimony, the Court noted that "Silva was chest-down on the ground when deputies were on top of him." *Id*. Dr. Sheridan's tendentious failure to notice anywhere in the record that Silva was chest down with weight on his back militates against admitting his testimony under *Daubert* principles.

In sum, Plaintiffs contend that it cannot be said of Dr. Sheridan that "the expert has reliably applied the principles and methods to the facts of the case." Rule 702. Accordingly, his testimony should not be admitted.[3]

**C.     Dr. Karch**

Dr. Steven B. Karch has been retained in 79 cases where the cause of death was alleged to be restraint asphyxia. Karch Dep., 8:8-14. Dr. Karch's opinion is that there is "no way to diagnosis [sic] asphyxia post mortem," and he does not "believe in" restraint asphyxia. Karch Dep., 29:8-17. He has reviewed 100 autopsies where medical examiners attributed death to restraint asphyxia, and he disagrees with each one. Karch Dep., 30:15-24. Plaintiffs contend that his proposed opinions are further examples of the same problems as the opinions of Dr. Sheridan and Dr. Chan. There is little that is scientific or helpful about the way the relevant medical science has been purportedly applied to the facts of this case.

Dr. Karch purports to rule out restraint asphyxia based on the supposed absence of observable petechiae in the bodies of people who are alleged to have

---

[3] Sheridan also has improper and inadmissible testimony regarding the credibility of witnesses and about "what happened" in this case, such as the following: "The testimony of the officers in subsequent depositions was also consistent with their original statements." Sheridan Dep., 116:13-15.

asphyxiated, but he admitted that "the medical literature says one can die of asphyxia without having petechiae." Karch Dep., 31:14-16. Indeed, no peer-reviewed medical literature indicates that the absence of observable petechiae equals no restraint asphyxia. Karch Dep., 32:18-25. This concession undermines his purported opinion that restraint asphyxia was not involved in Silva's death in this case.

Dr. Karch has not reviewed any medical records in this case. Karch Dep., 12:16-23. Nor has he reviewed any of the statements or depositions of the involved officers. Karch Dep., Karch Dep., 20:22-21:2. Nevertheless, Dr. Karch believes that the cause of Silva's death was not the beating or the pile of officers on Silva's back causing him to asphyxiate. Karch Dep., 50:7-10. His opinion is that Silva died of an unrelated heart attack or a pre-existing abnormality in his heart. Karch Dep., 14:6-7 (heart attack caused by "some other genetic mutation"); Karch Dep., 38:12-25 (heart attack was "triggered by high levels of catecholamines"). The "high levels of catecholamines" theory is essentially the same theory as Dr. Chan, discussed above. and suffers from the same error. Since being beaten and asphyxiated can result in elevated levels of catecholamines, this theory does not help the jury understand anything.

An expert's "bald assurance of validity is not enough. Rather, the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology." *Sanderson v. Int'l Flavors & Fragrances, Inc.*, 950 F. Supp. 981, 993-94 (C.D. Cal. 1996) (citing *Daubert*). Since in this case there is no scientific, forensic, medical, or other evidence that Silva died from any cause other than his encounter with law enforcement, these opinions designed to confuse and mislead the jury should be excluded.

**IV.   CONCLUSION**

1 Expert testimony " 'can be both powerful and quite misleading because of the difficulty in evaluating it.' " *Daubert,* 509 U.S. at 595, 113 S.Ct. at 2797 (quoting Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound: It Should Not Be Amended,* 138 F.R.D. 631, 632 (1991)). Therefore, a federal judge should exclude scientific expert testimony unless it meets the threshold set by *Daubert* and FED.R.EVID. 702.  *See Daubert,* 43 F.3d at 1321 n. 17; *Jones v. United States*, 933 F. Supp. 894, 900 (N.D. Cal. 1996) aff'd, 127 F.3d 1154 (9th Cir. 1997).  Specifically, the "subject of an expert's testimony must be 'scientific . . . knowledge.' The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 589-90 (citations omitted).  "[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method." *Id.*

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this motion in limine. The three disputed experts should not be permitted to testify. While Plaintiffs do request a formal *Daubert* hearing to determine the admissibility the disputed experts' opinions, Plaintiffs submit that the instant motion should be granted without such a hearing. *See United States v. Alatorre*, 222 F.3d 1098 (9th Cir. 2000) (trial courts are not compelled to conduct pretrial hearings in order to discharge the gatekeeping function under *Daubert* as to expert testimony).

Respectfully Submitted,

Dated: March 25, 2016

CHAIN | COHN | STILES
/s/
David K. Cohn
Neil K. Gehlawat
*Attorneys for Plaintiffs M.L.S., C.J.S., C.R.S., and E.Z.S. by and through their guardian ad litem Judy Silva; MERRI SILVA;*

-12-
MOTION IN LIMINE NO. 5
BY PLAINTIFFS M.L.S.. C.J.S.. C.R.S.. E.Z.S.. MERRI SILVA. AND CHRIS SILVA