# EXHIBIT "B"

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF CALIFORNIA

3                              - - -

4    TARA GARLICK, individually,     )
     et al.,                         )
5                                    )
                  Plaintiffs,         )
6                                    )
         vs.                         ) Case No: CV 13-010510
7                                    )          LJO-(JLTx)
     COUNTY OF KERN, a municipality; )
8    DONNY YOUNGBLOOD, an individual;)
     DOUGLAS SWORD, an individual;   )
9    RYAN GREER, an individual;      )
     TANNER MILLER, an individual;   )
10   JEFFREY KELLY, an individual;   )
     LUIS ALMANZA, an individual;    )
11   BRIAN BROCK, an individual;     )
     DAVID STEPHENS, an individual;  )
12   MICHAEL PHILLIPS, an individual;)
     MICHAEL BRIGHT, an individual;  )
13   DOES 1-10, inclusive;          )
                                     )
14              Defendants.          )
                                     )
15   and consolidated action.        )
     _____)

16

17                        DEPOSITION

18                    THEODORE C. CHAN, M.D.

19                    San Diego, California

20                    October 16, 2015

21

22          ATKINSON-BAKER, INC.
            COURT REPORTERS
23          (800) 288-3376
            www.depo.com

24
            REPORTED BY:  SUZANNE M. SOPER, CSR NO. 8120
25          FILE NO.:  A90AB3C

1                    UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF CALIFORNIA

3                            - - -

4     TARA GARLICK, individually,      )
      et al.,                          )
5                                      )
                 Plaintiffs,           )
6                                      )
          vs.                          ) Case No: CV 13-010510
7                                      )          LJO-(JLTx)
      COUNTY OF KERN, a municipality; )
8     DONNY YOUNGBLOOD, an individual;)
      DOUGLAS SWORD, an individual;    )
9     RYAN GREER, an individual;       )
      TANNER MILLER, an individual;    )
10    JEFFREY KELLY, an individual;    )
      LUIS ALMANZA, an individual;     )
11    BRIAN BROCK, an individual;      )
      DAVID STEPHENS, an individual;   )
12    MICHAEL PHILLIPS, an individual;)
      MICHAEL BRIGHT, an individual;   )
13    DOES 1-10, inclusive;           )
                                       )
14               Defendants.           )
                                       )
15    and consolidated action.         )
      ------------------------------)
16

17

18          DEPOSITION OF THEODORE C. CHAN, M.D., taken on

19       behalf of Plaintiffs, at 1747 Pacific Highway,

20       San Diego, California, commencing at 10:03 a.m.,

21       on Friday, October 16, 2015, before Suzanne M.

22       Soper, CSR 8120.

23

24

25

```
 1   percentiles, but I would say the majority involved

 2   deaths, but not all of them.

 3       Q.  So most of the 25 restraint asphyxia cases

 4   involved death; is that fair?

 5       A.  Yes.

 6       Q.  In the restraint asphyxia cases, was it -- did

 7   you testify on behalf of plaintiff in any of those

 8   cases?

 9       A.  I believe I consulted for the plaintiffs.  I

10   don't recall whether I testified in those cases.

11       Q.  Have you ever testified at a deposition or at

12   trial that a person died in police custody, died as a

13   result of restraint or positional asphyxia?

14       A.  I don't believe so.

15       Q.  We have already talked about your hourly rate

16   being $500.  Is that right?

17       A.  Yes, we did.

18       Q.  And is that your rate for whatever you're doing

19   in terms of preparing your report, reviewing documents,

20   testifying at deposition and testifying at trial?

21       A.  Yes.

22       Q.  And how many hours -- billable hours have you

23   spent in this case up to the present?

24       A.  I -- again, I don't have my records in front of

25   me, but it's probably been at least ten hours.
```

