# EXHIBIT "C"

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

TARA GARLICK, individually; M.L.S., C.J.S., C.R.S., C.R.S., AND E.Z.S., minors, by and through their guardian ad litem, Judy Silva, in each case individually and as successors in interest to David Silva, deceased; J.S., individually and as successor in interest to David Silva, by and through her guardian ad litem Adriane Dominguez; MERRI SILVA, individually; and SALVADOR SILVA, individually,

Plaintiffs,

vs.

COUNTY OF KERN, a municipality; DONNY YOUNGBLOOD, an individual; DOUGLAS SWORD, an individual; RYAN GREER, an individual; TANNER MILLER, an individual; JEFFREY KELLY, an individual; LUIS ALMANZA, an individual; BRIAN BROCK, an individual; DAVID STEPHENS, an individual; MICHAEL PHILLIPS, an individual; MICHAEL BRIGHT, an individual; DOES 1-10, inclusive,

Defendants.

No. CV 13-01051-LJO (JLTx)

DEPOSITION OF

FRANK SHERIDAN, M.D.

COLTON, CALIFORNIA

SEPTEMBER 25, 2015

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY: RENAE E. LOPEZ, CSR NO. 12142

FILE NO.: A90A9FC

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

TARA GARLICK, individually; M.L.S., C.J.S., C.R.S., C.R.S., AND E.Z.S., minors, by and through their guardian ad litem, Judy Silva, in each case individually and as successors in interest to David Silva, deceased; J.S., individually and as successor in interest to David Silva, by and through her guardian ad litem Adriane Dominguez; MERRI SILVA, individually; and SALVADOR SILVA, individually,

Plaintiffs,

vs.

COUNTY OF KERN, a municipality; DONNY YOUNGBLOOD, an individual; DOUGLAS SWORD, an individual; RYAN GREER, an individual; TANNER MILLER, an individual; JEFFREY KELLY, an individual; LUIS ALMANZA, an individual; BRIAN BROCK, an individual; DAVID STEPHENS, an individual; MICHAEL PHILLIPS, an individual; MICHAEL BRIGHT, an individual; DOES 1-10, inclusive,

Defendants.

No. CV 13-01051-LJO (JLTx)

Deposition of FRANK SHERIDAN, M.D., taken on behalf of Plaintiffs, at 2830 South Iowa Avenue, Colton, California, commencing at 1:03 p.m., Friday, September 25, 2015, before Renae E. Lopez, CSR No. 12142.

It's Russel, R-u-s-s-e-l, versus Los Angeles Police Department.

Q. Okay. Great. So let's just go --

A. And, by the way, I just remembered as we were talking about that, he had consulted me on another case some years ago, and I testified.

Q. Was that also a restraint asphyxia case?

A. Yes, it was a rather unusual aspect of the case, but yes, it was.

Q. Did you happen to read the newspaper today?

A. Today, no, I didn't, actually.

Q. Did you hear from any source on the news -- and I forget. I think it was in Saudi Arabia, but I'm not sure, there was some event that happened where --

A. Oh.

Q. -- a thousand or so people --

A. Yeah.

Q. -- died by weight being applied to them?

A. Well, a stampede. Yes, I did read about that yesterday, yeah, yeah.

Q. I mean, you would agree that people can die from weight being applied to their back?

A. They can, yes.

MR. FONTES: That's vague and ambiguous and overbroad.

BY MR. GALIPO:

Q. And you yourself have found so in autopsy reports before?

A. I have, a few times.

Q. And you have also testified as an expert, it sounds like, in plaintiffs' cases where your opinion was the cause of death was by restraint or compressive asphyxia, or words to that effect?

A. Yes.

MS. GUSTAFSON: Objection; misstates testimony.

BY MR. GALIPO:

Q. And what is, essentially, the mechanism? What happens when, you know, there's enough weight applied? Does it interfere, potentially, with someone's ability to breathe?

A. Yes. Before I go any further, and I think we're on the same page, the terminology is very important here, but anyway, can we use the word "compression asphyxia"?

Q. Sure.

A. Because that's --

Q. Whatever you're comfortable with.

A. I mean, restraint asphyxia is -- or let's put it this way, because there -- I've noticed many times the confusion that can arrive with these terms, but I

mean, if you take the word "restraint" -- the term "restraint asphyxia," that could include neck compression, you know, essentially strangulation.

Q. Right.

A. But I'm leaving -- in order to leave that out of it, the other form of restraint asphyxia, this is what we're talking about.

