# EXHIBIT 5

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF CALIFORNIA

3    TARA GARLICK, individually;      )
     M.L.S., C.J.S., C.R.S.,          )
4    C.R.S., AND E.Z.S., minors, by   )
     and through their guardian ad    ) No. CV 13-01051-LJO
5    litem, Judy Silva, in each       )     (JLTx)
     case individually and as         )
6    successors in interest to        )     DEPOSITION OF
     David Silva, deceased; J.S.,     )
7    individually and as successor    ) FRANK SHERIDAN, M.D.
     in interest to David Silva, by   )
8    and through her guardian ad      ) COLTON, CALIFORNIA
     litem Adriane Dominguez; MERRI   )
9    SILVA, individually; and         )  SEPTEMBER 25, 2015
     SALVADOR SILVA, individually,    )
10                                    )
                    Plaintiffs,       )
11                                    )
          vs.                         )
12                                    )
     COUNTY OF KERN, a municipality;  )
13   DONNY YOUNGBLOOD, an individual; )
     DOUGLAS SWORD, an individual;    )
14   RYAN GREER, an individual;       )
     TANNER MILLER, an individual;    )
15   JEFFREY KELLY, an individual;    )
     LUIS ALMANZA, an individual;     )
16   BRIAN BROCK, an individual;      )
     DAVID STEPHENS, an individual;   )
17   MICHAEL PHILLIPS, an             )
     individual; MICHAEL BRIGHT, an   )
18   individual; DOES 1-10, inclusive,)
                                      )
19                    Defendants.     )
     _____)

20

21   ATKINSON-BAKER, INC.
     COURT REPORTERS
22   (800) 288-3376
     www.depo.com
23

24   REPORTED BY:  RENAE E. LOPEZ, CSR NO. 12142

25   FILE NO.:  A90A9FC

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF CALIFORNIA

3

4    TARA GARLICK, individually;       )
     M.L.S., C.J.S., C.R.S.,           )
5    C.R.S., AND E.Z.S., minors, by    )
     and through their guardian ad     ) No. CV 13-01051-LJO
6    litem, Judy Silva, in each        )     (JLTx)
     case individually and as          )
7    successors in interest to         )
     David Silva, deceased; J.S.,      )
8    individually and as successor     )
     in interest to David Silva, by    )
9    and through her guardian ad       )
     litem Adriane Dominguez; MERRI    )
10   SILVA, individually; and          )
     SALVADOR SILVA, individually,     )
11                                     )
                     Plaintiffs,       )
12                                     )
          vs.                          )
13                                     )
     COUNTY OF KERN, a municipality;   )
14   DONNY YOUNGBLOOD, an              )
     individual; DOUGLAS SWORD, an     )
15   individual; RYAN GREER, an        )
     individual; TANNER MILLER, an     )
16   individual; JEFFREY KELLY, an     )
     individual; LUIS ALMANZA, an      )
17   individual; BRIAN BROCK, an       )
     individual; DAVID STEPHENS, an    )
18   individual; MICHAEL PHILLIPS,     )
     an individual; MICHAEL BRIGHT,    )
19   an individual; DOES 1-10,         )
     inclusive,                        )
20                                     )
                     Defendants.       )
21   _____)