19

```
1         A.  Okay.

2         Q.  Now, we talked about your assignment in this

3    case.  Had you reached any opinions in this case as a

4    result of that or in connection with that assignment?

5         A.  Yes.

6         Q.  What are your opinions?

7         A.  Well, I think my opinions are as expressed in

8    my letter.  I don't believe Mr. Silva's death was caused

9    by positional or restraint asphyxia as a result of his

10   prone or hobble restraint position or the application of

11   the restraint.

12        Q.  Do you think that the application of the

13   restraint was a factor in causing his death?

14        MR. FONTES:  It's vague.

15        THE WITNESS:  By application, what do you mean by

16   that?

17        MR. SEABAUGH:

18        Q.  Well, let's begin with the hobble restraint.

19   Do you think the hobble restraint was a factor in

20   causing his death?

21        MR. FONTES:  Same objection.

22        THE WITNESS:  So I think that the hobble restraint

23   in and of itself did not lead to asphyxiation.

24        MR. SEABAUGH:

25        Q.  Well, I understand that the point you're
```

23

1      MR. WEAKLEY:  Objection, lacking foundation,

2  incomplete hypothetical, and also calls for a legal

3  conclusion if you're asking about legal causation.

4      MR. FONTES:  It's also outside of the area of the

5  expertise of this witness.

6      MR. ESKUE:  And it misstates the opinion he just

7  gave.

8      THE WITNESS:  So I believe my answer is, as I said,

9  it could have played a role.

10     MR. SEABAUGH:

11     Q.  Is it your opinion that stress played any role

12  in Mr. Silva's death?

13     MR. FONTES:  Same objections as previously stated

14  on the record, and asked and answered.

15     THE WITNESS:  Stress could have played a role in

16  his death.

17     MR. SEABAUGH:

18     Q.  Why do you say stress could have played a role

19  in his death?

20     MR. FONTES:  Same objections.

21     THE WITNESS:  So given his overall profile of the

22  enlarged heart, the drugs that he had on board, physical

23  exertion, and stress could have played a role with all

24  of those other factors in precipitating a sudden cardiac

25  arrest.

                                                    25

1      MR. SEABAUGH:

2      Q.  And a sudden cardiac arrest is what you think

3   caused Mr. Silva's death?

4      MR. FONTES:  Same objections.

5      THE WITNESS:  Well, I believe he died from a sudden

6   cardiac arrest.

7      MR. SEABAUGH:

8      Q.  Okay.  So your opinion is he died of a sudden

9   cardiac arrest; is that correct?

10      MR. FONTES:  Asked and answered.

11      THE WITNESS:  Yes.

12      MR. SEABAUGH:

13      Q.  I'm sorry, was that a yes?

14      A.  Yes.

15      Q.  And you think that drugs could have played a

16   role in precipitating that cardiac arrest.  Is that

17   true?

18      MR. FONTES:  Same objections as before, asked and

19   answered.

20      THE WITNESS:  Yes.

21      MR. SEABAUGH:

22      Q.  What do you mean by stress from a medical

23   standpoint?

24      A.  Well, stress can be sort of physical stress,

25   physiologic stress or psychological stress, either of

26

1    which could increase an individual's endogenous or own

2    catecholamine production.

3         Q.   And what are catecholamines?

4         A.   Well, catecholamines are neurotransmitters, and

5    broadly and sort of in lay terms, they are really sort

6    of stimulants, really.

7         Q.   So would epinephrine be a catecholamine?

8         A.   Yes.

9         Q.   How about norepinephrine?

10        A.   Yes.

11        Q.   What is the relationship between catecholamine

12   and cardiac arrest?

13        A.   Well, catecholamines can overstimulate the

14   heart and lead to electrical disturbance in the heart

15   rhythm that would result in a cardiac arrest.

16        Q.   And you said that physical stress,

17   physiological stress and psychological stress could all

18   lead to the production of catecholamines?

19        A.   Yes.

20        Q.   And it's your opinion that physical stress,

21   physiological stress and psychological stress do

22   contribute to the production of catecholamines?