Q. Compressive?

A. Yeah, compressive.

Q. Okay.

A. So the question you asked me -- sorry, I've forgotten your exact question.

Q. In other words --

A. Uh-huh.

Q. -- if we use the term "compressive" --

A. Asphyxia.

Q. -- "asphyxia," that would be more where there's pressure, let's say, to the back area, and it's compressing the person's ability to breathe?

A. Yeah, clearly. It could be to the front as well, by the way.

Q. Of course.

A. But it's -- compression of the chest is the essential point, to the point where the person cannot breathe properly.

Q. And the compressional asphyxia, so the mechanism there would be weight applied to the back, affecting the ability to breathe?

MR. FONTES: Misstates testimony.

THE WITNESS: It doesn't have to be the back. Could be the front.

BY MR. GALIPO:

Q. Weight applied to the body, either the back or the front, affecting the ability to breathe?

A. To the chest specifically, yes.

Q. And that weight to the chest, it could occur if there's weight applied to the back, and the person is chest down, but it also could occur if someone's, let's say, laying on their back, and the weight is directly applied to the chest?

A. Correct.

MS. GUSTAFSON: Objection; compound, and I lost my train of thought.

MR. GALIPO: That's okay.

MS. GUSTAFSON: I'll stick with compound.

MR. GALIPO: Okay. Compound is good.

Q. Okay. Now, did you have some training, with respect to compressional asphyxia?

A. Well, it's -- first of all, it's part of the forensic pathology curriculum, if you want to put it

Q. Oh, I see.

A. -- don't go.

Q. I wonder how many lawyers would attend if they didn't get credit. Okay. When you say it's covered in -- in most, if not all of the forensic textbooks, can you think of the names of any of those textbooks offhand?

A. Yes, there's a book simply called Forensic Pathology by DiMaio, that's D-i-M-a-i-o and DiMaio, it's two, DiMaio, DiMaio. There's another textbook, also with the same title, Forensic Pathology, big book, and I never can remember the author's name.

Q. Okay.

A. And then although I -- there are two other major ones that I know deal with it, but I can't -- I haven't read them for some time. One is a book by Spitz, S-p-i-t-z, and Fischer, with a C in it as well, F-i-s-c-h-e-r, and the other one is a book by -- his last name is Knight, K-n-i-g-h-t, a British forensic pathologist. I am pretty sure that they covered it, those last two. I just haven't looked at those for some time.

Q. Okay. Now --

A. And, of course, there's other literature on it as well.

Q. Yes.

A. Other -- other articles and so forth.

Q. Okay.

A. Journals.

Q. Now, in terms of the different types of asphyxia, would you agree that many of the types of asphyxia that you described, you can have without necessarily having petechial hemorrhages?

A. Yes, most of them do not -- are not typically associated with petechial hemorrhages. First of all, the chemical asphyxia ones are not -- there's no -- there are no petechial hemorrhages. Strangulation, there are, as we've already mentioned, and then amongst that group of the suffocation, basically the only one in that category that has petechial hemorrhages routinely is the compressional one.

Q. Well, that's what I want to ask you a little bit about, because when you described the petechial hemorrhages with strangulation, you explained the cause as being the interruption with the blood supply --

A. Correct.

Q. -- which I can follow.

A. Uh-huh.

Q. Makes sense. But with compression asphyxia, as I understand the medical literature that I read, and

Q. Would you agree, or maybe you know or don't know, that some of the autopsy reports generated from your office, authored either by you or other medical examiners working under your supervision, found death by compressional asphyxia when there were no petechial hemorrhages noted in the case?

MR. FONTES: It's vague and overbroad.

THE WITNESS: Well, I don't know. I don't know of such a case. You'd have to show it to me.

BY MR. GALIPO:

Q. Okay.

A. And my colleagues don't always run their cases by me, especially some of them in the past. Nowadays, they do so more so, but --

Q. Okay. You have seen autopsy reports before where they have found death by compressional asphyxia when there were no petechial hemorrhages; true?

A. No. I mean, I have.

Q. I'm asking about other agencies now.

A. I know.

Q. Oh, go ahead.

A. Well, for example, the Oxnard case.

Q. Right.

A. Yeah, Dr. O'Halloran --

Q. Right.

BY MR. GALIPO:

Q. Okay. Now we'll go --

MR. FONTES: Good point for a break?

MR. GALIPO: I was going to go about three to five more things. Can you guys hang in there?

MR. FONTES: That's fine.

BY MR. GALIPO:

Q. So these texts --

A. The what? Sorry.

Q. Texts, the books --

A. Uh-huh.

Q. -- that you referred to on forensic pathology, do any one of them say that if there are no petechial hemorrhages, you can exclude death by compressive asphyxia, specifically?