22        Deposition of FRANK SHERIDAN, M.D., taken on behalf

23   of Plaintiffs, at 2830 South Iowa Avenue, Colton,

24   California, commencing at 1:03 p.m., Friday, September

25   25, 2015, before Renae E. Lopez, CSR No. 12142.

```
 1                    A P P E A R A N C E S

 2          FOR PLAINTIFFS:
            LAW OFFICES OF DALE K. GALIPO
 3          BY:  DALE K. GALIPO, ESQ.
            21800 Burbank Boulevard
 4          Suite 310
            Woodland Hills, California  91367
 5          (818) 347-3333

 6
            FOR PLAINTIFF TARA GARLICK:
 7          RODRIGUEZ & ASSOCIATES
            BY:  CHANTAL A. TRUJILLO, ESQ.
 8               (Present via teleconference)
            2020 Eye Street
 9          Bakersfield, California  93301
            (661) 578-5687
10

11          FOR THE STATE OF CALIFORNIA
            DEPARTMENT OF JUSTICE,
12          OFFICE OF THE ATTORNEY GENERAL
            BY:  EDWARD P. WOLFE, ESQ.
13          300 South Spring Street
            Suite 1702
14          Los Angeles, California  90013
            (213) 897-2183
15

16          FOR THE DEFENDANTS DOUGLAS SWORD, JEFFREY KELLY
            AND LUIS ALMANZA:
17          WEAKLEY & ARENDT
            BRANDE L. GUSTAFSON, ESQ.
18          1630 East Shaw Avenue
            Suite 176
19          Fresno, California  93710
            (559) 221-5256
20

21          FOR THE COUNTY OF KERN
            COUNTY OF KERN, COUNTY COUNSEL
22          BY:  MARSHALL S. FONTES, ESQ.
            1115 Truxtun Avenue
23          Fourth Floor
            Bakersfield, California  93301
24          (661) 868-3836

25
```

3

1                               I N D E X

2   WITNESS:  FRANK SHERIDAN, M.D.

3   EXAMINATION                                        PAGE

4          By Mr. Galipo                                 5

5

6

7   EXHIBITS
                              PLAINTIFF'S              PAGE
8   NUMBER                    DESCRIPTION

9    1 - Curriculum vitae of Frank Sheridan, M.D.    10

10   2 - Handwritten notes                           11

11   3 - Billing information                         11

12   4 - Report prepared by Frank Sheridan, M.D.     11

13   5 - Initial report prepared by Frank            13
         Sheridan, M.D.
14
     6 - Correspondence                              69
15

16

17

18  QUESTIONS INSTRUCTED NOT TO ANSWER:

19                  (NONE)

20

21  INFORMATION TO BE SUPPLIED:

22                  (NONE)

23

24

25

4

1          Q.   And we'll attach -- I'll give everyone a

2    chance to write these down.  So we will attach as

3    Exhibit 2 your notes, your 13 pages of notes, and we'll

4    arrange it so you can get your originals back.

5          A.   Okay.

6      (Plaintiffs' Exhibit 2 was marked for identification.)

7          Q.   And your billing sheets, we'll attach as

8    Exhibit 3.

9          A.   Both of them?

10         Q.   Yeah, we'll do it all together, if that's

11   okay.  And your report, we'll attach as Exhibit 4, and

12   that might help our court reporter with any spellings

13   later, and then the correspondence, I'll think about.

14   I'll look at it during our first break and figure out

15   whether there's any reason to attach it or not.

16         A.   Okay.

17              (Plaintiffs' Exhibits 3 and 4

18               were marked for identification.)

19         Q.   Okay.  Now, what were the circumstances, as

20   you understood it, that you were contacted by the DA's

21   office in 2014 regarding this case?

22         A.   When, they contacted me, they wanted an

23   opinion, my opinion as to the -- basically the cause of

24   death, and -- and obviously, manner of death is --

25   presented another issue as well, and basically, that's

1    it.   They wanted me to review the material they sent me

2    and give an opinion on those things.

3          Q.    Okay.

4          A.    Uh-huh.

5          Q.    Now, did you understand -- well, strike that.

6                What type of material, in general, did they

7    send you, in 2014?

8          MR. FONTES:   This is the district attorney?

9          MR. GALIPO:   Yes.

10         THE WITNESS:   Yes.   By the way, the report I wrote

11   for them is on my laptop, but -- however, I can -- okay.

12   BY MR. GALIPO:

13         Q.    Well, let me ask you this --

14         A.    Yeah.

15         Q.    -- while we're all here:   So you have your --

16   the report you wrote for them on your laptop?

17         A.    Yes, I do have.

18         Q.    Would you have any objection -- I realize you

19   probably can't do it today --

20         A.    Uh-huh.

21         Q.    -- but to forward that report to one of the

22   attorneys for the defense in this case, and if I mark an

23   Exhibit 5, we can just make arrangements to get that to

24   the court reporter and attach it as an exhibit?   Are you

25   okay with that?

1      A.    I'm fine with that, as long as I remember.

2      (Plaintiffs' Exhibit 5 was marked for identification.)