23        MR. FONTES:   Asked and answered.

24        THE WITNESS:   I think I said they can lead to the

25   production of endogenous catecholamine.

27

Atkinson-Baker Court Reporters
www.depo.com

```
 1   hypothetical, you could see that an individual would
 2   have elevated levels of catecholamines.
 3        MR. SEABAUGH:
 4        Q.  Did you see in your review of the witness
 5   testimony that some witnesses claimed they heard
 6   Mr. Silva saying, "Help"?
 7        A.  I did read that.
 8        Q.  Does that give you any indication whether he
 9   was under any kind of psychological stress?
10        MR. FONTES:  It's vague.
11        MR. WEAKLEY:  Yeah, it's vague, speculation.
12        THE WITNESS:  Uh, it may.
13        MR. SEABAUGH:
14        Q.  Why does "it may"?
15        MR. WEAKLEY:  It's also outside of his area of
16   expertise and beyond the scope of his designation.
17        THE WITNESS:  Again, it could be -- it could be an
18   indication that the individual is under psychological
19   stress.
20        MR. SEABAUGH:
21        Q.  And as we talked about, psychological stress
22   can be associated with increased catecholamine levels in
23   the blood?
24        A.  Yes, we did.
25        Q.  And that could increase a person's risk, among
```

38

1    many other factors, for a sudden cardiac risk?

2        MR. FONTES:  It's vague, incomplete hypothetical,

3    calls for speculation.

4        THE WITNESS:  It could.

5        MR. SEABAUGH:

6        Q.  Your understanding is that during the struggle,

7    at some point Mr. Silva was placed chest down on the

8    pavement?

9        A.  He was placed in the prone position, yes.

10       Q.  And that would be prone chest down?

11       A.  Yes.

12       Q.  And while he was prone and chest down before he

13   was handcuffed, there were deputies using their body

14   weight in an attempt to control him; is that correct?

15       MR. FONTES:  It's vague.

16       MR. WEAKLEY:  Yeah.

17       THE WITNESS:  So my understanding, there were

18   individuals applying force to him to keep him from

19   moving around and resisting.

20       MR. SEABAUGH:

21       Q.  When you reviewed testimony of Officer

22   Phillips, didn't he say that when he arrived, he saw one

23   of the deputies on Mr. Silva's back?

24       A.  That I would have to review his deposition

25   again.  There were also other law enforcement who

39

```
 1    you said?

 2         A.  I said besides case reports and case series.

 3         Q.  Were those reports or series published in a

 4    peer review medical journal?

 5         A.  Yes.

 6         Q.  Did those series or reports quantify the

 7    correlation between the rupture of the small blood

 8    vessels and compression asphyxia?

 9         A.  I don't recall.

10         Q.  You don't know whether it was 50 percent,

11    80 percent or 100 percent?

12         MR. FONTES:  Calls for speculation.

13         THE WITNESS:  That's correct.

14         MR. SEABAUGH:

15         Q.  Do you remember whether there was a margin of

16    error with respect to anything that was calculated in

17    these reports or series?

18         A.  I don't believe so.

19         Q.  You don't believe that a margin of error was

20    calculated or presented?

21         A.  That's correct.

22         Q.  Okay.  Sorry for that digression.  Back to a

23    hypothetical.

24         A.  Hold on.

25         MR. FONTES:  Counsel, we have been going about an
```

51

```
 1        MR. SEABAUGH:

 2        Q.  It's your understanding that when the

 3   paramedics arrived, Mr. Silva was not breathing and did

 4   not have a pulse?

 5        A.  Yes.

 6        Q.  During the struggle while he was chest down and

 7   handcuffed, a spit mask was placed over his head.  Do

 8   you remember seeing that in the materials that you

 9   reviewed?

10        A.  Yes.

11        Q.  After the spit mask was placed on, he vomited

12   into the spit mask.  Do you remember seeing that?

13        A.  Yes.

14        Q.  Have you ever done any studies or tests where

15   a spit mask is placed over a person who has been

16   hobbled?

17        A.  No.

18        Q.  Do you believe that having a spit mask filled

19   with vomit over his face would have interfered with his

20   ability to breathe?

21        MR. ESKUE:  Vague and ambiguous, calls for

22   speculation, incomplete hypothetical and lacks

23   foundation.

24        THE WITNESS:  Well, if the vomit is aspirated, it's

25   not moving around.  If he aspirates it when he's
```

58

1    participants in this study?