A. I don't think they do. It's not the kind of expression I'd expect to see in relation to almost anything in forensic pathology, because it's a -- what they do say is that they are there, but -- but no, I've never specifically seen a statement that if they're not there, but I -- I mean, since the whole mechanism, they talk about, and then they go on to say the petechial hemorrhages are going to be present, I mean --

Q. Don't --

A. What I'm trying to say, essentially, is

that -- and I think in compressional asphyxia, sometimes literally the only autopsy finding, literally the only one is these petechiae.

Q. Right, but --

A. So in the absence of it, in my opinion, you cannot make the diagnosis.

Q. Don't the texts themselves say that in a compressive or compressional asphyxia case, you don't necessarily need to see petechial hemorrhages?

MR. FONTES: It's asked and answered; it's argumentative.

THE WITNESS: Well, I've never come across that statement, but if I did, I would totally disagree with it.

MR. GALIPO: Okay. Is this a good time for a break?

THE WITNESS: Sure.

MR. FONTES: Thank you, sir.

(Brief recess was taken.)

MR. GALIPO: Let's go back on the record, and you said my next exhibit will be 6?

MS. GUSTAFSON: I believe so.

BY MR. GALIPO:

Q. So I separated, and there's some correspondence that I am going to mark as Exhibit 6, and

been described of excited delirium, sometimes you see the body temperature in the hospital 104, 105 degrees; correct?

A. That's right.

Q. And the normal body temperature, would it be 98.6?

A. Around that.

Q. So he was normal, even slightly under normal, according to the information?

A. Yeah, and so maybe his temperature was never elevated. Maybe they didn't actually take that temperature at all, because they didn't chart it.

Q. It isn't your opinion, is it, in this case, to a reasonable medical probability, that he died of excited delirium, is it?

A. No, I didn't say that, but he's got a lot of the features of it.

Q. Okay.

A. He died, I will say, though, with much the same -- much the same way as people with excited delirium die.

Q. Okay. Fine. Now, we were going through some of your other notes with respect to --

A. Oh, yeah.

Q. -- Dr. Carpenter.

weight onto the torso itself, no, I didn't.

Q. And you looked carefully for that?

A. I looked as carefully as I could on that video for it.

Q. But I'm not just talking about the video.

A. I know, I know.

Q. I'm talking about their depositions.

A. Yes, I know you are, and I really -- I did both.

Q. Okay.

A. And I never saw -- between all those things, I never saw any indication that anybody, at any time, was actually right on top of the decedent with their body weight on the chest. The shoulders were pinned, to some extent, during the process of the struggle, but I saw no indication, from any of these sources, that there was anybody applying their full weight to his back.

Q. Well, applying any weight, whether it's full weight --

A. Well --

Q. -- or half their weight, did you look for that?

A. I did.

Q. Okay.

A. But I don't remember any real -- any

significant -- I don't remember anything at all, but certainly nothing that struck me as significant.

Q. So when you went through the depositions --

A. Uh-huh.

Q. -- I'm just wondering whether you did this or not, did you make any notes as to, for example, how much a particular officer weighed, or how long -- whether they said they were holding him down or not, what part of the body they were on, and for how long?

MS. GUSTAFSON: Objection; compound.

THE WITNESS: I looked for all those things. I didn't put it into my report, but I mean, basically if I had seen anything significant in that regard, I would have.

BY MR. GALIPO:

Q. Did you include any of it in your 13 pages of notes?

A. I don't know.

Q. All right.

A. I'll have to go back.

Q. Why don't you take a quick look?

A. This might take a long time. Actually, I know I -- I'll tell you what. When it came to the depositions, I didn't make any -- hold on a second. I didn't make any notes at all, but what I did do was when

reading the depositions, I compared them to these notes, which are primarily based on the initial interviews with the officers; okay?

Q. Right.

A. Yeah, okay.

Q. And that's why I guess your first opinion was the initial statements made by the officers involved appear to be consistent with one another, and also consistent with the autopsy findings?

A. Yeah.

Q. Okay. And then you -- and this is under your opinions section at the bottom of the second page, and then you say, "The testimony of the officers in subsequent depositions was also consistent with their original statements." Do you see that in your report?

A. I do, yes.

Q. Okay. So --

A. Hold on a second, though. You asked me another question a minute ago, and as I had to look -- because I didn't actually have time today to review all these notes page by page.

Q. Well, just see if it's referenced anywhere, because I'm going to get a copy of those.

A. Sure. You are, yeah, I know, and I do have here on my original notes these -- the ones I'm