3      Q.    Yeah, or you can send it directly to the

4    court reporter, and she'll give you her information.

5      A.    I --

6      Q.    And if you leave a phone number, she's good

7    at probably following up.

8      A.    Or I can even e-mail it, since it's on the

9    laptop.

10     Q.    Yes.   Okay.   So that will be Exhibit 5, your

11   initial report.

12     A.    Okay.

13     Q.    And are you saying that that might reference

14   the materials you had up to that point in time?

15     A.    Well, it definitely does, and if I may look

16   at my report of this case, what I have here --

17     Q.    Sure.

18     A.    -- I'll be able to give you what I think the

19   answer anyway.   The material I had at that time when I

20   was being consulted by the district attorney's office

21   included investigation reports from Kern County

22   Sheriff's office, videos of the incident, and by the

23   way, as I think -- well, let me go on with my answer

24   first, and then I'll qualify it, as necessary.   The

25   autopsy report itself, including the toxicology report,

1    and there was -- I also had photographs that included

2    some scene photographs, photographs of the decedent in

3    the emergency room, and then autopsy photographs as

4    well.   So that's what I had the first time.   That is the

5    answer to that question.

6           Q.   Okay.  And --

7           A.   And then in the second paragraph of my report

8    on this one, I then go on to add since that time, I've

9    been provided with additional material.

10          Q.   We'll get to that in a moment.

11          A.   Okay.

12          Q.   Thank you.  So the additional material that

13   you described receiving from the district attorney's

14   office, do you believe that would also be on the disc,

15   the photographs?

16          A.   Oh, yeah, I mean, I do have them.  I do have

17   all the material still.

18          Q.   Okay.

19          A.   I've also loaded it up onto my laptop, but I

20   still have the discs themselves.  I have those here,

21   actually.

22          Q.   Okay.  The disc?

23          A.   Discs.  There are several.

24          Q.   Is there any way that we can make

25   arrangements to simply have your discs copied --

14

```
1            Q.    -- you would have been working at the
2    San Bernardino County Coroner's office?
3            A.    Yes, I've been there since 1988.
4            Q.    And so when you say you have ascribed some
5    deaths to compressive asphyxia, that would have been
6    during the '90s or the 2000s?  Is that the time period
7    we're talking about?
8            A.    Yeah.
9            Q.    Okay.  And --
10           A.    Well, I remember one case very well, because
11   it was very high profile.  It was an officer-involved
12   case, struggle, no shooting, but it wasn't
13   compressional.  It was neck -- at least there was
14   compression, but it was to the neck.  It was essentially
15   a strangulation.
16           Q.    Okay.
17           A.    And that was in the '90s, I remember very
18   well, because it was such --
19           Q.    Now, how --
20           A.    -- such a high profile case.
21           Q.    What's the mechanism there?  So if the neck
22   specifically is compressed, that can also interfere with
23   the ability to breathe?
24           A.    No, no, that's a misconception.  The -- when
25   the neck is compressed, in other words, we're talking
```

46

1    about strangulation.  That's what basically

2    strangulation means, pressure on the neck, and it's

3    not -- in spite of what people, some people may think,

4    it's not interfering with the breathing there.  It's

5    interfering with the blood supply to the brain.

6         Q.   I understand.  So what happens in that type

7    of case is you have a sensation of the blood flow to the

8    brain, the blood carries the oxygen, and that's the

9    mechanism of death if it's -- if you have enough time?

10        A.   If it's, I use the word a disruption of the

11   blood supply, because depending on the exact amount of

12   pressure, there may not be a complete cutoff of the

13   blood going to the brain, but there is, at least at the

14   very minimum, this pressure on enough on the veins to

15   interfere with the return of blood from the brain, which

16   causes a stagnation within the brain, so it's a -- it

17   has the same effective result, in the sense that the

18   brain does not get enough oxygen.

19        Q.   Is that the return -- is that related to the

20   concept of the venous return?

21        A.   Yes.

22        Q.   Now, in that type of case, sometimes you will

23   see petechial hemorrhages; is that fair?