2         A.   In this study, correct.

3         Q.   You didn't put weight on the back of any of

4    the -- backs of any of the participants in this study;

5    is that fair?

6         A.   That's fair.

7         Q.   And obviously you didn't have them get bitten

8    by dogs or hit them with batons before you took the

9    measurements; is that fair?

10        A.   We didn't do it.   Whether they were bitten by a

11   dog before they walked into our lab, I don't know.

12   Sorry, I'm --

13        Q.   Who was -- who were the test subjects in these

14   studies?   Were these university students?

15        A.   They were recruited from the medical center and

16   university, so I can't tell you whether some were

17   students or not.

18        Q.   Were many of them students?

19        A.   In this particular study, I actually think that

20   some of them were, but not the majority.   But again, I

21   don't -- this is over ten -- you know, this is quite a

22   while ago, so I don't recall exactly the makeup of who

23   we recruited.

24        Q.   Did you exclude obese people from the study?

25        A.   Well, we did exclude anybody with a body mass

                                                          63

1    index greater than 30.

2         Q.   And why did you do that?

3         A.   Well, this was the first study of its kind to

4    really look at the physiologic impact of restraint and

5    prone restraint.   There had been another study with a --

6    much smaller subjects that had a number of flaws.   So we

7    were seeing whether there was a true impact of this --

8    of this restraint position and we wanted to eliminate

9    any factor that could, uh, cause some errors in

10   assessing the impact of restraint by itself.

11        So we did focus on individuals who did not have any

12   known cardiac or pulmonary history and we limited it to

13   body mass index of less than 30.

14        Subsequently -- and really our -- our Human Subject

15   Committee at the University said, "Well, nobody has

16   really studied this, so really you have to study this in

17   people without these other factors first to see what the

18   impact is."

19        Once we showed that there was really no respiratory

20   impact, we have subsequently done studies with obese

21   subjects, with putting weight force on them, and that

22   sort of thing.   But because this was the very first

23   study really investigating this, we limited it to the

24   population that we did because we didn't know the answer

25   at the time.

Case 1:13-cv-01051-LJO-JLT   Document 185-3   Filed 03/25/16   Page 15 of 26


```
 1   protocol because of this speculation on this idea of

 2   restraint asphyxia."

 3       And when they looked at before and after the change

 4   in protocol, there was no change in the death rate of

 5   subjects who were restrained.  So I think new knowledge

 6   helps to inform policy.

 7       I'm done now.

 8       MR. SEABAUGH:

 9       Q.  Wasn't this study funded by the County of

10   San Diego Sheriff's Department?

11       A.  It was funded by the County of San Diego.

12       Q.  Wasn't it an attorney who represents the County

13   of San Diego Sheriff's Department who came up with the

14   idea of the study?

15       A.  I do not believe that's correct.

16       Q.  Didn't Ricky R. Sanchez come up with the idea

17   for this study?

18       A.  Dr. Tom Neuman was the one who came up with the

19   study.  I believe he worked with Ricky Sanchez to get

20   funding for the study, but I do not believe it was Ricky

21   Sanchez who came up with the idea for the study.  Let me

22   finish.

23       You would have to ask Mr. Sanchez and Mr. --

24   Dr. Neuman.  I was not a party to those discussions.

25       Q.  Ricky Sanchez is San Diego County Deputy
```

Atkinson-Baker Court Reporters
www.depo.com

1    Counsel?

2        A.   I believe he was at that time.  I don't know

3    what he's doing now.