24        A.   I would say every single case.

25        Q.   And why is that when you interfere with the

47

1    blood supply or the venous return, might you see

2    petechial hemorrhages?

3         A.   Because basically, if you're interfering with

4    the venous return, the blood is pooling.  I'm going to

5    use the word pooling.  It's getting backed up or

6    congested inside the head, generally, including the

7    brain, obviously, and this includes the entire head, and

8    it includes the small blood vessels in the skin of the

9    face and the conjunctiva of the eyes, and the vessels

10   become engorged, congested, and some of them just burst.

11   They're small vessels, capillaries, very small veins.

12   Maybe they burst, giving you these little petechial or

13   pinpoint, as they're sometimes called, hemorrhages.

14   They're not obviously -- there's not much blood loss.

15   We're not talking about blood loss here, but you can see

16   them as little hemorrhages, and that's what happens, and

17   it's a very good -- it's a very consistent feature of

18   strangulation deaths.

19        Q.   Okay.  In terms of -- and that's caused, at

20   least in those instances, because of the interference or

21   disruption of the blood supply?

22        A.   Yes, uh-huh.  Can you just give me one

23   second?

24        MR. GALIPO:  Let's go off the record for a moment.

25             (Brief recess was taken.)

1   BY MR. GALIPO:

2        Q.   So let's go back on the record.   Now,

3   asphyxia -- there's different types of asphyxia; is that

4   true?

5        A.   Several different types, yeah.

6        Q.   Can you explain what some of those different

7   types are?

8        A.   The most commonly used classification of

9   asphyxia is to divide asphyxia as a whole into three

10   categories.   One of these is suffocation, which has a

11   number of subsidiary types; okay?

12        Q.   Okay.

13        A.   Second big category is strangulation, which

14   we've actually just been discussing, and the third one

15   is chemical asphyxia.

16        Q.   Okay.

17        A.   And that's typically something like carbon

18   monoxide.

19        Q.   Is -- okay.   Let's go back to the first --

20        A.   Yeah.

21        Q.   -- category, suffocation.

22        A.   Suffocation, yeah.

23        Q.   What would be some of the subcategories of

24   suffocation?

25        A.   Basically, you have -- the definition of

1    suffocation, basically, is that blood -- oxygen's not

2    getting into the blood.  That's sort of the -- sort of

3    the foundational starting point, and you have several

4    different types.  And so in a logical order, as I think

5    about when I'm teaching anyway, the first category is

6    where there's simply no oxygen or there's inadequate

7    oxygen in the air, usually because the person's in a

8    confined space, or else there's other gas replacing the

9    air, but there's inadequate oxygen in the air, so that's

10   the first type.

11         The second type is smothering, where there's

12   obstruction of the nose and mouth, has to be both, and

13   that can be accidental or homicidal, whatever, but

14   it's -- even suicide, but basically the essence of that

15   one, as I said, is there's no air getting into the nose

16   or the mouth, because there's an obstruction of some

17   form.

18         Then the third one -- again, trying to follow

19   a logic of the breathing, what breathing's all about,

20   the third one is choking, which that's another term

21   that's sometimes misused, but choking means blockage of

22   the airway, particularly the trachea, the windpipe,

23   usually by a bit of food.  That's the most common.  A

24   solid piece of food, not liquid food, but solid food

25   gets inhaled and blocks the airway completely, so that's

1    choking.

2              And then you come to compressional asphyxia,

3    where there's oxygen in the air, the nose and mouth are

4    open, the airway's open, but the person is unable to

5    breathe because of excessive pressure on their chest.

6         Q.   Okay.  And are those the categories you can

7    think of under the suffocation?

8         A.   Yes, uh-huh.

9         Q.   And then we already talked about the

10   strangulation; correct?

11        A.   Yes, uh-huh, I did mention it.  Yes,

12   strangulation is separate from suffocation, yes.

13        Q.   Right.

14        A.   Yeah.

15        Q.   That's the second category?

16        A.   That's the second major category.

17        Q.   Now, with strangulation, because most of us,

18   when we think of strangulation, watching too many movies

19   probably, we think of the person with the hands around

20   the neck.  That would be one way; correct?