4        Q.   At the time that the study was funded, Ricky

5    Sanchez was San Diego County Deputy Counsel?

6        A.   I don't know his exact title at the time.

7    He -- I know he worked for the County.

8        Q.   And the County was at that time confronting a

9    number of lawsuits -- civil rights lawsuits about

10   in-custody death?

11       A.   I don't know.  There -- I don't know if they

12   were confronting a number of cases.

13       Q.   Do you know whether they were confronting any

14   cases?

15       A.   I believe there may have been one case -- at

16   least one case.

17       Q.   And Ricky Sanchez was involved in defending

18   County deputies in that case?

19       A.   He may have been involved in the case.  I don't

20   know the extent of his involvement.  I was not involved

21   in the case.

22       Q.   He would have been involved in the case on the

23   defense; is that correct?

24       MR. WEAKLEY:  Speculation.

25       THE WITNESS:  Yeah, I don't know what his exact

68

1    says that?

2         A.   Uh-hmm.

3         Q.   Is that a "yes"?

4         A.   Yes.

5         Q.   What is that 165.5 -- what unit is that number

6    in?

7         A.   Which number, I'm sorry?

8         Q.   165.5.

9         A.   So it's liters per minute.

10        Q.   Okay.  And liters is a unit of volume?

11        A.   Yes.

12        Q.   So someone who is sitting can ventilate

13   165 liters of air?

14        A.   Well, in this study, yes, the subjects did

15   that.

16        Q.   And when that person was in the restraint

17   position, that number dropped to 131?

18        A.   Yes.

19        Q.   .1?

20        A.   Yes.

21        Q.   Now, if you look at the fourth column, very

22   bottom number, it says, "Minus 23."  Do you see where it

23   says that?

24        A.   Yes.

25        Q.   What does that number mean?

71

```
 1        A.   That is the percent change from the sitting

 2   position.

 3        Q.   So someone who is in the restraint position has

 4   a 23 percent reduced MVV as opposed to a sitting

 5   position?

 6        A.   Yes, in this study.

 7        Q.   So it's not the case that there's no change in

 8   MVV in the restraint position as opposed to a sitting

 9   position; is that fair?

10        A.   That's fair.

11        Q.   And that's without weight on their back?

12        A.   That is correct.

13        Q.   What does FEV1 stand for?  What is that?

14        A.   That's the force of.

15        Q.   Or what does that stand for?

16        A.   Forced expiratory volume.

17        Q.   And what specifically is that measuring in

18   layman terms?

19        A.   That's measuring how much air you can breathe

20   out when you fully expand your lungs in the first

21   second.

22        Q.   And then on this table, you have next to

23   Sitting, number 4.31?

24        A.   Yes.

25        Q.   Do you see where it says that?
```

72

1      A.  Yes.

2      Q.  What is 4.3 -- 4.31, what -- what's the unit?

3      A.  So that is also a measure of volume over, you

4  know, time.  So it's generally liters per second.

5      Q.  And so what does that tell you about a person's

6  overall respiratory function, that number?

7      A.  Which one?

8      Q.  That 4.31.

9      A.  So it tells you that they can breathe out in

10  the first second and on exhalation that amount of air.

11  They exhale in the first second that amount of air.

12      Q.  And in the restraint position in this study,

13  the number is 3.7?

14      A.  That is correct.

15      Q.  Is that true?

16      A.  Yes.

17      Q.  And then going over to the fourth column, it

18  says "Minus 14"?

19      A.  That's right.

20      Q.  So that FEV1 dropped by 14 percent from the

21  sitting to the restraint position in your study?

22      A.  Yes.

23      Q.  And that's without weight on the back?

24      A.  That is correct.

25      Q.  What does the FVC(L) stand for?

73

1          Q.  On the very bottom of that column, there's a

2    sentence that begins, "This study did not attempt."  Do

3    you see that?