21        A.   Yes, uh-huh.

22        Q.   Could it happen, just hypothetically, if

23   someone had their knee, let's say --

24        A.   Huh?

25        Q.   -- their knee with enough body weight on

1    of completeness, what would be an example of that?

2         A.   The most common, by far, is carbon monoxide.

3         Q.   Oh, okay.

4         A.   There are others, but that's --

5         Q.   How about drowning?   Where is that

6    categorized?

7         A.   Drowning is often, for some reason, separated

8    out, but really when all is said and done, you could

9    probably call it environmental would make the most

10   sense, because when you're drowning, your head's

11   immersed in a fluid, and obviously, you don't have

12   access to air.   So I think if you were to put it into

13   that group, it would be in the first category, but

14   it's -- interestingly enough, it's often treated

15   separately, although it is, indeed, a form of asphyxia.

16        Q.   And the smothering or the inadequate -- the

17   smothering -- in other words, the other thing we

18   sometimes see in the movies is where someone takes a

19   pillow and puts it over someone's face.   That would

20   be -- that would be in the first category of suffocation

21   somewhere?

22        A.   Yeah, as I said, that is smothering.

23        Q.   Yes.

24        A.   I mentioned smothering as one of the

25   subdivisions of suffocation.

1      Q.   Yes.

2      A.   Other -- other articles and so forth.

3      Q.   Okay.

4      A.   Journals.

5      Q.   Now, in terms of the different types of

6  asphyxia, would you agree that many of the types of

7  asphyxia that you described, you can have without

8  necessarily having petechial hemorrhages?

9      A.   Yes, most of them do not -- are not typically

10 associated with petechial hemorrhages.  First of all,

11 the chemical asphyxia ones are not -- there's no --

12 there are no petechial hemorrhages.  Strangulation,

13 there are, as we've already mentioned, and then amongst

14 that group of the suffocation, basically the only one in

15 that category that has petechial hemorrhages routinely

16 is the compressional one.

17     Q.   Well, that's what I want to ask you a little

18 bit about, because when you described the petechial

19 hemorrhages with strangulation, you explained the cause

20 as being the interruption with the blood supply --

21     A.   Correct.

22     Q.   -- which I can follow.

23     A.   Uh-huh.

24     Q.   Makes sense.  But with compression asphyxia,

25 as I understand the medical literature that I read, and

57

1   you can correct me if I'm wrong, the mechanism generally

2   described of the death is not interruption of the blood

3   supply, but it's interruption, with the ability to

4   breathe?

5        A.   It is, that's correct.

6        Q.   Okay.  So I could imagine given that, that if

7   someone's ability to breathe is interrupted, and they

8   don't have an interruption of blood supply --

9        A.   Well, actually, sorry.  I need to step back.

10       Q.   Oh.

11       A.   I mean, the primary element -- we may as well

12  get straight to the point.  The primary aspect of

13  compression asphyxia is, as we've been discussing now,

14  pressure to the chest, to the point where the person

15  can't breathe.

16       Q.   Right.

17       A.   But there is another immediate consequence of

18  the compression, and that is, in fact, disruption of

19  blood going to and from the heart and the head.  So you

20  do, indeed, have disruption as well, and it's because

21  with the excessive pressure on the chest, the blood

22  that's in the head that's trying, if I may use a term

23  like that, to come back to the heart and the veins, is

24  not able to do so, because you have a backup of --

25  there's a pressure head in the chest, because the

1  pressure inside the chest is so high, the blood can't

2  flow into the chest.  So you get the same -- it's -- it

3  has some similarities in this regard to asphyxia, in

4  terms -- I'm sorry, to strangulation, but the difference

5  is that the -- that the blockage, if you were -- if you

6  will, or the cause of the disruption is somewhat

7  different.  So what you get with compression asphyxia,

8  first of all, yes, obviously, by definition, there's

9  interference with the breathing, to the point where the

10  person cannot breathe, but this other phenomenon comes

11  in immediately as well, and you have failure of the

12  blood to recirculate through the head.

13        Q.   Are you saying that in every case of

14  compression asphyxia, you have interruption of the blood

15  flow, as well as the interference with the breathing?