4          A.  Yes.

5          Q.  That sentence reads, "This study did not

6    attempt to duplicate exact field conditions under which

7    restraint positional deaths have occurred."

8          My question is, is that something -- well, first of

9    all, is that true?

10         A.  Obviously we cannot reproduce in lab setting

11   exactly every condition that occurs in this field

12   setting.

13         Q.  During the peer review process on this article,

14   were there comments made?

15         A.  I'm sure there were.

16         Q.  Was this sentence added as a result of a

17   comment that was made during the peer review process?

18         A.  You know, I couldn't tell you.  This study was

19   published over, what, 15 years ago.  So I can't tell you

20   for sure.  I can't tell you exactly what the comments

21   were or what changes were made.

22         I guarantee you there were some comments.  There

23   always are.  And there were some changes.  There always

24   are.  I just don't recall.

25         Q.  Has there ever been a study that attempted to

1    the part that begins, "In addition."

2        A.  Yes, I'm there.

3        Q.  Okay.  That sentence acknowledges that in many

4    of the field conditions, weight has been applied to the

5    backs of the people who were being restrained.  This

6    particular test did not involve weight on the back?

7        A.  Well, we said, you know, during apprehension,

8    pressure may have been exerted, but we did not study --

9    and we said, "What effects these differences may have

10   remain to be determined."

11       Q.  This test did not attempt to reproduce the

12   effects of trauma and psychological stress?

13       A.  Yes, we did not attempt to reproduce trauma

14   other than putting somebody in a restraint position, and

15   we did not measure stress, psychological stress.

16       Q.  The first sentence of the second paragraph from

17   the bottom says the following, "It is possible that a

18   combination of factors, including underlying medical

19   condition, intoxication, agitation, delirium, and

20   struggle as well as body position, may result in

21   respiratory compromise that would not be detected by our

22   study."  Is that true?

23       A.  That is what it says.

24       Q.  Do you agree with that as you sit here today?

25       A.  Well, I think there have been additional

1    Q.  Just so that I'm clear -- I'm sorry if I

2    interrupted you.

3    A.  So I -- the sentence says that it was not

4    detected -- it was not detected by our study, and I

5    agree it would not have been detected by our study.

6    Q.  The conclusion you reached in this study was

7    that "There is no evidence to suggest that

8    hypoventilatory respiratory failure or asphyxiation

9    occurs as a direct result of body restraint position in

10   the healthy, awake, non-intoxicated individuals with

11   normal cardiopulmonary function."

12   As stated, is that true?

13   A.  That's what it says.

14   Q.  And is that true?

15   A.  Yes.

16   Q.  Um, when you were accepting subjects for this

17   initial study, did you ever have any people who, for

18   whatever reason, their body should not be physically put

19   into the hogtie position?

20   A.  Yes.

21   Q.  You rejected the subject?

22   A.  I believe we did.  I believe we put it in our

23   results.  Um, maybe we didn't.  I remember somebody who

24   had broken his arm and so there was a question of

25   whether we could get them into sort of the hogtie hobble

81

1    study?

2         A.   That sounds familiar.

3         Q.   So just so I understand the 44 percent figure,

4    that refers to their MVV or to the relationship between

5    their MVV in the PMRP after restraint with weight on

6    their back versus the resting PMRP.  Is that correct?

7         A.   That is not correct.

8         MR. WEAKLEY:  I was going to make an objection.

9         MR. SEABAUGH:

10        Q.   What does that 44 percent figure refer to?

11        A.   I believe, and not having the study in front of

12   me, what it refers to is their minute ventilation over

13   the MVV that was measured in the prone maximal restraint

14   position with the maximum weight.

15        Q.   And then at 44 percent of what?

16        A.   Again, it's 44 percent minute ventilation --

17   their minute ventilation was 44 percent of their MVV in

18   the prone maximal restraint position with the highest

19   weight.