16        A.   Yes.

17        MR. FONTES:  Vague and ambiguous and overbroad, but

18  please answer.

19  BY MR. GALIPO:

20        Q.   Okay.

21        A.   Yes, I'm doing a study on this at the moment.

22  I'm collecting all of our cases.  I've been doing so for

23  some time.  I spoke about it at the IPICD conference

24  last year in November.  At that time, I hadn't pulled

25  together all of my cases, but I am gradually working on

1    it.

2         Q.   Okay.

3         A.   I'm talking about cases where we know exactly

4    what happened.  In other words, we know it's compression

5    asphyxia.  These examples of this are as follows, but

6    this is just a few examples:  The most common one of

7    all, every pathologist sees one of these cases at least

8    once a year, I'd say, a person working on their car,

9    they're underneath the car, the car is up on the jack,

10   the jack slips or gets knocked away, and the chassis of

11   the car comes down and pins them.  Now, it doesn't crush

12   them, because the other wheels are holding the car from

13   completely going to the ground.  These are not crushing

14   injuries.  These are injuries where the chest is pinned

15   in such a way that they -- the person cannot breathe.

16   That's one example.  So these are cases, I emphasize,

17   where we know exactly what happened.  So that would be

18   the classical one is the one most often quoted,

19   actually, of -- a classic example of compression

20   asphyxia, and the answer is yes, every one of these will

21   have florid petechial.

22              And the other collection of cases that I'm

23   putting together over the years, and it's not complete

24   yet, we had two cases, actually, as it happened, within

25   the last year where the circumstances, very slightly

1    different, but in both cases, a person got pinned --

2    adult got pinned in a standing position between their

3    car door and the -- what's it called?  The B pillar of

4    the car, because the car was in drive, and they were

5    half in and half out, and they got literally squished.

6    Now again -- they got squeezed is what I was trying to

7    say.  Again, this is classic compression asphyxia.  They

8    were both found in that position, so we know exactly

9    what happened to them, and they had florid -- that's the

10   term often used to mean marked petechial hemorrhages in

11   the face and eyes, and then there are other examples as

12   well.

13        Q.   Okay.  Let me just follow up on this a little

14   bit.  Do you recall -- and you may not recall, because I

15   have a lot of your depositions from years past.  Do you

16   recall ever giving testimony when you said someone could

17   die of compressional asphyxia without having petechial

18   hemorrhages?

19        A.   I don't recall doing that.

20        Q.   Okay.

21        A.   It's become more of an interest to me in the

22   last few years, but I can't imagine myself ever saying

23   it, but --

24        Q.   All right.

25        A.   Uh-huh.

# Frank Sheridan M.D.

**Anatomic Pathology, Forensic Pathology
and Neuropathology**

**Redlands, California
Phone: (909) 307 0615
Email: The4N6doc@aol.com**

## Re:  David Silva (deceased)

I have reviewed the material submitted to me on this case, including Kern County Sheriff's Office investigative reports, videos of the incident under investigation  and the autopsy report (including a toxicology report) prepared by Eugene Carpenter M.D. on the body of David Silva (hereinafter referred to as the subject), a 33-year-old white male. Also reviewed were several photographs, including scene photographs, photos of the subject in the Emergency Room and autopsy photographs.

Summary of incident: -

The following summary is based primarily on the statements of the officers involved in the incident. Some video footage from patrol cars and bystanders was also submitted but was of little help visually. The video sound tracks did help to confirm that the subject was making loud noises throughout most of the incident.