20        Q.   Our Exhibit 2 is a journal article published in

21   September 1998?

22        A.   Yes, I have it.

23        MR. FONTES:  Hang on.  Are we going back to the

24   study we have already talked about?

25        MR. SEABAUGH:

1          Q.   Exhibit 3, I'm sorry.

2          MR. FONTES:   All right.   That was the confusion.

3     Thank you.   Thank you.   Can you identify it again?

4          MR. SEABAUGH:

5          Q.   Looking at your conclusions on page 7.

6          MR. FONTES:   Hang on, Thomas.   We don't all have

7     copies of this.   I want to make sure what you're marking

8     as Exhibit 3.

9          MR. SEABAUGH:   Exhibit 3 is an article titled,

10    "Reexamination of Custody Restraint Position and

11    Positional Asphyxia."

12         MR. FONTES:   Okay.   Thank you, Thomas.   Go ahead.

13         (Whereupon the document referred to is marked by

14    the reporter as Exhibit 3 for identification.)

15         MR. SEABAUGH:

16         Q.   I'm looking at page 7 under Conclusions.   Let

17    me know when you're there.

18         A.   I'm there.

19         Q.   In the second sentence, you write, "Illicit

20    drug use, physiologic stress, hyperactivity,

21    hyperthermia, catecholamine hyperstimulation, and trauma

22    from struggle may be more important factors in the

23    deaths of these individuals."

24         Do you see where it says that?

25         A.   Yes.

                                                              87

1        THE WITNESS:  Again, it depends on the level that

2    you're saying their significant inability to breathe.

3    But, you know, oxygen would not be the first thing to

4    drop, by the way.  Their carbon dioxide would rise.

5        So again, it depends on your significant impairment

6    of ability to breathe, what you mean by that.

7        MR. SEABAUGH:

8        Q.  If it's significant enough, then it could

9    result in a decrease in oxygen levels in the blood?

10       MR. ESKUE:  Same objection.  It's still an

11   incomplete hypothetical now.

12       THE WITNESS:  Significant enough to what?

13       MR. SEABAUGH:

14       Q.  To -- well, let me ask it this way:  If someone

15   has their breathing impaired completely, cut off

16   entirely, then over time you would expect there to be a

17   decrease in oxygen levels in their blood?

18       A.  Yes.

19       Q.  Yes?

20       A.  Yes.

21       Q.  The heart is sensitive, isn't it, to decreases

22   of oxygen in the blood?

23       MR. FONTES:  It's vague.

24       THE WITNESS:  Yes.

25       MR. SEABAUGH:

Atkinson-Baker Court Reporters
www.depo.com

1     Q.   If oxygen levels decrease, that can be a factor

2  in leading to a heart attack?

3     A.   Yes.

4     Q.   And also, if oxygen in the blood decreases,

5  that can lead to a cardiac arrhythmia?

6     A.   Well, if you are surmising that this was a

7  result of stopping your breathing, we see people who

8  have respiratory arrests in the hospital all the time.

9  So classically what happens in terms of cardiac function

10  is their heart rate slows and slows and slows and

11  becomes bradycardic and then goes into asystole.

12     Q.   Um, Mr. Silva was in asystole when the

13  paramedics arrived; is that true?

14     A.   Well, any time the heart stops, eventually you

15  go to asystole when somebody dies.

16     Q.   So you would agree that he was in asystole when

17  the paramedics arrived?

18     A.   I believe they documented that, yes.

19     Q.   Do you have any disagreement with the medical

20  examiner in this case, Dr. Carpenter?

21     MR. WEAKLEY:   I'll object as vague, speculative.

22     MR. FONTES:   Yeah, lacks foundation, assumes facts.

23     MR. ESKUE:   And beyond the scope of his

24  designation.

25     THE WITNESS:   Uh, is there something specific,

93

Atkinson-Baker Court Reporters
www.depo.com