EXHIBIT 5
Sheridan, MD
9-25-15

Shortly before midnight on May 7, 2013 a call was received regarding a man lying on the ground at a street corner. The first officer to respond to the scene found the subject lying on the ground, apparently asleep, and attempted to wake him. The subject roused, began yelling and speaking in an unintelligible manner and tried to get to his feet, falling a few times and hitting his head. Believing the subject to be possibly under the influence of drugs, the officer ordered him to stay down, but the subject continued to try and get up. The officer summoned his dog from the patrol car and a struggle ensued, during which the officer attempted unsuccessfully to apply wrist restraints. The subject was a large man and apparently very strong. Additional officers began to arrive and eventually there was a total of nine officers (including two California Highway Patrol officers) at the scene. The subject continued to struggle, yelling continuously and resisting attempts to restrain him. Baton strikes were applied to the subject's body and the officers held the subject down in a prone position, eventually applying handcuffs and hobbles to the ankles. The subject continued to struggle and it was noted that he was sweating profusely and had blood on his face. At about this time the subject suddenly became quiet and was rolled onto his side. Initially a pulse was detected but the subject subsequently went into cardiac arrest. CPR was initiated. Paramedics had been summoned and took over resuscitation efforts. They transported the subject to the Emergency Room of Kern County Medical Center (which was just across the street) where the subject was pronounced dead at 0044 hours on May 8, 2013. According to the statements made by all the officers, there was no use of an electrical conduction device (ECD), there were no baton blows to the head and none of the officers applied his full weight to the subject's back.

Autopsy: -

Forensic pathologist, Eugene Carpenter M.D. performed an autopsy on the body of the subject on May 9, 2013. The subject's weight was recorded as 261 pounds (including the clothing and body bag), the height as 71 inches. The body was noted to be obese but muscular. There were multiple bruises and abrasions on the body, including linear bruises consistent with baton strikes on the torso and left arm, as well as marks consistent with dog bites. There were no fractures and none of these injuries was life threatening. Examination of the head revealed scalp hemorrhage in the left fronto-temporal area but no skull fractures, intracranial hemorrhage or evidence of brain injury. There were no signs of baton strikes to the head. There were no petechial hemorrhages in the eyes, indicating that restraint asphyxia was probably not a factor in the subject's death. There was also no evidence of trauma to the mouth.

The subject's heart was enlarged (weight: 470 grams) with hypertrophy of the left ventricle and toxicological examination was positive for the presence of alcohol, methamphetamine and caffeine. Clonazepam was also detected.

The cause of death was listed as "Hypertensive cardiovascular disease" and contributing factors were listed as : acute intoxication, chronic alcoholism, severe abdominal obesity, chronic hypertension, and acute pulmonary-cardiovascular strain.

The manner of death was listed as "Accident".

Opinion: -

The statements made by the officers involved appear to be consistent with one another and also consistent with the autopsy findings.

The autopsy was done in a thorough manner and all the findings were well documented with photographs. There is no evidence that the subject's death was a result of blunt force trauma or physical restraint that caused him to be

unable to breathe.

The overall impression is of an individual who was a chronic alcoholic and methamphetamine abuser and was also obese. The combined effect of the drugs and obesity was hypertension with an enlarged heart that put him at risk for sudden death, especially under the stress of a struggle. The description of his behavior leading up to death and the fact that he was reportedly sweating profusely is strongly suggestive of a condition known as excited delirium syndrome (ExDS), a state of extreme agitation with irrational and violent behavior that often results in an altercation with law enforcement, sometimes ending in sudden death. The death is typically due to a complex mixture of acute intoxication, hyperthermia, an enlarged heart and the physiological stress caused by the struggle. The undersigned is not an expert in police use of force issues. However, as stated above, there is no evidence that the subject's death was caused by injury inflicted by the officers and it is reasonable to consider the manner of death to be an accident.

Frank Sheridan M.D.
March 16, 2014

```
 1                    REPORTER'S CERTIFICATE

 2

 3

 4       I, RENAE E. LOPEZ, CSR No. 12142, Certified

 5  Shorthand Reporter, certify;

 6       That the foregoing proceedings were taken before me

 7  at the time and place therein set forth, at which time

 8  the witness was put under oath by me;

 9       That the testimony of the witness, the questions

10  propounded, and all objections and statements made at

11  the time of the examination were recorded

12  stenographically by me and were thereafter transcribed;

13       That the foregoing is a true and correct transcript

14  of my shorthand notes so taken;

15       I further certify that I am not a relative or

16  employee of any attorney of the parties, nor financially

17  interested in the action.

18       I declare under penalty of perjury under the laws

19  of California that the foregoing is true and correct.

20       Dated this 7th day of October _____, 2015.

21

22

23       _____

24       Renae E. Lopez, CSR No. 12142

25
```